**SO ORDERED.**

**SIGNED this 4 day of February, 2020.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-01298-5-JNC** |
| **CAH ACQUISITION COMPANY 7, LLC,** | ) | |
| **d/b/a PRAGUE COMMUNITY** | ) | **Chapter 11** |
| **HOSPITAL,** | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER (A) APPROVING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

THIS MATTER came before the Court upon the *Trustee's Motion for (I) an Order (A) Establishing Bidding Procedures, (B) Approving Form and Manner of Notices, (C) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief; and (II) an Order (A) Approving Sale Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Sale Motion") [Dkt. No. 341] filed on November 6, 2019, by Thomas W. Waldrep, Jr., Chapter 11 trustee (the "Trustee") for the above-captioned debtor (the "Debtor"), for entry of an order (the "Sale

1

Order" or the "<u>Order</u>") (a) authorizing and approving the Sale[1] of the Transferred Assets[2] free and clear of all liens, claims, and interests under Section 363(f) of the Bankruptcy Code (defined below) pursuant to that certain Asset Purchase Agreement (the "<u>APA</u>" or the "<u>Agreement</u>"), in substantially the form attached as **<u>Exhibit A</u>** to this Sale Order, by and between the Debtor (the "<u>Seller</u>") and Transcendental Union with Love and Spiritual Advancement ("<u>TULSA</u>" or the "<u>Purchaser</u>"); (b) approving the Agreement; and (c) granting related relief; and the Court having entered the *Order (A) Establishing Bidding Procedures, (B) Approving Form and Manner of Notices, (C) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* on November 27, 2019 (the "<u>Bidding Procedures Order</u>") [Dkt. No. 369]; and upon adequate and sufficient notice of the Sale Motion, the hearing before the Court on January 16, 2020 (the "<u>Sale Hearing</u>"); and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, and (z) the statements of counsel and evidence presented in support of the relief requested at the Sale Hearing; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interest of the Debtor, its estate, and creditors, and other parties-in-interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in this Chapter 11 case, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefore, the Court hereby finds and determines that:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

[2] As used in this Order, the term "Transferred Assets" shall have the meaning ascribed to the term "Assets" in the Agreement (defined below).

**Jurisdiction and Venue**

1.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

**Sale Necessity and Purpose**

2.      The Debtor does not have the resources to continue to operate within the confines of a bankruptcy case and will likely experience cashflow and financing issues if the Sale is not approved.  There is insufficient time to obtain confirmation of the Trustee's Amended Chapter 11 plan, filed on October 17, 2019 [Dkt. No. 480] prior to the Sale.

3.      This Court approved and expedited a post-petition marketing period in recognition of this reality.  The marketing in this case was conducted by the sales agent to the Trustee, Sherwood Partners, Inc. ("Sherwood").

4.      On November 6, 2019, the Trustee filed the Sale Motion.  With respect to the Sale Order requested therein, the Trustee filed a brief and memorandum of law in this case in support of the Trustee's Motion addressing the Trustee's ability to sell, transfer, and assign the Debtor's provider agreement (the "Provider Agreement") with the Centers for Medicare and Medicaid Services ("CMS") free and clear of any successor liability for underpayments owed to CMS (the "Trustee's Brief") [Dkt. No. 524 in Case No. 19-00730-5-JNC].

5.      On November 15, 2019, Complete Business Solutions Group, Inc. ("CBSG") filed a response and objection to the Trustee's motion for entry of the Bidding Procedures Order [Dkt. No. 357], and on December 20, 2019, CBSG filed a substantially identical objection and reservation of rights to the Sale Motion (the "CBSG Objection") [Dkt. No. 405].  On December 24, 2019, Paul Nusbaum and Steve White ("Nusbaum/White") filed its objection to the Sale

3

Motion (the "Nusbaum/White Objection") [Dkt. No. 346].  On December 27, 2019, the United States Department of Health and Human Services ("USDHHS") filed its objection to the Sale Motion (the "USDHHS Objection") [Dkt. No. 408].  On January 6, 2019, Cohesive Healthcare Management and Consulting, LLC ("Cohesive") filed its objection to the Sale Motion (the "Cohesive Objection," and together with the CBSG Objection, the Nusbaum/White Objection, and the USDHHS Objection, the "Sale Objections") [Dkt. No. 426].

6.       After a hearing on November 19, 2019, the Court entered the Bidding Procedures Order on November 27, 2019.  The Bidding Procedures Order granted the Trustee, in consultation with the Consultation Parties, defined in the Bidding Procedures Order to include Nusbaum/White, the City of Horton, and the Bankruptcy Administrator (the "BA"), broad latitude to conduct a sale with the primary purpose of maximizing the return for all constituencies in this case.  Certain assets were marketed for sale as defined in the Bidding Procedures Order as Transferred Assets while other assets were excluded from the Sale, as specifically set forth in Schedule 1 attached to the Agreement, such as cash, cash equivalents (including investments), accounts receivable, restricted use assets, causes of action under Chapter 5 of the Bankruptcy Code, any claims or causes of action (other than claims or causes of action arising under any Assumed Contract), any amounts payable to the Debtor as a result of any underpayments to the Debtor based on any cost reports (including Medicare and Medicaid cost reports) for the periods prior to the closing of the Sale, any grants, payments or subsidies payable to the Debtor relating to the Debtor's operations prior to the closing of the Sale, any insurance policies and the rights and proceeds thereunder, and any other assets that the Trustee may have determined to exclude from the Sale.

7.       In a case such as this, those constituencies include entities beyond the creditors,

and can include the community, such as the one in which the Debtor's hospital and clinic is located.  Specifically, the Bidding Procedures Order provided that, notwithstanding any other provisions in the Bidding Procedures Order, the Debtor, in consultation with the Consultation Parties, was permitted "to conduct the auction in any manner that may result in one or more of the highest and best offers for any or all of the Transferred Assets that will maximize the value of any of the Transferred Assets."

## Auction

8.      Pursuant to the Bidding Procedures Order, the Bidding Procedures Order and the notice containing the date of the Auction (defined below), the Sale Hearing, and the deadline to file objections to the Sale were provided to all potential purchasers previously identified or solicited by the Trustee and its professionals, the Consultation Parties, all parties that were known to possess or assert a lien, claim, encumbrance, or interest in or upon any of the Transferred Assets, all applicable federal, state, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the Transferred Assets, and all parties on the most current Master Service List filed in this case.

9.      In accordance with the Bidding Procedures Order, potential bidders were required to submit bids by 5:00 p.m. Eastern Time on December 12, 2019.  Pursuant to the provisions of the Bidding Procedures Order, the Trustee extended the bid deadline to 10:00 a.m. Eastern Time on December 16, 2019.  The Trustee received three bids from bidders deemed to be qualified pursuant to the Bidding Procedures Order: TULSA, Cohesive, and Rural Wellness Fairfax, Inc.

10.      The Trustee, with the assistance of Sherwood, conducted an auction of the Debtor's assets pursuant to the Bidding Procedures Order on December 19, 2019 in Charlotte, North Carolina (the "Auction").  At the close of bidding, the Trustee determined that TULSA's

bid of $400,000.00, plus 100% of accounts receivable constituted the highest and best offer.  The Trustee designated Cohesive as the backup bidder entitled to purchase the Transferred Assets subject to bankruptcy court approval if the sale to TULSA was not consummate or was otherwise disapproved by the Court.

11.     Pursuant to the Bidding Procedures Order, the Sale Hearing was originally set for January 2, 2020.  On December 30, 2019, the Trustee filed the *Motion to Continue Sale Hearings* [Dkt. No. 412] seeking a continuance to January 16, 2020.  On December 31, 2019, the Court entered an order granting the requested continuance [Dkt. No. 413].

12.     On January 14, 2020, the Trustee filed his response to the Sale Objections (the "Sale Objections Response") [Dkt. No. 436].

## Sale Hearing

13.     At the Sale Hearing on January 16, 2020, the Trustee presented evidence in support of his request to approve his proposed Sale of the Transferred Assets to TULSA.  Such evidence included testimony from the Trustee, David M. Johnson of Sherwood, and Dr. Vishal Aggarwal, President of TULSA.  The Objections had been settled prior to the Sale Hearing, and all parties attending the Sale Hearing supported the entry of this Sale Order.

## Notice of Sale

14.     Notice of the Sale of the Transferred Assets and the Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and Sale Hearing.  As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Hearing, and the transaction contemplated thereby, was provided in accordance with the orders previously entered by this Court, Section 363 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007, and 9008

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, or Sale shall be required.  The disclosures made by the Trustee concerning the Sale Motion, the Auction, and the designations regarding the successful and backup bidders were good, complete, and adequate.  A reasonable opportunity to object and to be heard with respect to the Sale and the Sale Motion and the relief requested has been afforded to all interested persons and entities.

## Good Faith of the Purchaser

15.    The Sale was negotiated, proposed, and entered into by the Trustee and by the Purchaser without collusion, in good faith and from arms-length bargaining positions.  The Purchaser is not an insider or affiliate of the Debtor as those terms are defined by the Bankruptcy Code.  Neither the Trustee nor the Purchaser have engaged in any conduct that could cause or permit the Agreement to be avoided or costs and damages to be imposed under Section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person, and the aggregate price paid by the Purchaser for the Transferred Assets was not controlled by an agreement among the bidders.  The Purchaser is purchasing the Transferred Assets in good faith and is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code.  The Purchaser proceeded in good faith in all aspects of the Sale; accordingly, the Purchaser is entitled to all of the protections afforded under Section 363(m) of the Bankruptcy Code.

## No Fraudulent Transfer

16.    The consideration provided by the Purchaser pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Transferred Assets, (iii) will

provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Trustee's determination that the Agreement constitutes the highest or otherwise best offer for the Transferred Assets constitutes a valid and sound exercise of the Trustee's business judgment. Approval of the Sale Motion and the Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors, and other parties-in-interest.

17.    The Purchaser is not a mere continuation of the Debtor or its estate, and there is no continuity of enterprise between the Purchaser and the Debtor. The Purchaser is not holding itself out to the public as a continuation of the Debtor. The Purchaser is not a successor to the Debtor or its estate, and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtor.

**<u>Validity of Transfer</u>**

18.    The Trustee has, on behalf of the Debtor, (i) full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all corporate and partnership authority necessary to consummate the transactions contemplated by the Agreement, and (iii) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby. The Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Agreement, are required for the Trustee to consummate

the Sale, Agreement, or transactions contemplated thereby.

19.     The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Trustee nor the Purchaser is fraudulently entering into the transaction contemplated by the Agreement.

20.     The Debtor has good and marketable title to the Transferred Assets and is the lawful owner of the Transferred Assets.  Subject to the indefeasible payment in full of the purchase price by the Purchaser and all other provisions of the Agreement, and pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets to the Purchaser will be, as of the closing of the transaction contemplated by the Agreement and this Order (the "Closing Date"), a legal, valid, and effective transfer of the Transferred Assets, which will vest the Purchaser with all right, title, and interest of the Seller to the Transferred Assets free and clear of (i) all liens (as that term is defined in Section 101(37) of the Bankruptcy Code), claims, and Encumbrances (defined below) (including any right of first offer or refusal regarding or option to purchase any real property) relating to, accruing or arising any time prior to the Closing Date (collectively, the "Liens") and (ii) all debts arising under, relating to, or in connection with any act of the Debtor or claims (as that term is defined in Section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (defined below) and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal,

purchase, or repurchase right or option, or termination of, the Trustee's, the Debtor's, or the Purchaser's interests in the Transferred Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, assignment, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "Claims"), relating to, accruing, or arising any time prior to the Closing Date, except as expressly provided in this Order and/or the Agreement.

21.     This Order shall be the Court's determination that all Liens, Claims, Encumbrances, and other interests have been unconditionally released, discharged, and terminated from the Transferred Assets with all such Liens, Claims, Encumbrances, and other interests attaching only to the sale proceeds of the Transferred Assets with the same priority, validity, force, and effect, if any, as they now have in or against the Assets subject to all claims and defenses the Debtor, the Trustee, and other parties-in-interest may possess with respect thereto.

### MEDIATED SETTLEMENT WITH NUSBUAM/WHITE, COHESIVE, & CBSG

22.     As set forth above, objections to the Sale were filed by Nusbaum/White, Cohesive, and CBSG.  Nusbaum/White, Cohesive, and CBSG have consented to the Sale on the terms set forth herein.

23.     All of the proceeds from the Sale shall be placed into a segregated account controlled by the Trustee.  Additionally, all proceeds from the collection of accounts receivable received post-closing (including but not limited to cost report receivables) shall be placed into the foregoing segregated account.  The amounts placed into trust pursuant to this paragraph are referred to herein as the "Collateral Trust Funds."

24. The Trustee is authorized to use and disburse the remaining cash on hand in the bankruptcy estate's bank accounts as of the Closing to the extent provided in the cash collateral orders and debtor in possession financing orders of this Court, with the understanding that if the case is or becomes administratively insolvent then the Court may compel return of any funds used and disbursed. All parties retain their respective rights and interests pursuant to such cash collateral and debtor in possession financing orders and rights under 506(c) of the Bankruptcy Code.

25. The Collateral Trust Funds shall be allocated between (i) a carve-out or surcharge for the benefit of the estate, (ii) the rights, claims, and interests of Nusbaum/White, (iii) the rights, claims, and interests of Cohesive, and (iv) the rights, claims, and interests of CBSG, as shall be determined and/or approved by this Court pursuant to further order(s) of this Court. Provided, however, nothing herein shall be construed as a stipulation as to the validity of any surcharge rights, lien rights, or any other right or interests, and the parties reserve their rights and arguments on these issues in all respects.

26. The Trustee, Nusbaum/White, Cohesive, and CBSG shall participate in a mediated settlement conference pursuant to E.D.N.C. LBR 9019-2, for the purpose of attempting to negotiate and resolve the disposition of the Collateral Trust Funds. The mediator shall be selected pursuant to E.D.N.C. LBR 9019-2(2), and the cost of the mediator shall be divided equally among the parties pursuant to E.D.N.C. LBR 9019-2(4)(d). All persons required by Rule 9019-2(4)(a) to attend the conference shall be physically present unless such physical presence is excused pursuant to an agreement between the parties and the mediator, or by an order of the Court. The mediator and the parties shall schedule the date, time, and location of the conference, and shall conduct such mediation within 60 days after the closing of the Sale. All individuals and entities

attending the settlement conference shall hold all statements made and conduct occurring at the conference confidential except as necessary to obtain approval of any settlement reached and as provided in E.D.N.C. LBR 9019-2(7).

## Section 363(f) Is Satisfied

27.    The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtor may sell the Transferred Assets free and clear of all Liens, Claims, Interests, and Encumbrances of any kind or nature whatsoever against the Debtor, its estate, or any of the Transferred Assets (except as otherwise provided in this Order and/or the Agreement).

## Compelling Circumstances for an Immediate Sale

28.    Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and other parties-in-interest.  The Trustee has demonstrated (i) good, sufficient, and sound business purposes and justifications for approving the Agreement and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business, pursuant to Section 363(b) of the Bankruptcy Code and (b) a Chapter 11 plan, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate and the Sale will provide the means for the Trustee to maximize distributions to the creditors of the Debtor.

29.    Given all of the circumstances of this Chapter 11 case and the adequacy and fair value of the consideration under the Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

30.    The Sale does not constitute a sub rosa Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither

impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

31.     The inclusion of patients' personally identifiable information in the Transferred Assets is consistent with the Debtor's pre-petition privacy policy because the transfer is necessary to the ongoing provision of health care services.  Pursuant to 11 U.S.C. § 363(b)(1)(A), the Trustee may sell patients' personally identifiable information without the need for the appointment of a consumer privacy ombudsman.

32.     The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Section 363(b), Section 363(f), and Section 363(m) thereof.

**IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

33.     The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent set forth in this Sale Order.

34.     Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing, the provisions of this Order, or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise (except the reservations of right and objections expressly preserved in this Order), are hereby denied and overruled with prejudice.

**<u>Approval of the Agreement</u>**

35.     The Agreement and all of the terms and conditions thereof are hereby approved and incorporated herein by reference.

36.     The Sale of the Transferred Assets and the consideration provided by the Purchaser

under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

37.     Pursuant to Sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated in the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement, and fully close the Agreement to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale.

38.     This Order shall be binding in all respects upon (a) the Trustee, (b) the Debtor, (c) the Debtor's estate, (d) all creditors of the Debtor, (e) all holders of Liens, Claims, Encumbrances or other interests (whether known or unknown) in, against, or on all or any portion of the Transferred Assets, (f) the Purchaser and all successors and assigns of the Purchaser, (g) the Transferred Assets, and (h) any trustees, if any, subsequently appointed in the Debtor's Chapter 11 case or upon a conversion of this case to a case under Chapter 7 under the Bankruptcy Code. This Order and the Agreement shall inure to the benefit of the Debtor, its estate and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

**Transfer of the Assets**

39.     Pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Transferred Assets to the Purchaser on the Closing Date upon satisfaction and fulfillment or waiver of the conditions to Closing contained in the Agreement, and such transfer shall (a) constitute a legal, valid, binding, and effective transfer of the Transferred Assets,

14

(b) vest the Purchaser with title to the Transferred Assets, and (c) upon the Trustee's receipt of the purchase price and all other provisions of the Agreement, be free and clear of all Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever (except as otherwise provided in this Order and/or the Agreement), including but not limited to, successor or successor-in-interest liability and Claims, with such Liens, Claims, Encumbrances and other interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, extent, force, and effect that they have against the Transferred Assets as of the Closing Date.  Upon the closing of the Sale (the "Closing"), the Purchaser shall take title to and possession of the Transferred Assets subject only to any interests and/or obligations expressly provided for in this Order and/or the Agreement.

40.    Except as expressly provided for in this Order and/or the Agreement, all persons and entities that are in possession of some or all of the Transferred Assets on the Closing Date are directed to surrender possession of such Transferred Assets to the Purchaser or its assignee at the Closing.  The provisions of this Order authorizing the sale of the Transferred Assets free and clear of Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever (other than as expressly provided for in this Order and/or the Agreement) shall be self-executing, and neither the Trustee nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order; provided, however, that this paragraph shall not excuse the Trustee or the Purchaser from performing any and all of their respective obligations under the Agreement.

41.    Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order. If Purchaser fails to consummate the purchase of the Assets on or before January 31, 2020 (unless such failure arises from Seller's uncured material breach and unless Seller and Purchaser agree to

extend such deadline in writing), Seller is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court.

42.     At Closing, Purchaser shall remit to the Trustee the cash purchase price of $400,000.00, less the amount of any deposit held by the Trustee.

43.     The Trustee is hereby authorized to take any and all actions necessary to consummate the Agreement without further need of obtaining such approvals.

44.     After the Closing has occurred in accordance with the Agreement and this Order, a certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other Encumbrances (defined below) of record except with respect to any interests expressly provided for in this Order and/or the Agreement.

45.     On the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Seller's interests in the Transferred Assets.  This Order is and shall be effective as a determination that, on the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), all encumbrances and other interests of any kind or nature whatsoever existing as to the Transferred Assets prior to the Closing Date, including without limitation any hypothecation, encumbrance, liability, Lien, Claim, Interest, security interest, security agreement, interest, mortgage, pledge, restriction, covenant, charge, license, preference, reclamation claim, cause of action, suit, contract, right of first refusal, offset and recoupment (except as specifically excepted in this Order and/or the Agreement), alter-ego, transferee, or successor liability claims, tax (including federal, state, and local tax), governmental order of any kind or nature, conditional

sale, or other title retention agreement or lease having substantially the same effect as any of the foregoing, assignment or deposit arrangement in the nature of a security device, whether secured, unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, perfected or unperfected, allowed or disallowed, matured or unmatured, disputed or undisputed, material or immaterial, known or unknown (referred collectively, whether having arisen, been incurred or accrued pre-petition or post-petition, whether imposed by agreement, understanding, law, equity, or otherwise, as "Encumbrances") pursuant to Section 363(f) of the Bankruptcy Code, except as otherwise provided in this Order and/or the Agreement, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

46.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), subject to the provisions of the Agreement, to operate under any (i) federal, state, or local governmental or regulatory license, permit, registration, and (ii)

governmental authorization or approval of the Debtor with respect to the Transferred Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date free and clear of Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever.

47.     To the extent permitted by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Transferred Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtor's Chapter 11 case or the consummation of the transactions contemplated by the Agreement.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

48.     Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement releases the Purchaser from compliance with any applicable governmental license, permit, registration, authorization, or approval of or with respect to a governmental unit as though such sale took place outside of bankruptcy.  The Purchaser shall continue to honor and comply with the terms and requirements of any such applicable license, permit, registration, authorization, or approval.

49.     Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement shall authorize the transfer or assignment of any governmental license if such transfer or assignment is prohibited by applicable non-bankruptcy law.

50.     The Trustee is authorized and empowered to cause to be filed with the secretary of

18

state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transaction contemplated by the Agreement, any related agreements, and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the professionals of the Trustee may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the applicable business corporation, trust, and other laws of the applicable governmental units, including for the change of the Debtor's corporate name, with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

51.     For the avoidance of doubt, nothing in this Sale Order shall limit, modify, or in any way affect the United States Secretary (the "Secretary") of Health and Human Services' authority to regulate Debtor's or the Purchaser's enrollment or participation as a Medicare or Medicaid provider of services (to the extent the Purchaser enrolls or participates as a Medicare or Medicaid provider of services) or the right and authority of the Secretary, CMS, or their contractors to review, approve, deny, or pay Medicare or Medicaid claims in the ordinary course of business in accordance with the Medicare or Medicaid Statute and regulations, and the policies and procedures thereunder. The United States does not take a position with respect to, and nothing herein shall be construed as the Secretary's consent to, or acceptance of, the Agreement or any underlying

transactions described in or supporting the Agreement.

52.     For the avoidance of doubt, notwithstanding anything to the contrary in this Sale Order or the Agreement, the Trustee and the Purchaser have agreed that for purposes of this case only the Debtor's Medicare provider agreement and Medicaid provider agreement shall not be sold pursuant to Section 363 of the Bankruptcy Code free and clear of any successor liability but shall be assumed and assigned, including, without limitation, any and all liability arising from or under the Medicare provider agreement or the Medicaid provider agreement, pursuant to and in accordance with Section 365 of the Bankruptcy Code and the Medicare Statute, the Medicaid Statute, the regulations promulgated under either the Medicare Statute or the Medicaid Statute, CMS' Medicare policies and procedures, and federal or state Medicaid policies and procedures.

53.     Nothing herein shall have any precedential effect as to whether any Medicare provider agreement or Medicaid provider agreement is or is not an executory contract pursuant to Section 365 of the Bankruptcy Code.

54.     For the avoidance of doubt, notwithstanding any other provision of this Sale Order, the Agreement, or any other document implementing the Sale, the Trustee and the Purchaser have agreed that (i) the Debtor shall not assume and assign or otherwise transfer any national provider identifier, provider transaction access number, Medicare enrollment agreement, or Medicaid enrollment agreement to the Purchaser; and (ii) the Debtor shall not loan or otherwise permit the Purchaser to use or submit claims under the Debtor's provider transaction access number, Medicare enrollment agreement, or Medicaid enrollment agreement, except in accordance with the Medicare Statute, the Medicaid Statute, the regulations promulgated under the Medicare Statute or the Medicaid Statute, CMS' Medicare policies and procedures, federal or state Medicaid policies and procedures, and with the approval of CMS.

55.     Any cure amount set forth by the Debtor or the Trustee is not binding on the United States, and shall not be interpreted to set a cure amount related to the Debtor's Medicare provider agreement or Medicaid provider agreement or limit successor liability with respect to the Debtor's Medicare provider agreement or Medicaid provider agreement that are assumed and assigned to the Purchaser.

56.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Transferred Assets to the Purchaser in accordance with the terms of the Agreement and this Order.

57.     The Excluded Assets (as defined in the Agreement, the "Excluded Assets") are not being sold to and are not property of the Purchaser.  If any Excluded Assets and/or proceeds thereof come into the possession of the Purchaser, (i) the Purchaser shall hold such Excluded Asset and/or the proceeds thereof in trust for the benefit of the Debtor and (ii) the Purchaser shall promptly deliver such Excluded Asset and/or the proceeds thereof to the Trustee or its designated assignee.

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

58.     Pursuant to Sections 365(a), (b), (c), and (f) of the Bankruptcy Code, the Trustee, on behalf of the Debtor, is authorized to assume and assign the Assumed Executory Contracts, which are referred to as the Assumed Contracts in the APA, subject to the procedures provided herein; provided, however, that there shall be no assumption of any such Assumed Executory Contract absent simultaneous assignment thereof to the Purchaser.

59.     Pursuant to the Bidding Procedures Order, the Trustee originally issued a *Notice of Executory Contracts and Unexpired Leases Subject to Possible Assumption and Assignment and Proposed Cure Amounts* [Dkt. No. 576] on December 6, 2019 and served that notice on then-known executory contract counterparties.    Subsequent discussions with contract

counterparties and the Purchaser indicated that the first notice was premature, as the Purchaser had not yet confirmed intent to be assigned specific executory contracts.

60.     The Assumed Executory Contracts identified on Schedule 2.7 of the Agreement are deemed assumed by the Trustee and assigned to the Purchaser effective as of the Closing Date, except that the Trustee shall serve an *Amended Notice of Executory Contracts and Unexpired Leases Subject to Possible Assumption and Assignment and Proposed Cure Amount* ("Amended Cure Notice") on all of the contract counterparties to the Assumed Executory Contracts within three (3) days of the Closing Date.  Such contract counterparties shall have fourteen (14) days from the date of service of the Amended Cure Notice (the "Cure Objection Deadline") to object to the assumption and assignment of the Assumed Executory Contracts to the Purchaser.

61.     The Court will schedule a hearing to consider any objections to the Amended Cure Notice that are filed by the Cure Objection Deadline (the "Disputed Assumed Contracts"). In the event that the Court declines to approve the assumption and assignment of any Disputed Assumed Contract following the hearing, such contract or lease shall be deemed rejected, effective as of the Closing Date.  Notwithstanding anything to the contrary herein or in the Agreement, the Purchaser shall be solely responsible for performance of all obligations and payment of all amounts arising under the Disputed Assumed Contracts from and after the Closing Date through the rejection date of each such contract.

62.     As part of its consideration for the Transferred Assets and except as provided in and limited by the Agreement and this Order with respect to Cure Payments (as defined in the Agreement), the Purchaser will cure any and all defaults with respect to the Assumed Executory Contracts and compensate all counterparties for any actual pecuniary loss resulting from such

defaults.

63.     On or as promptly after the Closing Date as is practical, the cure amounts relating to the Assumed Executory Contracts to which the Purchaser and the applicable counterparty have agreed, or that have been fixed by operation of this Order or another order of this Court, shall be paid by the Purchaser.  Cure amounts for Assumed Executory Contracts that are still subject to dispute at that time shall be paid (i) on or as promptly after the Closing Date as is practical or (ii) fourteen (14) days after a final, non-appealable order determining the cure amount has been entered by this Court, whichever is later.  Payment of the cure amounts shall be deemed to discharge the Trustee's obligations to (i) cure, or provide adequate assurance that the Trustee will promptly cure, any defaults under the Assumed Executory Contracts; and (ii) compensate, or provide adequate assurance that the Trustee will promptly compensate, any counterparty to the Assumed Executory Contracts for any actual pecuniary loss resulting from any default under the Assumed Contracts.  Pursuant to Section 365(k) of the Bankruptcy Code, the Trustee shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Executory Contracts.

64.     In accordance with Sections 365(b)(2) and (f) of the Bankruptcy Code, upon assignment of the Assumed Executory Contracts to the Purchaser, (i) the Purchaser shall have all of the rights of the Trustee or Debtor thereunder and each provision of such Assumed Executory Contracts shall remain in full force and effect for the benefit of the Purchaser notwithstanding any provision in any such Assumed Executory Contract or in applicable law that prohibits, restricts, or limits in any way such assignment or transfer, and (ii) no Assumed Executory Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of

23

the consummation of the transactions contemplated by the Agreement.

65.    Any party to a personal services contract that has not objected to the assignment thereof is deemed to consent to such assignment pursuant to Section 365(c) of the Bankruptcy Code to the extent that such contract is an Assumed Executory Contract.

66.    The failure of the Trustee or the Purchaser to enforce, at any time, one or more terms or conditions of any Assumed Executory Contract shall not be a waiver of such terms and conditions or of the Trustee's or the Purchaser's rights to enforce every term and condition of the Assumed Executory Contracts.

67.    Except as otherwise provided herein, unless and until an Assumed Executory Contract is assumed and assigned pursuant to the terms of this Order, the Purchaser shall have no liability under any such Assumed Executory Contract; provided, however, that the Purchaser shall remain solely responsible for all accrued but unpaid costs and obligations arising under such contracts and leases between the Closing Date and the assumption/assignment date.

68.    In the event that the Sale does not close, none of the Debtor's executory contracts or unexpired leases shall be assumed by virtue of this Order and shall remain subject to further administration in this case.

### Other Provisions

69.    This Order and the Agreement shall be binding in all respects upon the Trustee, the Purchaser, all creditors of the Debtor, all successors and assigns of the Debtor, any of their respective affiliates and subsidiaries, and any trustees, examiners, "responsible persons," or other fiduciaries appointed in the Debtor's bankruptcy case or upon a conversion of such case to a case under Chapter 7 of the Bankruptcy Code in accordance with the Bankruptcy Code and other applicable law.    The Agreement shall not be subject to rejection or avoidance under any

24

circumstances.

70.    The Agreement may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate and is consistent with the terms of this Order.

71.    The consideration provided by the Purchaser to the Trustee pursuant to the Agreement for the Transferred Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession or the District of Columbia.

72.    Except as otherwise expressly provided for in this Order or the Agreement, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Trustee, the Debtor and/or its estate, including, but not limited to, any bulk sales or similar law, successor or transferee liability, antitrust law, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtor, or any of their predecessors or affiliates or any obligations of the Debtor or their predecessors or affiliates arising prior to the Closing Date, for any liabilities, debts, commitments or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) in any way whatsoever relating to or arising from the Transferred Assets or the Trustee's or the Debtor's operation of the Debtor's businesses or use of the Transferred Assets on or prior to the Closing Date, including, but not limited to, any liabilities, debts, commitments, or obligations arising prior to the Closing and under or in

connection with: (a) any employment or labor agreements (including any collective bargaining agreements), consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtor is a party; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtor; (c) the cessation of the Debtor's operations, pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, obligations that might otherwise arise from or pursuant to applicable law; (d) workmen's compensation, occupational disease, or unemployment or temporary disability insurance claims; (e) environmental liabilities, debts, claims, or obligations arising from conditions first existing on or prior to Closing; (f) any liabilities, debts, commitments or obligations of, or required to be paid by, the Trustee or the Debtor for any taxes of any kind for any period; (g) any liabilities, debts, commitments or obligations for any taxes relating to the business of the Trustee, the Debtor, or the Transferred Assets for or applicable to the pre-Closing period; (h) any litigation; (i) any products liability, other tort or similar claims, whether pursuant to any state or any federal law; and (j) any excluded liabilities in the Agreement.  The Purchaser has given substantial consideration under the Agreement for the benefit of the holders of any Liens.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor or transferee liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in the Debtor or any of the Transferred Assets.

73.    The transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein

to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of Section 363(m) of the Bankruptcy Code.

74.      Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this Chapter 11 case, (b) any subsequent Chapter 7 case into which this Chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement (as modified by this Order) or the terms of this Order.

75.      The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety; *provided*, *however*, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary agreements) and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

76.      As the sale, transfer, assignment, conveyance and delivery of the Transferred Assets are in exchange for the purchase price and provisions of the Agreement, no withholding of U.S. federal income tax pursuant to sections 1441 or 1442 of the Internal Revenue code is required.

77.      The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Trustee or the Debtor is a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction

to (a) compel delivery of the Transferred Assets to the Purchaser, (b) interpret, implement, and enforce the provisions of this Order, and (c) protect the Purchaser against any Liens, Claims, Encumbrances or other interest in or against the Debtor or the Transferred Assets of any kind or nature whatsoever.

78.     This Order shall take effect immediately, shall not be stayed, and the Court finds and concludes that good cause exists to waive any applicable stay provided under Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, 9014, or otherwise.  Accordingly, any such stay is hereby waived, and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Order in accordance with and subject in all respects to the terms and conditions of the Agreement.

79.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a) notwithstanding Bankruptcy Rules 6004(h) and 6006(d).

80.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this Chapter 11 case, the terms of this Sale Order shall govern.

81.     The Trustee and the Purchaser shall provide reasonable updates to the Bankruptcy Administrator and those parties asserting liens on the Transferred Assets regarding their respective efforts to satisfy the conditions to Closing set forth in the Agreement.  If it becomes apparent that the Trustee and the Purchaser will be unable to satisfy any condition to Closing set forth in the Agreement, the Trustee and the Purchaser shall promptly notify each other, the Bankruptcy Administrator, those parties asserting liens on the Transferred Assets, and if necessary, the Court.

82.     Subject to the entry of an order confirming a plan of liquidation in this case or other further order of this Court, there shall be no distribution of cash proceeds of the Sale to any party, except as set forth herein.

83.    Nothing contained in this Order shall be deemed an allocation of the purchase price to any of the Transferred Assets, and all rights, claims, and objections of all parties in interest with respect to such an allocation are expressly reserved and preserved.

--END OF DOCUMENT--

**<u>EXHIBIT A</u>**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**THOMAS W. WALDREP, JR., AS CHAPTER 11 TRUSTEE FOR CAH ACQUISITION COMPANY 7, LLC d/b/a PRAGUE COMMUNITY HOSPITAL**

(AS SELLER)

**AND**

**TRANSCENDENTAL UNION WITH LOVE AND SPIRITUAL ADVANCEMENT**

(AS PURCHASER)

**Dated as of February __, 2020**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 1

    1.1    Certain Definitions............................................................................................. 1

    1.2    Other Definitional and Interpretive Matters ..................................................... 8

ARTICLE II PURCHASE AND SALE OF ASSETS ...................................................... 9

    2.1    Sale of Assets ..................................................................................................... 9

    2.2    Purchase of Assets ............................................................................................. 9

    2.3    Excluded Liabilities ........................................................................................... 9

    2.4    Excluded Assets ............................................................................................... 10

    2.5    Nonassignable Assets ...................................................................................... 10

    2.6    Method of Conveyance .................................................................................... 10

    2.7    Assumed Contracts .......................................................................................... 10

    2.8    Assumption of Liabilities................................................................................. 10

    2.9    Intentionally Deleted ....................................................................................... 11

    2.10   Intentionally Deleted ....................................................................................... 11

    2.11   Purchaser's Deposit ......................................................................................... 11

    2.12   Purchase Price .................................................................................................. 12

    2.13   Intentionally Deleted ....................................................................................... 12

    2.14   Closing ............................................................................................................. 12

    2.15   Medicare and Medicaid Provider Agreements ................................................ 12

    2.16   Closing Payments............................................................................................. 13

    2.17   Closing Deliveries of Seller ............................................................................ 13

    2.18   Closing Deliveries of Purchaser ...................................................................... 14

    2.19   Intentionally Deleted ....................................................................................... 14

    2.20   Further Conveyances and Assumptions........................................................... 14

    2.21   Intentionally Deleted ....................................................................................... 15

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 15

    3.1    Power of Seller................................................................................................. 15

    3.2    Validity and Enforceability of Agreement....................................................... 15

    3.3    Consents; Waivers and Approvals ................................................................... 15

    3.4    No Conflict....................................................................................................... 15

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 3.5 | Rights to Acquire Assets | 16 |
| 3.6 | Title to and Adequacy of the Assets | 16 |
| 3.7 | Intentionally Deleted | 16 |
| 3.8 | Existing Medicare and Medicaid Provider Agreements | 16 |
| 3.9 | Intentionally Deleted | 16 |
| 3.10 | Intentionally Deleted | 16 |
| 3.11 | Intentionally Deleted | 16 |
| 3.12 | Intentionally Deleted | 16 |
| 3.13 | Intentionally Deleted | 16 |
| 3.14 | Compliance with Laws; Permits | 16 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 17 |
| 4.1 | Corporate Existence of Purchaser | 17 |
| 4.2 | Validity and Enforceability of Agreement | 17 |
| 4.3 | Authorization and Authority | 17 |
| 4.4 | No Conflict | 17 |
| 4.5 | Ability to Consummate Transaction | 17 |
| 4.6 | Solvency | 18 |
| 4.7 | Litigation and Arbitration | 18 |
| 4.8 | Brokers and Intermediaries | 18 |
| ARTICLE V | CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER | 18 |
| 5.1 | Access and Information | 18 |
| 5.2 | Authorizations | 20 |
| 5.3 | Conduct of Business | 21 |
| 5.4 | Commercially Reasonable Efforts | 22 |
| 5.5 | Adequacy of Purchaser's Review | 22 |
| 5.6 | Intentionally Deleted | 22 |
| 5.7 | Tax Matters | 22 |
| 5.8 | Announcement | 23 |
| 5.9 | Post-Closing Business Operations Commitment | 23 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.10 | Risk of Loss; Casualty Loss | 23 |
| 5.11 | Bankruptcy Actions | 24 |
| 5.12 | Intentionally Deleted | 24 |
| 5.13 | DISCLAIMERS | 24 |
| 5.14 | Further Assurances | 25 |
| 5.15 | Confidentiality | 25 |
| 5.16 | Acceptance and Discharge | 26 |
| 5.17 | Cooperation | 27 |
| 5.18 | Surrender of License | 27 |
| 5.19 | Removal of Certain Liens | 27 |
| 5.20 | Insurance | 27 |
| 5.21 | Final Cost Report | 27 |
| **ARTICLE VI** | **CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS** | **27** |
| 6.1 | Entry of the Sale Order | 27 |
| 6.2 | No Injunctions | 28 |
| 6.3 | Compliance with Applicable Law | 28 |
| 6.4 | Consents | 28 |
| 6.5 | Intentionally Deleted | 28 |
| **ARTICLE VII** | **CONDITIONS TO PURCHASER'S OBLIGATIONS** | **28** |
| 7.1 | Representations and Warranties of Seller | 28 |
| 7.2 | Schedules | 28 |
| 7.3 | Documents | 29 |
| 7.4 | Performance of Obligations | 29 |
| 7.5 | No Changes to Business | 29 |
| 7.6 | Intentionally Deleted | 29 |
| 7.7 | Release of Liens | 29 |
| 7.8 | Consents | 29 |
| 7.9 | Intentionally Deleted | 29 |
| 7.10 | Intentionally Deleted | 29 |

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE VIII CONDITIONS TO SELLER'S OBLIGATIONS ............................................ 29

8.1     Representations and Warranties of Purchaser ....................................................... 29

8.2     Performance of this Agreement ........................................................................... 29

8.3     Payment of Purchase Price and Assumption of Liabilities and Assumed
        Contracts ........................................................................................................... 30

8.4     Documents ....................................................................................................... 30

ARTICLE IX SURVIVAL ............................................................................................ 30

9.1     Survival .......................................................................................................... 30

ARTICLE X LIMITED AGREEMENT TERMINATION RIGHTS ...................................... 30

10.1    Termination of Agreement ................................................................................. 30

10.2    Procedure for Termination ................................................................................ 31

10.3    Effects of Termination ...................................................................................... 31

ARTICLE XI MISCELLANEOUS ................................................................................. 31

11.1    Assignment; Binding Agreement ........................................................................ 31

11.2    Post-Closing Cooperation .................................................................................. 32

11.3    Expenses ......................................................................................................... 32

11.4    Entire Agreement and Modification ................................................................... 32

11.5    Severability ..................................................................................................... 32

11.6    Waiver ............................................................................................................ 32

11.7    Counterparts .................................................................................................... 33

11.8    Headings; Interpretation .................................................................................... 33

11.9    Governing Law ................................................................................................ 33

11.10   Bankruptcy Court Jurisdiction ........................................................................... 33

11.11   Notices ............................................................................................................ 33

11.12   Effectiveness .................................................................................................... 34

11.13   No Third Party Beneficiaries ............................................................................. 34

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made as of the _____ day of February, 2020, by and between Thomas W. Waldrep, Jr., as Chapter 11 Trustee ("Seller" or "Trustee") for CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital ("Debtor") and Transcendental Union with Love and Spiritual Advancement, an Oklahoma non-for-profit organization ("Purchaser").

### WITNESSETH:

WHEREAS, the Debtor is a Delaware limited liability company that operates a for-profit hospital in Prague, Oklahoma (the "Hospital"). The Debtor does not own the real property on which the Hospital is located. The Hospital is classified a Critical-Access Hospital ("CAH") by the Centers for Medicare and Medicaid Services ("CMS");

WHEREAS, the Debtor presently operates the Hospital, provides hospital services and other health care programs and services at the Hospital, operates the Business, and owns the Assets;

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1     **Certain Definitions**. For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

1

"<u>Affiliate</u>" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"<u>Agreement</u>" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"<u>Assessed Cost Report Liability</u>" means the aggregate liability as finally determined and assessed by any Healthcare Program arising from any Cost Reports ending prior to the Effective Time.

"<u>Assets</u>" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"<u>Assignment of Lease</u>" has the meaning ascribed to it in Section 2.6.

"<u>Assumed Contracts</u>" has the meaning ascribed to in Section 2.7.

"<u>Assumed Liabilities</u>" has the meaning ascribed to it in Section 2.8(a).

"<u>Authorizations</u>" means all Healthcare Regulatory Consents, Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"<u>Bankruptcy Case</u>" means the case under Chapter 11 of the Bankruptcy Code, styled, *CAH Acquisition 7, LLC, d/b/a Prague Community Hospital*, Case No. 19-01298-5-JNC, pending before the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of North Carolina and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Eastern District of North Carolina with jurisdiction over the Bankruptcy Case.

"<u>Bill of Sale</u>" has the meaning ascribed to it in Section 2.6.

"<u>Billing Services</u>" has the meaning ascribed to it in Section 2.15.

"<u>Books and Records</u>" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

2

"Business" means the Hospital, the services and programs provided thereat, and the outpatient, ancillary, and other healthcare businesses incident to the operation of the Hospital.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in Oklahoma are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"CLIA" means Clinical Laboratory Improvement Amendments (CLIA) of 1988, which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States.

"Closing" means the consummation of the transactions contemplated by this Agreement.

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than February 28, 2020, or such later date, as may be required to obtain Authorizations, or as the Parties may in writing agree; provided that if the Closing shall not have occurred by such outside date and this Agreement shall not have been terminated in accordance with its terms by Purchaser based on an uncured material breach hereunder by Seller, then Seller shall have the right to extend the outside closing date for an additional sixty (60) days.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Debtor in connection with the Business.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Debtor" means CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital.

"Deed" has the meaning ascribed to it in Section 2.6.

"Deposit" has the meaning ascribed to the term "Bidder's Deposit" in the Order (A) Establishing Bidding Procedures, (B) Approving Stalking Horse Bidder, (C) Approving Form and Manner of Notices, (D) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases and, (E) Granting Related Relief entered on [Date] [Docket No. ____].

"Dispute" has the meaning ascribed to it in Section 11.10(a)

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"Excluded Assets" means those assets of Debtor that are set forth on Schedule 1 attached hereto.

4

"Excluded Liabilities" means each and every Liability, obligation, debt, or commitment of the Business or Debtor, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Final Cost Report Liability" means the amounts necessary, if any, to satisfy liability incurred as a result of the filing of any Cost Report including, without limitation, the Assessed Cost Report Liability.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Health Care Laws" means, all applicable laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d-1320d-8), the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 U.S.C.§§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. §§ 801 et seq.), the regulations promulgated pursuant to such laws, and any other law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority with legally binding effect which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, licensure, accreditation or any other aspect of providing health care.

"Healthcare Programs" shall have the meaning set forth in Section 3.8 of this Agreement.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained by such party in order for such party to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind, to the extent necessary, under or through CLIA, CMS, DEA, and any other approvals, authorizations, waivers, Orders, licenses, or Permits of any Governmental Authority required to consummate the transactions contemplated hereby and for Purchaser to operate the Business.

"Hospital" means the hospital operated by Seller located in Prague, Oklahoma known as Prague Community Hospital and operated in connection with the Business.

"Knowledge" means (a) as to Seller, the actual knowledge of Seller and (b) as to Purchaser, the actual knowledge, after due inquiry, of the senior leadership team members of Purchaser listed on Schedule 2.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

"Party" or "party" means either Purchaser or Seller, and "Parties" means both Purchaser and Seller together.

6

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, Medicare and Medicaid provider numbers and agreements, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 5 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Private Programs" means any private insurance or reimbursement programs.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Provider Agreements" means Debtor's existing provider agreements with the Medicare and Medicaid programs.

"Purchased Intellectual Property Licenses" means those intellectual property licenses of the Debtor included within the Assets, if any.

"Purchase Price" has the meaning ascribed to it in Section 2.12(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Sale Order" has the meaning ascribed to it in Section 6.1.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.15(a).

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

## 1.2   **Other Definitional and Interpretive Matters**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods.  When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to "$" means United States dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     Including.  The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)     Made Available to Purchaser.  The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)     No Construction Against Drafter.  No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     **Sale of Assets**.  At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign, and deliver or cause to be sold, transferred, conveyed, assigned, and delivered to Purchaser, all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under all of the assets and associated rights and interests, tangible and intangible, of whatever kind, owned by Debtor (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets used in or related to the Business, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets").  The Assets shall include, to the extent transferrable, all Patient Records (Seller and its representatives shall continue to have access to all Patient Records as necessary to respond to governmental or other inquiries or issues, to defend malpractice claims, and for other reasonable legitimate reason upon request) but excluding any Excluded Documents.  None of the Excluded Assets will be conveyed to Purchaser.

2.2     **Purchase of Assets**.  Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3     **Excluded Liabilities**.  Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a)     Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities.  Purchaser shall, at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

(b)      Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Debtor related to any pension or retirement plans or programs.

(c)      Subject to, and consistent with the Sale Order, Purchaser shall not be responsible for any Liabilities of Debtor related to Debtor's participation in the Healthcare Programs, including any liability or obligation for overpayments, recapture, recoupment, or set off for previously paid or reimbursed amounts.

(d)      The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(e)      Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business, the Hospital, or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser which has been released pursuant to the Sale Order.  To the extent this Section 2.3(d) conflicts with any other provision of this Agreement, this Section 2.3(d) controls.

2.4      **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser.  The Seller shall retain all right, title, and interest to, in, and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5      **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6      **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of an assignment and bill of sale in the form of Exhibit A (the "Bill of Sale") conveying all right, title, and interest of Seller and Debtor's bankruptcy estate in all Assets that comprise tangible or intangible personal property, all to the fullest extent permitted by Law, free and clear of any and all Liens.

2.7      **Assumed Contracts**.  On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "Assumed Contracts").  Except for the Assumed Contracts, Purchaser shall not assume and shall not be responsible for any of Debtor's contracts or leases.

2.8      **Assumption of Liabilities**.

(a)      As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms all

10

Liabilities of the Hospital or the Business (the "Assumed Liabilities") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

(b)      As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms the obligations of Seller arising from and after the Effective Time under Assumed Contracts which Seller shall assign and as to which Purchaser shall assume all obligations thereunder, including that Purchaser shall, subject to the provisions of Section 2.8(e), assume the obligations to pay Cure Payments relating to the Assumed Contracts.

(c)      On the Closing Date, Purchaser shall assume no liability for Debtor's accrued payroll, accrued payroll taxes, and accrued paid annual leave.

(d)      Purchaser shall, subject to the limitations set forth below, be responsible for the payment of the Cure Payments, if any, required with respect to the Assumed Contracts with said payments being made to the counterparty to the Assumed Contracts when the Cure Payments become due pursuant to the Sale Order unless the Purchaser and the counterparty to an Assumed Contract agree otherwise.

(e)      Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of each of Seller to object to such terms are expressly preserved and reserved.

(f)      Debtor shall not assume any contracts and/or assign any contracts to Purchaser unless Purchaser agrees to pay the full Cure Payments with respect to any contract so assumed and any non-permitted assumption or assignment shall be void and of no effect.

(g)      Purchaser shall be responsible for prosecuting all objections to the Cure Payments.  Purchaser shall, at Purchaser's sole cost, (i) negotiate the amount of all Cure Payments and/or (ii) pay all of Purchaser's legal and other fees and expenses (and, if any, Seller's legal fees and expenses to the extent incurred because of Seller being required to intervene or defend) relating to any litigation or other dispute in connection with or otherwise relating to Cure Payments.

2.9      **Intentionally Deleted.**

2.10     **Intentionally Deleted**.

2.11     **Purchaser's Deposit**.

(a)      Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order.  If Purchaser fails to consummate the purchase of the Assets on or before February 28, 2020 (unless such failure arises from Seller's uncured material breach and unless Seller and Purchaser agree to extend such deadline in writing), Seller is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further

Orders of the Bankruptcy Court. If Purchaser fails to consummate the purchase of Assets hereunder through no fault of its own, Seller shall not consummate any transaction unless the Deposit is repaid to Purchaser. If Purchaser fails to consummate the transaction as a result of Purchaser's uncured material default, the entire Deposit and all accrued interest thereon will be retained by Seller as liquidated damages (it being agreed that it may be difficult to measure damages arising from such failure and such amount is a reasonable estimate of the amount of damages Seller will suffer under the circumstances), which, except in cases of an intentional tort, shall constitute Seller's sole or exclusive remedy and limitation of damages for any default hereunder by Purchaser.

2.12    **Purchase Price**.

(a)    In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of $400,000.00 (the "Cash Purchase Price"); (iii) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; (iv) pay the amount required under Section 2.9; and (v) pay all Transfer Taxes due in connection with the closing of the transactions contemplated herein (collectively, the "Purchase Price").

(b)    As additional consideration for the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall spend at least $150,000.00 in capital investments at the Hospital during the three (3) year period following the Closing Date. As used in this Section 2.12(b), the term "capital investments" shall mean investments in new equipment including information technology systems, equipment replacement, facility renovations, new facilities (including additional personnel), medical office space, development of new services and expansion of existing clinical services, working capital, information systems, physician recruitment, and other capital improvements, including commitments incurred pursuant to operating or capital leases, or other off balance sheet financing mechanisms. The dollar amount of capitalized expenditures made under this Section 2.12(b) will be determined in accordance with GAAP.

(c)    The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.12.

2.13    **Intentionally Deleted.**

2.14    **Closing**. The Closing shall take place at 10:00 a.m., prevailing Eastern Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing. The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time. Seller will operate the Business until immediately prior to the Effective Time.

2.15    **Medicare and Medicaid Provider Agreements**. Purchaser shall seek to have assigned to Purchaser all current and valid provider contracts of Debtor with the Medicare, Medicaid and TRICARE programs, including, without limitation, the Provider Agreements, subject to the Government's approval of Seller's assignment and Purchaser's assumption thereof.

12

Seller shall provide Purchaser with information and other assistance as may be reasonably requested by Purchaser with respect to its request to assume the Provider Agreements. To the extent permitted by applicable laws, Purchaser shall be solely liable for any and all amounts that are or may become due in connection with the Provider Agreements. Upon the Effective Time, to the extent permitted by applicable laws, Purchaser may use Debtor's National Provider Identifier and Medicare/Medicaid provider/supplier numbers and provider/supplier agreements to submit claims to the Part A Medicare Administrative Contractor and the Oklahoma Department of Health and Human Services, Department of Medical Assistance ("DHB," collectively with the Part A Medicare Administrative Contractor, the "Payors") for health care services provided after the Effective Time (the "Billing Services").

(a)     Seller agrees not to take any action to change its EFT/bank account information used by Payors to deposit monies to be paid as a result of the Billing Services (any such monies deposited to be referred to herein as a "Payment"). Seller acknowledges and agrees that any Payments deposited into the Seller's bank account that belong to Purchaser pursuant to this Agreement shall be provided to Purchaser by wire transfer along with an accounting of all payments received on a weekly basis or by some other method mutually agreed to by the parties. The Parties acknowledge and agree that the continued use of the Debtor's EFT/bank account information shall be in accordance with the statutes and regulations governing the change of ownership of accounts receiving Payments in accordance with Provider Agreements. The Parties acknowledge and agree that the Debtor's current bank account is scheduled to close on March 31, 2020, and the Parties shall work in concert after the Effective Time (a) to establish a new account, maintained in joint control, to permit the escrow, analysis, and segregation of proceeds received from the Excluded Assets and the Assets, and (b) to coordinate the transfer of post-Effective Time Payments received pursuant to the Provider Agreements to such new account. In the event Seller receives notice of any adjustment to any Payments related to Billing Services, Seller agrees to inform Purchaser and send a copy of such notice to Purchaser by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice.

(b)     Whenever a Payor sends other notice to or requests information from Seller regarding a claim for services rendered after the Closing Date, Seller shall send a copy of such notice or inform Purchaser of such request by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice or request.

2.16     **Closing Payments**. No later than five (5) Business Days prior to the Closing Date, Seller shall provide to Purchaser, in writing, Seller's calculation of the Closing payments due as of the Effective Time based on the payment of the Purchase Price, as set forth in Section 2.12, and the estimated apportionment of Taxes and assessments. If within three (3) Business Days following receipt of such calculation, Purchaser has not given Seller written notice of its good faith objection to Seller's calculations, then the transaction shall close based on Seller's calculations. If Purchaser gives such notice of objection, then the Parties will work together in good faith to resolve the estimated apportionment of Taxes and assessments provided that if they are unable to agree, the Parties shall close and the disputed amount shall be appropriately escrowed.

2.17     **Closing Deliveries of Seller**. At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise

required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a)    the execution and delivery of this Agreement by Seller;

(b)    a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby; and

(c)    copies of Debtor's most recent Cost Reports as filed with the Medicare and Medicaid programs.

2.18    **Closing Deliveries of Purchaser**.    At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a)    the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.12 herein;

(b)    a true and complete copy of Purchaser's organizational documents and, if applicable, a certificate of existence of Purchaser from the State of North Carolina, together with a certificate by an authorized officer of Purchaser that the certificate of formation of Purchaser has not been amended since the date of the certification described above and that nothing has occurred since the date of issuance of the certificate of existence that would adversely affect Purchaser's existence;

(c)    certificates from an authorized officer of Purchaser as to the incumbency and signatures of each officer of Purchaser executing this Agreement and any other documents required under this Agreement;

(d)    a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

(e)    copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.19    **Intentionally Deleted.**

2.20    **Further Conveyances and Assumptions**. From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its

successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.  Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

     2.21    **Intentionally Deleted.**

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

    3.1    **Power of Seller**.  Seller has the power to enter into this Agreement, to perform his obligations hereunder, and to consummate the transactions contemplated hereby.  Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

    3.2    **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Purchaser, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

    3.3    **Consents; Waivers and Approvals**.  Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code and approvals relating to the Healthcare Regulatory Consents, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

    3.4    **No Conflict**.  Subject to the issuance of the Sale Order and approvals relating to the Healthcare Regulatory Consents and the transfer of the Provider Agreements, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

        (a)    violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject to.

15

3.5    **Rights to Acquire Assets**.  Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets.  Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6    **Title to and Adequacy of the Assets**.  Debtor owns each of the Assets.  Subject to the approval of this Agreement by the Bankruptcy Court, the Debtor's right, title, and interest in the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for the Permitted Encumbrances.  The Assets comprise all items used in the operation of the Hospital and the Business except for (i) Contracts that require consents to the transfer of Contracts made available to Purchaser prior to the date hereof that have not been obtained, (ii) Authorizations that are not transferrable or not transferrable without a consent that has not been obtained, and (iii) the Provider Agreements.

3.7    **Intentionally Deleted.**

3.8    **Existing Medicare and Medicaid Provider Agreements**.  Debtor is eligible to receive payment under Titles XVIII and XIX of the Social Security Act, is a "provider" under the Provider Agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries.

3.9    **Intentionally Deleted.**

3.10    **Intentionally Deleted.**

3.11    **Intentionally Deleted.**

3.12    **Intentionally Deleted.**

3.13    **Intentionally Deleted**.

3.14    **Compliance with Laws; Permits**.

(a)    To Seller's Knowledge, the Hospital is duly licensed and authorized by all applicable Governmental Authorities including, but not limited to, the State of North Carolina, to operate all of its health care and medical services.

(b)    To Seller's Knowledge, Seller has all permits that are necessary to enable it to own, lease or otherwise hold the Assets and to enable it to operate the Business as currently conducted.  All such permits are in full force and effect.  To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

16

(c)    To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business.  There are no charges of a material violation of a Law pending or to the Knowledge of Seller threatened against Seller.

(d)    There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby makes the following representations and warranties:

4.1    **Corporate Existence of Purchaser**.  Purchaser is duly authorized to conduct business in [state].  Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2    **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

4.3    **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4    **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5    **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

17

4.6    **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7    **Litigation and Arbitration**.

(a)    There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that is not resolved herein seeking to prevent the consummation of the transactions contemplated by this Agreement.

(b)    There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives, and there are no existing facts relating to any Person referred to in this Section 4.7(b), that may cause any required Health Care Regulatory Consent or other consent to the transactions contemplated hereby to not be given.

(c)    There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.  Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8    **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission. Provided, however, the Parties acknowledge and agree that, to the extent allowed by Order of the Bankruptcy Court, any fees and expenses payable by Seller to Sherwood Partners, Inc. shall be paid from the cash proceeds of the Sale.

## ARTICLE V
## CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER

5.1    **Access and Information**.

(a)    Purchaser agrees to retain and maintain all employee and medical records as required under all applicable laws and regulations.

(b)    Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities,

employees, medical staff members, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose. Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(c)    Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Debtor's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(d)    Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to the employees within the Hospital for the purpose of administering the hiring process as to such employees. Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees. Purchaser agrees to conduct all such activities in compliance with applicable Law.

(e)    After the Closing, Purchaser shall permit, for a period of not less than six (6) years, each of the Seller, any direct or indirect successor to the Seller and their respective professionals (collectively, the "Permitted Parties") access to all Books and Records that are in connection with or that otherwise relate to the Hospital (including the Business) prior to the Closing and/or to Seller and that are in the control or the possession of Purchaser or any of its Affiliates or their respective agents or representatives except for Excluded Records (collectively, "Business Records") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets, (ii) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any Claim, Action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Seller pursuant to this Agreement, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the Claims reconciliation process relating to Seller, including, without limitation, with respect to Claims against any Person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative Claims and any other general unsecured Claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering Debtor's estate including, without limitation, the preparation and confirmation of a plan relating to Debtor and the preparation of a disclosure statement relating to Debtor, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down Debtor's estate, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

(f)     The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party to copy at the Permitted Party's premises or the Hospital at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to in Section 5.1(e) and (ii) Purchaser's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent as to this clause (ii) such Permitted Party furnishes Purchaser with reasonable written descriptions of the materials to be so copied. Purchaser shall not dispose of or destroy any of the Business Records transferred to Purchaser ("Transferred Business Records") before the seventh anniversary of the Closing Date and will provide the Permitted Parties and the Bankruptcy Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Party that requests copies of any Transferred Business Records within such ninety (90) day period copies of all requested Transferred Business Records at the cost of the requesting Permitted Party.

(g)     Subsequent to the Closing Date, Purchaser will cooperate with each of the Permitted Parties relating to all matters in connection with the administration of Debtor's estate, including without limitation, in connection with all Claims, Actions, and causes of action relating to the Excluded Assets or Excluded Liabilities that any Permitted Party elects to pursue, dispute, or defend.  Without limiting the generality of the preceding sentence, Purchaser shall use commercially reasonable efforts to make reasonably available to Seller employees of the Business who became employees of Purchaser to assist Seller in connection with the administration of Debtor's estate, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

(h)     Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the Assets being sold pursuant to this Agreement and the transactions contemplated hereby.  Such books, records, and documents shall include, but are not limited to, patient records, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records.

5.2     **Authorizations**.  Purchaser shall use its commercially reasonable efforts to promptly obtain all Authorizations required to enable Purchaser to purchase the Assets and/or operate the Hospital.  Purchaser shall provide to Seller a weekly report as to the status of obtaining such Authorizations.  Seller agrees to execute and deliver such instruments and documents reasonably satisfactory to Seller, and to take all such other and further actions reasonably satisfactory to Seller, that Purchaser cannot take or cause to be taken by any Person other than Seller, that are required to enable Purchaser to obtain such Authorizations or transfer such Authorizations from Seller to Purchaser,  provided that Seller shall not be obligated to undertake any material Liabilities or other obligations, individually or in the aggregate, relating to such obligations.  Notwithstanding the foregoing, Purchaser shall not be obligated to consent to the imposition of materially burdensome conditions on Purchaser or its lenders in order to obtain the Authorizations it being specifically understood and agreed that conditions required under the Oklahoma Regulations (or any Federal corollary) shall not constitute a materially burdensome condition.

5.3   **Conduct of Business**.

(a)   Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall:

(i)   operate the Business in the Ordinary Course of Business in all material respects;

(ii)   use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent with past practices and (B) maintain the insurance coverage currently in place with respect to the Assets or obtain comparable replacement coverage;

(iii)   perform when due all undisputed post-petition obligations under its contracts, including leases of Real Property or personal property to the extent of available funds;

(iv)   comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)   without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Debtor's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Debtor's relationships with the patients, employees, physicians, suppliers, and others with whom it deals; and

(vi)   perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)   Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)   make or enter into any Contract that would be required to be assumed by Purchaser;

(ii)   other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Debtor or by any existing Contract or CBA made available to Purchaser that the Seller is a party to or bound by;

21

(iii)    subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

(iv)    other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(v)    cancel or compromise any material debt or claim or waive or release any material right of Debtor that constitutes an Asset except in the Ordinary Course of Business;

(vi)    permit or allow relocation of (other than within the Hospital), any services or programs of the Business; or

(vii)    other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4    **Commercially Reasonable Efforts**.  Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumption of the Assumed Contracts and satisfy conditions required under the Oklahoma Regulations.

5.5    **Adequacy of Purchaser's Review**.  Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, are implied, arise by operation of law, or that may otherwise be deemed to apply, regarding the Assets, or the completeness of any information provided in connection therewith except, as to clauses (b) and (c), solely for Seller's representations and warranties that are contained in Article 3 of this Agreement.

5.6    **Intentionally Deleted**.

5.7    **Tax Matters**.

(a)    The Parties agree to request that the Bankruptcy Court find that the sale of the Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and, in accordance with section 1146(a) of the Bankruptcy Code, all transfers in connection therewith shall be exempt from any and all Transfer Taxes.  To the extent that the Bankruptcy Court does not so order, Purchaser shall be responsible for the payment of all Transfer Taxes (whether or not

22

payable by Seller as a matter of law), including that Purchaser shall promptly reimburse Seller for its share of all Transfer Taxes paid by Seller upon receipt of reasonable documentation evidencing such amount. Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes. Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Purchaser.

(b)    After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i)    assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii)    cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii)    make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)    furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.8    **Announcement**. Other than confirming information that is already a part of the public record or that is contained in filings a Party hereafter makes with the Bankruptcy Court, Seller will not issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law or the applicable regulations of any exchange. Subject to the last sentence of this Section 5.8, if Seller is required by Law or pursuant to applicable regulations of any exchange to issue a press release or otherwise make any public statement or disclosure with respect to this Agreement and the transactions contemplated hereby, Seller will use commercially reasonable efforts to promptly notify Purchaser so that Purchaser may seek a protective order or other appropriate remedy, and in the event that no such protective order or other remedy is obtained, Seller may make such disclosure as Purchaser is advised in writing by counsel as may be required by Law or pursuant to applicable regulations of any exchange. The preceding sentence shall not apply to any filing that Seller reasonably concludes may be required to be made with, or is appropriate to be made with, the Bankruptcy Court.

5.9    **Post-Closing Business Operations Commitment.** Purchaser shall operate the Hospital as an acute care hospital with an open and accessible emergency department and medical/surgical services as that facility is herein defined or in the form of a new facility as contemplated by the Parties herein.

5.10    **Risk of Loss; Casualty Loss**. All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and

after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $100,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $100,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within twenty (20) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.11    **Bankruptcy Actions**.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Sale Order.

(b)    If an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order.  In the event of an appeal of the Sale Order, Seller shall, at its own expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c)    From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Sale Order.

(d)    Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the Assets, the Business, or any appeal as described in paragraph 5.11(b), prior to the filing thereof in the Bankruptcy Case, except any involving adversarial matters between Seller and Purchaser.

5.12    **Intentionally Deleted.**

5.13    **DISCLAIMERS**.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND

TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.14    **Further Assurances**.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all the conditions to their respective obligations to consummate same.  Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.15    **Confidentiality**.

(a)    From and after the date hereof, Purchaser shall maintain in confidence, including that it shall not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller's Confidential Information relating to or obtained from Seller; provided, however, the foregoing restriction shall not apply to any disclosure by Purchaser of Seller's Confidential Information to any Affiliate of Purchaser or to its lenders and legal and financial advisors.  For purposes of this Section 5.15, "<u>Seller's</u> <u>Confidential Information</u>" shall mean any information that is confidential or proprietary in nature that is related to the Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller's Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its agents or other representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Seller's Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and provided further, that upon the Closing, the restrictions contained in this Section 5.15 shall not apply to confidential or proprietary information related primarily to the Assets, the Assumed Liabilities or the Business.  Purchaser may disclose Seller's Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential.  Purchaser shall instruct such Persons having access to Seller's Confidential Information of such obligation of confidentiality.  If Purchaser or anyone to whom they has transmitted Seller's Confidential Information subject to the confidentiality obligations herein becomes legally compelled, including, but not limited to, through an action brought pursuant to N.C. Gen. Stat. § 130A-131.16 and N.C. Gen. Stat. § 15A-266.12 to disclose any of such Confidential Information, Purchaser shall provide Seller with notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy.  If such protective order or

other remedy is not obtained, or Seller waives compliance with the provisions of this Section 5.15(a), Purchaser shall furnish only that portion of Seller's Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.  Purchaser shall have no liability to Seller with respect to the disclosure of Seller's Confidential Information ordered by a court of competent jurisdiction pursuant to North Carolina §130A-131.16; §15A-266.12 or other applicable law, or required by law or regulatory or accrediting agencies.

(b)     From and after the date on which the Sale Order is entered, unless this Agreement is terminated, Seller shall maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by any Governmental Authority or any filings with the Bankruptcy Court, (iii) compliance activities prior to or after the Closing related to periods occurring prior to the Closing Date; (iv) any legal proceedings; (v) enforcing any rights or other claims of Seller under this Agreement or otherwise; and (vi) performing any obligations of Seller under this Agreement.  For purposes of this Section 5.15(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to Purchaser or to the Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller (other than in connection with filings with the Bankruptcy Court), (ii) becomes available to Seller on a non-confidential basis from a source other than Purchaser, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure.  Seller may disclose Business Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential subject to the same confidentiality obligations herein.  Seller shall instruct such Persons having access to Business Confidential Information of such obligation of confidentiality.  If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information (other than in connection with filings with the Bankruptcy Court), Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 5.15(b), Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(c)     The obligations contained in this Section 5.15 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

5.16    **Acceptance and Discharge**.  Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any

Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

5.17    **Cooperation**.  Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.18    **Surrender of License**.  Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.

5.19    **Removal of Certain Liens**.  If any Liens other than Permitted Encumbrances encumber any Assets, Seller shall have the right, within thirty (30) days of Seller's receiving Purchaser's written notice of any such Lien, to cause such Lien to be removed.

5.20    **Insurance**.  Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.21    **Final Cost Report.**  Purchaser shall file or cause to be filed on Seller's behalf, at Purchaser's sole cost, the final Cost Reports for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other Third-Party Payor or Governmental Body as a result of the consummation of the contemplated transactions.  Any payments owed and paid to Seller for final settled Cost Reports for any periods prior to Closing are acknowledged as part of the Excluded Assets and are not conveyed to Purchaser by this Agreement.  All Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.

## ARTICLE VI
## CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1    **Entry of the Sale Order**.  The Bankruptcy Court shall have entered a sale order in form and substance reasonably satisfactory to the Parties (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval to transfer the Assets; (d) the total consideration to be realized by Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of Seller in and

to the Assets free and clear of all Liens, Claims, interests except as provided herein and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither Seller nor Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Section 363(n) of the Bankruptcy Code.  In addition, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.2    **No Injunctions**.    No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Sale Order.  No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

6.3    **Compliance with Applicable Law**.  To the extent required by Law, the filing and waiting period requirements relating to any and all approvals necessary under the Healthcare Regulatory Consents and any other applicable Law, if necessary, relating to consummation of the Closing or the transactions provided for herein shall have been duly complied with and/or such approvals shall have been obtained.

6.4    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations that Purchaser is required to apply for and/or obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Oklahoma Regulations.

6.5    **Intentionally Deleted**.

## ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

7.1    **Representations and Warranties of Seller**.  The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

7.2    **Schedules**.  The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

7.3    **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4    **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5    **No Changes to Business**.  Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that (i) were projected to occur in any forecast or budget provided by Seller and/or (ii) relate to a proposed sale of all or substantially all of Debtor's assets, thereby leaving Seller without an operating business.

7.6    **Intentionally Deleted**.

7.7    **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.8    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations, including any judicial proceedings and appeals related thereto, which Purchaser is required to apply for and obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the Oklahoma Regulations.

7.9    **Intentionally Deleted**.

7.10    **Intentionally Deleted.**

## ARTICLE VIII
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1    **Representations and Warranties of Purchaser**.   The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2    **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.  The Purchaser shall have delivered to the Seller a

certificate signed by a duly authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect.

8.3     **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

8.4     **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

## ARTICLE IX
## SURVIVAL

9.1     **Survival**.  Sections 2.7, 2.8, 2.9, 2.20, 5.1, 5.5, 5.7, 5.8, 5.9, 5.13, 5.14, 5.15, 5.16, 5.17, 5.18, 5.19, 5.20 and 5.21, this Section 9.1 and Article 11, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein.  The representations and warranties of the Parties shall expire upon the consummation of the Closing.

## ARTICLE X
## LIMITED AGREEMENT TERMINATION RIGHTS

10.1     **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)     by mutual written consent of Purchaser and Seller;

(b)     except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c)     by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)     by Purchaser if there shall be a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e)     by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)    by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)    by Seller or Purchaser if the Bankruptcy Court fails to approve this Agreement and enter the Sale Order by February 28, 2020, subject to Seller's right to extend the date of Closing as provided in the definition of Closing Date.

10.2    **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3    **Effects of Termination**.  If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.  Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination or alter the right of Seller to retain the Deposit if permitted to do so pursuant to this Agreement.  Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated herein, or out-of-pocket expense reimbursement or other fees, shall be payable to any party upon termination of this Agreement pursuant to Section 10.1.

### ARTICLE XI
### MISCELLANEOUS

11.1    **Assignment; Binding Agreement**.

(a)    Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent.  Any purported assignment or delegation without such consent shall be void. Provided, however, Purchaser may assign any or all of its rights under this Agreement, provided that it remains responsible for performance hereunder. Purchaser intends, subject to advice and consent by legal, financial, and governmental agencies, to operate the Hospital as a not-for-profit entity, separately formed to hold the provider contracts.

31

(b)     This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

(c)     Purchaser shall have the right to assign its rights and obligations under this Agreement including, without limitation, its right to acquire all or any portion of the Assets to its Affiliates, any successor to Purchaser, and/or to its lender if a sale/leaseback transaction is used to finance the transactions contemplated by this Agreement.  Notwithstanding any transfer permitted by this Section 11.1(c), Purchaser shall remain liable to Seller with respect to its obligations under this Agreement.

11.2    **Post-Closing Cooperation**.  From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser.  From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities.  From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3    **Expenses**.  Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4    **Entire Agreement and Modification**.  This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement.  No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5    **Severability**.  If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms.  To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6    **Waiver**.  Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the

Party entitled to the benefit thereof.  Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver.  The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7    **Counterparts**.  This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

11.8    **Headings; Interpretation**.  The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9    **Governing Law**.  This Agreement shall be construed and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.  All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and continued and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.

11.10    **Bankruptcy Court Jurisdiction**.

(a)    Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b)    The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case.  To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11    **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:                              If to Seller, to:

| Transcendental Union with Love | Thomas W. Waldrep, Jr. |
| and Spiritual Advancement | Waldrep LLP |
| 3336 E 32 Street, Suite 100 | 101 S. Stratford Rd., Suite 210 |
| Tulsa, OK 74135 | Winston-Salem, NC 27104 |
| E-Mail: vpaggarwal@yahoo.com | E-Mail: twaldrep@waldrepllp.com |

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above. Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12   **Effectiveness**. This Agreement shall be effective only when duly signed by Seller in accordance with the order of the Bankruptcy Court approving the sale to Purchaser.

11.13   **No Third-Party Beneficiaries.** Nothing expressed or referred to in this Agreement will be construed to give any person other than the  Parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.


SELLER: Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital


By:_____
Print Name: Thomas W. Waldrep, Jr.
Title: Trustee


PURCHASER: Transcendental Union with Love and Spiritual Advancement


By:_____
Print Name: Dr. Vishal Aggarwal, M.D.
Title: President

**Schedules and Exhibits**

| | |
|---|---|
| Schedule 1 | List of Excluded Assets |
| Schedule 2 | Selected Senior Managers of Purchaser |
| Schedule 2.7 | Assumed Contracts |
| | |
| Exhibit A | Form of Bill of Sale and Assignments |

35

## SCHEDULE 1

### Excluded Assets

"Excluded Assets" means the following assets, properties, interests, and rights of Seller:

(a)     all cash and cash equivalents on hand as of the Closing;

(b)     Debtor's accounts receivable for services rendered through and including the day before Closing;

(c)     any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code;

(d)     all Actions and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all Actions and/or causes of action that Seller may bring against any current or former director, officer, employee or consultant;

(e)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(f)     the residual rights in and proceeds of any employee benefits plans that are not transferred to Seller;

(g)     all Contracts, Permits, and other assets that require a consent (taking into consideration the provisions of the Bankruptcy Code), to transfer same unless (i) such written consent is obtained and (ii) the Purchaser assumes all liabilities arising thereunder, including all Cure Payments, if applicable (it being understood that Seller shall not be required to obtain or attempt to obtain any such consent);

(h)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(i)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(j)     all rights relating to all applications for grants filed prior to the Effective Time, including all proceeds of grants awarded (including awards made and/or grant funds provided after the Closing);

(k)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing or that relate to any of the

36

Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents referred to in this clause (v)).  With respect to documents necessary to prepare cost reports, which shall be specified in writing by the Purchaser, the Purchaser shall receive the original document (to the extent such original can reasonably be located by Seller) and Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(l)     all of Debtor's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(m)     any assets disposed of or consumed in the ordinary course of business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(n)     Debtor's minute book and similar corporate records;

(o)     payments received from any Medicare Dependent Status claim made prior to the Closing Date;

(p)     any payments from, and all rights to payments that may become due from, Medicare or Medicaid programs based on adjustments to cost reports covering services prior to the Effective Time, including the Final Cost Reports;

(q)     any Privilege that relates to any Excluded Asset or any Excluded Liability; and

(r)     All funds with respect to the Debtors' self-funded (i) insurance, (ii) benefits, or (iii) similar programs.

## SCHEDULE 2

### Selected Senior Managers of Purchaser

- Dr. Vishal Aggarwal, MD, President

**SCHEDULE 2.7**

**Assumed Contracts**

- The Provider Agreements

- [Other Contracts To Be Identified Prior to Closing]

EXHIBIT A

## **EXHIBIT A**

# BILL OF SALE

THIS BILL OF SALE is entered into this _____ day of January, 2020 (the "**Effective Date**") by and between Transcendental Union with Love and Spiritual Advancement ("**Purchaser**"), and Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital ("**Seller**") with reference to that certain Asset Purchase Agreement of even date herewith ("**Purchase Agreement**").   Purchaser and Seller are collectively referred to as "**Parties**" and each a "**Party**."

WHEREAS, the Seller and Purchaser are parties to the Purchase Agreement pursuant to which Seller has agreed to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser has agreed to purchase the Purchased Assets, for consideration in the amount and on the terms and conditions provided in the Purchase Agreement.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. **Capitalized Terms.**  Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

2. **Purchased Assets.**  Effective as of the Effective Date, Seller hereby sells, transfers, assigns, conveys, and delivers to Purchaser all Seller's and Debtor's right, title, and interest in and to the Assets (other than Excluded Assets) (the "**Purchased Assets**") free and clear of all Encumbrances to the maximum extent permitted by Section 363 of the Bankruptcy Code; and Purchaser hereby purchases, acquires, and accepts the Purchased Assets.

3. **Delivery of Transfer Documents.**  Seller agrees that it shall promptly: (a) so far as possible, make and give physical delivery and possession of the Purchased Assets to Purchaser in accordance with the terms of the Purchase Agreement and (b) deliver to Purchaser such deeds, bills of sale, endorsements, consents, assignments, and other good and sufficient instruments of conveyance and assignment as the Parties and their respective counsel shall deem reasonably necessary or appropriate to vest in Purchaser all of its right, title, and interest in, to, and under the Purchased Assets.

4. **Purchase Agreement.**  This Agreement is intended only to effect the sale, transfer, conveyance, assignment, and delivery of the Purchased Assets pursuant to the Purchase Agreement and is in accordance with and is subject to all of the representations, warranties, covenants, and agreements set forth in the Purchase Agreement.  In the event of any conflict between this Agreement and the Purchase Agreement, the terms of the Purchase Agreement shall control.

5. **Authority Representations.**  Seller and Purchaser each hereby guarantee, warrant, and represent that the individual or individuals signing this Assignment has the power, authority, and legal capacity to sign this Assignment on its behalf and to bind all entities, corporations, partnerships, limited liability companies, joint venturers, or other organizations and entities on whose behalf such individual or individuals have signed.

6.   **Governing Law; Jurisdiction.**   This Agreement shall be construed and enforced in accordance with, and all questions, concerning the construction, validity, interpretation, and performance of this Assignment shall be governed by, the laws of North Carolina, without giving effect to provisions thereof regarding conflict laws, except where governed by means of Title 11 of the United States Code, Section 101 et seq.  Section 11.10 (Bankruptcy Court Jurisdiction) of the Purchase Agreement shall apply to this Agreement and is incorporated herein by reference.

7.   **Counterparts; Facsimile Signatures.**   This Agreement may be executed in two or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the Parties and delivered to each of the other Parties. An executed copy of this Assignment may be delivered by means of a facsimile machine or other electronic transmission (including .pdf., tif, .gif, .jpeg, or similar attachment to electronic mail files), and shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale and to be executed the day and year first above written.

**SELLER:**

**Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital**

By: _____
    Thomas W. Waldrep, Jr.

**BUYER/PURCHASER:**

**Transcendental Union with Love and Spiritual Advancement**

By: _____
    Name: _____
    Title: _____