**SO ORDERED.**

**SIGNED this 9 day of April, 2020.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| **IN RE:** | )<br>) **Case No. 19-01298-5-JNC**<br>**CAH ACQUISITION COMPANY 7, LLC,** )<br>d/b/a **PRAGUE COMMUNITY HOSPITAL,** ) **Chapter 11**<br>)<br>**Debtor.** )<br>)<br>_____ ) |

**FIFTH INTERIM ORDER (A) AUTHORIZING THE USE OF CASH COLLATERAL**
**AND (B) SCHEDULING FINAL HEARING PURSUANT TO RULE 4001 OF THE**
<u>**FEDERAL RULES OF BANKRUPTCY PROCEDURE**</u>

This matter came before the Court, to consider the *Trustee's Motion For: (i) Interim Order (A) Authorizing the Use of Cash Collateral and (B) Scheduling Final Hearing Pursuant To Rule 4001 of the Federal Rules of Bankruptcy Procedure; and (ii) a Final Order Authorizing the Use of Cash Collateral* (the "<u>Motion</u>") filed by Thomas W. Waldrep, Jr., Trustee[1] for the above-captioned Debtor pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001.

---

[1] Terms not defined herein shall have the same meaning ascribed to them in the Motion.

After due consideration of the evidence presented, the evidence presented, the record in this case, and the comments of parties wishing to be heard, it appears to the Court that allowing the use of Cash Collateral subject to the terms and conditions set forth below is reasonable and appropriate, in the best interests of the bankruptcy estate and all creditors, and should be approved, and for good and sufficient reasons appearing the Court makes the following findings, conclusions and orders on an interim basis:

1. The Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§ 151, 157 and 1334, and this is a core proceeding within 28 U.S.C. §157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. On March 21, 2019, the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court.

3. On March 29, 2019, the Court entered an Order approving the appointment of the Trustee. The Trustee is the duly appointed, qualified, and acting trustee of the Debtor's estate.

4. Since his appointment on March 29, 2019, the Trustee has administered the estate of the Debtor, as well as the estates of seven Affiliated Debtors that are all currently pending before this Court. See *Order Directing Joint Administration of Chapter 11 Cases*, Case No. 19-00730, Dkt. No. 75.

5. No official committee of unsecured creditors has been appointed.

6. The Debtor operates Prague, a for-profit, Critical Access Hospital, in Prague, Oklahoma. Prior to the Petition Date, Prague provided acute care, swing bed, emergency medicine, radiology, physical rehabilitation, laboratory, skilled nursing, and related outpatient ancillary services to residents in Prague and in surrounding communities.

4.	It appears that the Debtor is currently owned by HMC/CAH Consolidated, Inc. ("HMC") (20% interest) and Health Acquisition Company, LLC ("HAC," and together with HMC, the "Owners") (80% interest). It appears that the Owners are in the business of acquiring and operating a system of acute care hospitals located in rural communities that are certified by The Centers for Medicare and Medicaid Services ("CMS") as Critical Access Hospitals. Upon information and belief, the Owners own and/or operate rural hospitals in several states, including Kansas, North Carolina, Missouri, Tennessee, and Oklahoma.

5.	Through and until January 7, 2019, Empower managed Prague under one or more contracts with the Debtor. Empower is a Delaware limited liability company headquartered in Kansas City, Kansas. Empower formerly provided the financial support, legal support, centralized business office, and revenue cycle and IT services necessary to the operations of Prague.

6.	It appears that as of January 7, 2019, EmpowerHMS no longer operated or managed Prague, the management of which was transferred by EmpowerHMS to iHealthcare by the Terminating Services Agreement.

7.	After January 7, 2019, iHealthcare attempted to begin to manage Prague, but such efforts were delayed by several transition and financial issues with Empower.

8.	As of the date of the Motion, the Trustee had custody or control over approximately $360,000.00 in this case, which may be "cash collateral" as that term is defined in 11 U.S.C. § 363(a).

9.	The Debtor has concluded that in order to preserve the property of the Debtor's estate, to prevent further loss to the estate, and to maximize the value of the assets of Prague for the benefit of creditors of the Debtor, the Trustee must pay certain ordinary course operating expenses, including paying wages to a reduced staff to maintain the facility.

10. Without the use of Cash Collateral, the values of the Debtor's assets, including the going-concern value of its business, will significantly decline, resulting in financial loss to all parties in interest and a loss to the community of its health care choice.

11. The following entities, the Purported Cash Collateral Creditors, may assert an interest in, or lien against, all or a portion of the Cash Collateral:

   a. First Financial Corporate Leasing, LLC;

   b. Paul Nusbaum and Steve White as successors-in-interest to HMC/CAH Note Acquisition, LLC (collectively "Nusbaum/White"); and

   c. GEL Funding, LLC.

12. Prior to the commencement of the bankruptcy case, Cohesive Healthcare Management and Consulting, LLC ("Cohesive") was the state court appointed receiver of Prague. Cohesive was appointed receiver on March 4, 2019. After being appointed receiver, and before the commencement of the bankruptcy case, Cohesive advanced $201,735.35 of its own funds to pay employees, service providers and suppliers of Prague to keep the hospital open and operating.

13. Since the commencement of the bankruptcy case, Cohesive has continued to manage the Prague hospital. Pursuant to an interim order entered April 29, 2019 and a final order entered May 15, 2019 (the "Prague Management Agreement Orders"), the Court granted the *Trustee's Motion for Authority to (1) Reject Certain Executory Contracts with iHealthcare Management II Company and iHealthcare Software Services, Inc.; (2) Enter Into Interim Management Agreement with Cohesive Healthcare Management & Consulting LLC; and (3) Provide Cohesive Healthcare Management & Consulting LLC with an Allowed Administrative Claim in the Amount of $401,684.48 for Certain Expenses Incurred to Preserve and Maintain the Debtor Estate* and approved Cohesive's management of the Prague hospital.

14. After the commencement of the bankruptcy case, and continuing to the present, Cohesive has continued to fund, from its own funds, much of the cost of operating the Prague hospital. Although the Court approved use of cash collateral on August 24, 2019 and October 23, 2019, such cash collateral use was insufficient to fund the operations of the Prague hospital and keep its doors open. As a result, between the commencement of the bankruptcy case and April 26, 2019, when the Court entered an order[2] (the "Prague Financing Order") approving post-petition financing (also provided by Cohesive), Cohesive asserts that it paid out-of-pocket (a) $271,000.00 in post-petition advances, (b) $149,000.90 in payroll and benefits to the hospital's employees, (c) $157,812.95 to Cohesive Staffing Solutions for temporary employees, (d) $38,435.95 for Cohesive RevOps, (e) $55.00 for MediRyde, and (f) $23,915.88 in other expenses. These amount are in addition to Cohesive's management fee that the Trustee was supposed to pay under the Court-approved management agreement, most of which has not been paid.

15. After the entry of the Prague Financing Order, Cohesive asserts that it advanced pursuant to the terms of the Prague Financing Order an additional $888,344.86 to fund the hospital's operations.

16. Pursuant to paragraphs 5 and 7 of the Prague Financing Order, Cohesive asserts that it was granted (a) a "first, prior, perfected and superior" lien on the accounts of the hospital accruing after the date of the promissory note executed pursuant to the Prague Financing Order, and (b) a super-priority administrative expense claim under 11 U.S.C. § 364(c)(1). The lien and

---

[22] The order is entitled *Final Order (A) Authorizing the Trustee, on Behalf of the Debtor, to Obtain Secured Post-Petition Financing Pursuant to Section 364(c)(1) and (2) of the Bankruptcy Code and Bankruptcy Rule 4001, (B) Granting Super-Priority Administrative Expense Treatment and Certain Liens of the Debtor's Property to the Lender as Security for the Obligations Hereunder, and (C) Scheduling Final Hearings Pursuant to Bankruptcy Rule 4001, As Well As (II) A Final Order Authorizing the Trustee, on Behalf of the Debtor, to Obtain Secured Post-Petition Financing on a Final Basis,*

the administrative expense claim were made subject to a carve out for payment of certain approved professional fees.

17. In addition to cash advancements made by Cohesive, pursuant to the Management Agreement approved by the Court in the Prague Management Agreement Order, Cohesive asserts that it is entitled to be paid management fees of $225,000 per month. $40,000 of that amount is due on or before the first day of each month and the balance is due upon collection by the Prague hospital from CMS and other payors. Cohesive asserts that the Trustee is behind on paying Cohesive the $40,000 portion of the management fees that is due by the first of each month, and Cohesive has not received any of the $185,000 deferred portion of the management fees. The Trustee believes that all $40,000 monthly payments to Cohesive for such portion of the management fees have been remitted thus far. In total, through January 29, 2020, Cohesive asserts that it has earned and is entitled to be paid an additional $1,889,959.16 in management fees.

18. In total, as of December 31, 2019, Cohesive asserts administrative claims of $3,756,860.40, at least $888,344.86 of which is secured and entitled to super-priority under the Prague Financing Order.

19. Cohesive asserts an interest in the Debtor's cash collateral and, therefore, is included in the term Purported Cash Collateral Creditors, without prejudice to any of its rights to be paid in accordance with prior orders of this Court.

20. The terms, conditions, and limitations of this Order are reasonably tailored to protect the interests of all creditors in this bankruptcy case.

**NOW, THEREFORE**, based upon the foregoing, the Court concludes that allowing the use of Cash Collateral is necessary and that an order granting interim relief, followed by a further or final hearing upon due notice, would not prejudice the rights of the Purported Cash Collateral

Creditors, or any other party in interest, and for good and sufficient reasons appearing it is hereby **ORDERED** as follows:

  A. Subject to the terms and conditions contained in this Order, the Trustee may use cash collateral in accordance with Section 363 of the Bankruptcy Code on an interim basis and for the period through and including April 30, 2020 (the "Expiration Date"), in the amounts and for the purposes set forth in the budget, not to exceed 115% on a line-item cumulative basis, pending further orders of the Court after notice and hearing. A copy of the budget is attached hereto as Exhibit 1.

  B. As adequate protection for the use of Cash Collateral:

    a. The Trustee will use the Cash Collateral only in the ordinary course of the Debtor's business, subject to an agreed upon budget, and subject to further order of the Court;

    b. Any person or entity claiming an interest in the Cash Collateral, including the Purported Cash Collateral Creditors, will receive a continuing post-petition lien and security interest (the "Post-Petition Liens") in all property and categories of property of the Debtor in which, and of the same priority as, said creditor held a similar, unavoidable lien as of the Petition Date, and the proceeds thereof, whether acquired pre-petition or post-petition (the "Post-Petition Collateral"), equivalent to a lien granted under Sections 364(c)(2) and (3) of the Bankruptcy Code, but only to the extent of Cash Collateral used. The validity, enforceability, and perfection of the aforesaid post-petition liens on the Post-Petition Collateral shall not depend upon filing, recordation, or any other act required under applicable state or federal law, rule, or regulation; and

    c. Such Post-Petition Liens shall be senior, first-priority, validly perfected liens, subordinate only to (i) payment of fees to pursuant to 28 U.S.C. § 1930 and (ii) the

fees and expenses of the professionals retained by the Debtor and the Committee that are allowed by the Bankruptcy Court prior to any termination of the use of Cash Collateral and after termination of the use of Cash Collateral, if so terminated, any unpaid fees and expenses of such professionals that are allowed by the Bankruptcy Court (collectively, the "Carveout"). Provided however, the Carveout may not be used in connection with challenging the secured claims asserted by Nusbaum/White, except that up to $7,500 may be expended in connection with reviewing the claims, security interests and liens asserted by Nusbaum/White.

      d.     If and to the extent the adequate protection of the interests of the Purported Cash Collateral Creditors granted pursuant to this Order or further cash collateral orders of this Court proves insufficient, then the Purported Cash Collateral Creditors shall have the following:

          i.     an allowed claim under 11 U.S.C. § 507(b) in the amount of any such insufficiency (i.e., the post-petition diminution in Cash Collateral), with priority over (i) all costs and expenses of administration in this case that are incurred under any provision of the Bankruptcy Code, with the sole exception of the Carveout, and (ii) the claims of any other party in interest under 11 U.S.C. § 507(b); and

          ii.     a junior lien on all encumbered assets of the Debtor's bankruptcy estate, and a first-priority lien on all unencumbered assets of the Debtor's bankruptcy estate (with the sole exception of causes of action under Chapter 5 of the Bankruptcy Code), equivalent to a lien granted under Sections 364(c)(2) and (3) of the Bankruptcy Code, in the amount of any such insufficiency (i.e., the post-

petition diminution in Cash Collateral). The validity, enforceability, and perfection of the aforesaid post-petition liens shall not depend upon filing, recordation, or any other act required under applicable state or federal law, rule, or regulation

e. The Trustee shall provide Nusbaum/White and the Bankruptcy Administrator, and any other party in interest that requests a copy by written notice to counsel for the Trustee, with a "budget to actual" report for each month, within fifteen (15) business days after the end of each month, which sets forth on a cash basis all income and expenditures as compared to the budget.

C. The Trustee, without further notice and hearing, may not use cash collateral for any purpose other than (i) operations in the ordinary course of business, (ii) adequate protection payments to secured creditors, (iii) monthly payments on executory contracts or leases, or (iv) payment of allowed administrative fees, costs, or expenses.

D. Notwithstanding any suspension or termination of the right to use Cash Collateral on the Expiration Date, the Trustee shall be permitted to carve out from Cash Collateral or any replacement collateral and use an aggregate amount necessary to pay all Permitted Trailing Expenses. As used herein, the term "Permitted Trailing Expenses" shall mean, on the Expiration Date, the following expenses to the extent incurred post-petition and prior to such Expiration Date but in the aggregate amount not to exceed one hundred fifteen percent (115%) of the aggregate expenditures set forth in the Budget through such Expiration Date: (i) the costs of operating and preserving the estate, including professionals' fees and expenses, and (ii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(7).

E. This Order shall remain in full force and effect until the earlier of the (a) entry of an Order by the Court modifying the terms of this Order, or (b) entry of an Order by the Court terminating the right to use Cash Collateral.

F. Nothing contained herein shall be deemed as a waiver by any party in interest, including the Purported Cash Collateral Creditors, from seeking further or additional adequate protection of its collateral, asserting objections to the use of Cash Collateral beyond the Expiration Date, or pursuing any other rights or remedies available to it or any of them under law or equity.

G. The Trustee, the Debtor, and the Committee (if formed) shall have the right to challenge the existence, validity, and amount of any of Nusbaum/White's claims, or to challenge the extent, validity, or priority of any purported pre-petition security interests or liens, asserted by Nusbaum/White, whether such rights and remedies are based in law, equity, or otherwise, for a period of one hundred and twenty (120) days following the entry of the 1st Interim Cash Collateral Order (the "Challenge Period"). Unless the Trustee, the Debtor, or the Committee has initiated a contested matter or adversary proceeding challenging the claim of Nusbaum/White within the Challenge Period, then (i) the claims, liens, and security interests of Nusbaum/White shall be deemed to be allowed for all purposes in this case and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the bankruptcy estate shall be deemed to have waived any claim or cause of action related to the indebtedness at issue in Nusbaum/White's proof of claim. The provisions of this paragraph are referred to herein as the "Challenge Provisions." Provided however, and notwithstanding the foregoing, the Challenge Provisions shall not be binding upon a Chapter 7 trustee in the event this case is subsequently converted to Chapter 7.

H. Except as set forth in the Challenge Provisions, nothing herein shall prohibit any party, including the Trustee, from challenging the existence, validity, and amount of any of creditor's claims, including the Purported Cash Collateral Creditor's claims, or the extent, validity, or priority of any of purported pre-petition security interests in, and liens on, any of the Debtor's property, and the Trustee's rights and remedies, whether at law, at equity, or otherwise, with respect thereto are hereby reserved.

I. If any or all of the provisions of this Order are hereafter modified, vacated, or stayed by any subsequent order of this Court or any other court, such stay, modification, or vacation shall not affect the validity or enforceability of any lien or priority authorized or created hereby prior to the effective date of such modification, stay, vacation, or final order to the extent that said lien or priority is valid, perfected, enforceable and otherwise non-avoidable as of the Petition Date. The validity and enforceability of all liens and priorities authorized or created in this Order shall survive the conversion of this case to a proceeding under Chapter 7 of the Bankruptcy Code or the dismissal of this proceeding.

J. The terms of this Order shall be binding upon any Committee (if formed), and upon any trustee subsequently appointed, including but not limited to a Chapter 7 trustee upon conversion of this case to a case under Chapter 7 of the Bankruptcy Code; provided however, the findings, conclusions, or orders set forth herein are made on an interim basis, shall not constitute a final decision on any legal or factual issue, and are without prejudice to the right of any party to raise, contest, or seek the same or a different outcome at any subsequent hearing.

K. Nothing in this Order limits the right or ability of the Trustee, the Debtor, any Committee of Unsecured Creditors subsequently created, and any trustee subsequently appointed in this Chapter 11 proceeding or in any subsequent Chapter 7 proceeding, to challenge, avoid,

object to, set aside, or subordinate any claims, liens, security interests, or rights of setoff against the Debtor's property, or the rents, profits and income generated therefrom.

L. A further hearing (which may be a final hearing) on this Motion will be held by telephone at 1:00 p.m. Eastern Time on April 23, 2020, at which time the Court will further consider the Motion. The Court will issue call-in instructions to all parties in interest prior to the telephonic hearing.

M. Counsel for the Trustee shall serve a copy of this Order upon the Bankruptcy Administrator, the Purported Cash Collateral Creditors, and shall file a certificate of such service with the Clerk.

N. This Court recognizes Cohesive asserts an interest in the Debtor's cash collateral and shall be considered a "Purported Cash Collateral Creditor" for purposes of this Order and under the prior cash collateral Orders of this Court. Nothing in this, or any prior, cash collateral Order limits the rights of Cohesive to assert that it is entitled to be paid in accordance with prior orders of this Court or Sections 503, 506 or 507 of the Bankruptcy Code; provided however, the Trustee, Nusbaum/White and any other party in interest preserve their rights to contest the same.

[END OF DOCUMENT]

| Prague Cash Flow April | Week of 4/6/2020 | Week of 4/13/2020 | Week of 4/20/2020 | Week of 4/27/2020 | Total |
|---|---|---|---|---|---|
| **Week Beginning** | | | | | |
| **Cash - Beginning of Period** | 858,971 | 611,403 | 621,660 | 446,631 | 858,971 |
| **Cash Receipts** | | | | | |
| Medicare Inpatient Acute | 27,472 | 27,472 | 27,472 | 27,472 | 109,886 |
| Medicare Swing-Bed | - | - | - | 306,640 | 306,640 |
| Medicare Outpatient | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |
| Medicare RHC Receipts | 16,700 | 16,700 | 16,700 | 16,700 | 66,800 |
| All Other Payers | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |
| Cost Report lump sum | - | - | - | - | - |
| **Total Cash Receipts** | 64,172 | 64,172 | 64,172 | 370,812 | 563,326 |
| **Operating Expenses (cash basis)** | | | | | |
| Payroll Semi-Monthly Gross | 135,000 | - | 135,000 | 135,000 | 405,000 |
| Payroll Taxes | 12,500 | - | 12,500 | 12,500 | 37,500 |
| Payroll and Benefits Fee | 31,500 | - | 29,500 | 31,637 | 92,637 |
| PTO | - | - | - | 70,000 | 70,000 |
| Insurance Health - Employees | 24,000 | - | - | - | 24,000 |
| Insurance - Work Comp | - | - | - | 7,700 | 7,700 |
| Insurance General & Med Malpractice | 10,000 | - | - | 2,984 | 12,984 |
| Utilities Gas & Electric | 500 | - | - | 5,400 | 5,900 |
| Telephone, Internet, Cable | 2,000 | - | 200 | 1,000 | 3,200 |
| Purchased Services | 8,315 | 6,515 | 6,515 | 6,515 | 27,860 |
| Repairs and Maintenance | 250 | 250 | 250 | 250 | 1,000 |
| Supplies | 13,650 | 13,650 | 13,650 | 13,650 | 54,600 |
| HERC CT Lease | - | - | 8,085 | - | 8,085 |
| Cohesive Management Fee - Paid by 5th | 40,000 | - | - | - | 40,000 |
| Contract Labor | 31,500 | 31,500 | 31,500 | 63,000 | 157,500 |
| Centralized Billing Office | - | - | - | 45,500 | 45,500 |
| Cohesive Historical Invoices | | | | | |
|    Management Fee | - | - | - | - | - |
|    Payroll and Benefits | - | - | - | - | - |
|    Expenses Paid Directly | - | - | - | - | - |
|    Staffing | - | - | - | - | - |
|    Centralized Billing Office (Historical) | - | - | - | - | - |
| Electronic Health Record | - | - | - | - | - |
| Lab Information System | - | - | - | - | - |
| Website, Email accounts, Encryption | - | - | - | - | - |
| Cost Report Preparation | - | - | - | - | - |
| Admin Expenses | 524 | - | - | - | 524 |
| Contingency | 2,000 | 2,000 | 2,000 | 2,000 | 8,000 |
| Other (Operating) | - | - | - | - | - |
| **Total Operating Expenses** | 311,739 | 53,915 | 239,200 | 397,136 | 1,001,990 |
| **Net Operating Cash Flow** | (247,567) | 10,257 | (175,029) | (26,324) | (438,664) |
| **Non-Operating Expenses** | | | | | |
| Debt Service | - | - | - | - | - |
| Pre-Petition Missed Payroll | - | - | - | - | - |
| Reimbursement of Post-Petition Advances | - | - | - | - | - |
| Capital Expenditures | - | - | - | - | - |
| Professional Fees | - | - | - | - | - |
| Ch11 Trustee Fees | - | - | - | - | - |
| Other | - | - | - | - | - |
| Bankruptcy Administrator | - | - | - | 23,000 | 23,000 |
| IT Costs | - | - | - | - | - |
| **Total Non-Operating Expenses** | - | - | - | 23,000 | 23,000 |
| **Net Cash Flow** | (247,567) | 10,257 | (175,029) | (49,324) | (461,664) |
| **DIP Funding** | | | | | |
| Beginning DIP Balance | 888,345 | 888,345 | 888,345 | 888,345 | 888,345 |
| Draw | - | - | - | - | - |
| Ending DIP Balance | 888,345 | 888,345 | 888,345 | 888,345 | 888,345 |
| **Approved DIP Funding Remaining** | 811,655 | 811,655 | 811,655 | 811,655 | 811,655 |
| **Cash - End of Period** | 611,403 | 621,660 | 446,631 | 397,307 | 397,307 |