# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 19-00730-5-JNC |
| CAH ACQUISITION COMPANY #1, LLC,) | |
| d/b/a WASHINGTON COUNTY) | Chapter 11 |
| HOSPITAL, ) | |
| ) | |
| Debtor. ) | |
| _____) | |
| IN RE: ) | |
| ) | Case No. 19-01298-5-JNC |
| CAH ACQUISITION COMPANY 7, LLC,) | |
| d/b/a PRAGUE COMMUNITY HOSPITAL,) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |
| _____) | |
| IN RE: ) | |
| ) | Case No. 19-01697-5-JNC |
| CAH ACQUISITION COMPANY 12, LLC,) | |
| d/b/a FAIRFAX COMMUNITY) | Chapter 11 |
| HOSPITAL, ) | |
| ) | |
| Debtor. ) | |
| _____) | |
| IN RE: ) | |
| ) | Case No. 19-01227-5-JNC |
| CAH ACQUISITION COMPANY 16, LLC,) | |
| d/b/a HASKELL COUNTY COMMUNITY) | Chapter 11 |
| HOSPITAL, ) | |
| ) | |
| Debtor. ) | |
| _____) | |

## TRUSTEE'S MOTION FOR (I) AN ORDER CONFIRMING THAT (A) CERTAIN STIMULUS FUNDS WERE USED IN ACCORDANCE WITH APPLICABLE TERMS AND CONDITIONS AND (B) TRUSTEE MAY TRANSFER ANY REMAINING STIMULUS FUNDS TO PURCHASERS; AND (II) AN ORDER ELIMINATING ANY LIABILITY OF TRUSTEE AND DEBTORS' ESTATES FOR USE OF STIMULUS FUNDS

1

Thomas W. Waldrep, Jr., the duly appointed Chapter 11 Trustee (the "Trustee") in the cases of CAH Acquisition Company 1, LLC d/b/a Washington Community Hospital ("Washington"); CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital ("Prague"); CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Fairfax"); and CAH Acquisition Company 16, LLC d/b/a Haskell County Community Hospital ("Haskell") (collectively, the "Hospitals"), hereby moves the Court, pursuant to Section 363 of the Bankruptcy Code for (i) an Order confirming that (a) the Trustee used certain COVID-19-related stimulus funds (the "Used Funds") in accordance with applicable terms and conditions ("T&Cs") and (b) the Trustee may transfer any remaining COVID-19-related stimulus funds the Trustee has in his possession (the "Unused Funds," and together with the Used Funds, the "Funds") to purchasers of the Hospitals (collectively, the "Purchasers") to be used in accordance with applicable T&Cs; and (ii) an Order barring the U.S. Department of Health and Human Services or any other government entity ("HHS") from holding the Trustee or the bankruptcy estates of the various Hospitals liable for any use of the Funds.  In support hereof, the Trustee respectfully shows the Court and interested parties as follows:

### Jurisdiction and Venue

1.    The United States Bankruptcy Court for the Eastern District of North Carolina (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this bankruptcy case and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicate for the relief sought herein is Section 363 of the Bankruptcy Code in that the Court's ruling on the Motion will aid in the consummation of certain Court-approved sales.

## Background Facts

**A. Washington**

3.        On February 19, 2019, three creditors of Washington—Medline Industries, Inc.; Robert Venable, M.D.; and Washington County, North Carolina—filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code in the Court. On March 15, 2019, this Court entered its Order converting Washington's case to a case under Chapter 11 of the Bankruptcy Code.

4.        On February 22, 2019, during the pendency of the Chapter 7 portion of Washington's case, the Trustee was appointed as interim trustee for Washington.  On March 15, 2019, upon conversion of the case, the Trustee was appointed as Chapter 11 Trustee for Washington pursuant to Section 1104 of the Bankruptcy Code.  No official committee of unsecured creditors was appointed in this case.

5.        Washington is a for-profit 25-bed hospital.  Washington is classified a Critical-Access Hospital ("CAH") by the Centers for Medicare and Medicaid Services ("CMS").

6.        The Trustee closed the sale of Washington to Affinity Health Partners, LLC on April 20, 2020 (the "Washington Closing Date").

**I.  Washington: First Round of Funds**

7.        On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was signed into law.

8.        Under the CARES Act, Congress allocated $100 billion (the "Provider Relief Fund") to HHS "to prevent, prepare for, and respond to coronavirus, domestically or

internationally, for necessary expenses to reimburse . . . eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. 116-136.

9.      Eligible health care providers are those providers "that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19." Pub. L. 116-136.

10.      Of the $100 billion allocated to HHS through the CARES Act, $50 billion of the Provider Relief Fund was allocated for general distribution to Medicare facilities and providers impacted by COVID-19, based on eligible providers' net patient revenue. Of that $50 billion in the Provider Relief Fund, an initial $30 billion was distributed between April 10, 2020 and April 17, 2020 (the "First Round"). The remaining $20 billion was distributed starting April 24, 2020 (the "Second Round"). HHS.gov, CARES Act Provider Relief Fund, (May 11, 2020), https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html.

11.      HHS broadly views every patient as a possible case of COVID-19. HHS.gov, CARES Act Provider Relief Fund, (May 11, 2020), https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html.

12.      Under the T&Cs governing the First Round, the First Round funds can be used to reimburse the recipient only for health care related expenses or lost revenues that are attributable to coronavirus after January 31, 2020. HHS.gov, DEPARTMENT OF HEALTH AND HUMAN SERVICES, RELIEF FUND PAYMENT FROM INITIAL $30 BILLION GENERAL DISTRIBUTION TERMS AND CONDITIONS (2020), (May 11, 2020), https://www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-30-b.pdf.

13.      On April 10, 2020, Washington received $161,947.49 from the First Round.

14.     Washington is an eligible health care provider under the CARES Act because it provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 after January 31, 2020.

15.     The Washington Closing Date was April 20, 2020.  Washington received the First Round disbursement on April 10, 2020.  Accordingly, the Washington First Round funds were not sold to Affinity Health Partners, LLC because, among other reasons, they constitute excluded assets as cash and cash equivalents under the Asset Purchase Agreement for Washington (the "Washington APA").

**II. Washington: Second Wave of First Round**

16.     Upon information and belief, there was a second wave of First Round funding released in mid-to-late April.

17.     The T&Cs of the first wave of the First Round continue to apply to the second wave of the First Round.

18.     Washington received $60,738.82 from the second wave of the First Round on April 24, 2020.

19.     As stated above, the Washington Closing Date was April 20, 2020. Notwithstanding the timing of the Washington Closing Date, however, the Trustee did not sell the second wave of the First Round funds to Affinity Health Partners, LLC because the Washington APA does not contemplate the Funds.  Further, when this Court approved the Washington APA, neither COVID-19 nor any stimulus funds related thereto, were considered by the parties or the Court.  Neither the parties nor the Court had any knowledge of them.  Therefore, the Funds were not included in the sale to Affinity Health Partners, LLC.  Congress allocated the Funds to the Hospitals to remedy a situation that was most desperate during the Trustee's control of the

Hospitals.  It could not have been the intent of Congress for the Funds to exclusively benefit the Washington Purchaser that only took control of the Hospital after the initial COVID-19 wave occurred.  In fact, if the Washington APA is interpreted to require the transfer of all Funds that the Trustee received after the Washington Closing Date, then Washington's bankruptcy estate will not be reimbursed for the expenses that it incurred fighting COVID-19 or receive the related lost revenue, violating Congressional intent.  Instead, the Washington Purchaser would benefit for lost revenue that it never experienced and expenses that it never paid.

### III. Washington: Rural Relief Fund

20.    Of the remaining $50 billion in the Provider Relief Fund, $10 billion was paid to rural healthcare providers (the "Rural Relief Fund").  HHS.gov, CARES Act Provider Relief Fund, (May 11, 2020), https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html.

21.    Eligible recipients of the Rural Relief Fund include CAHs.  HHS.gov, CARES Act Provider Relief Fund, (May 11, 2020), https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html.

22.    The permissible uses of the Rural Relief Fund are the same as those of the First Round funds.  DEPARTMENT OF HEALTH AND HUMAN SERVICES, RURAL RELIEF FUND PAYMENT TERMS AND CONDITIONS (2020), (May 11, 2020), https://www.hhs.gov/sites/default/files/terms-and-conditions-rural-relief-fund.pdf.

23.    On May 6, 2020, Washington received $3,340,513.28 from the Rural Relief Fund.

24.    Washington is an eligible health care provider under the Rural Relief Fund because it is a CAH.

25.     For the reasons stated above, notwithstanding the timing of the Washington Closing Date, the Trustee did not sell the funds from the Rural Relief Fund to Affinity Health Partners, LLC.

### IV. Washington: Total Disbursements

26.     In summary, Washington received three disbursements: (1) $161,947.49 from the First Round of the Provider Relief Fund; (2) $60,738.82 from the second wave of the First Round of the Provider Relief Fund; and (3) $3,340,513.28 from the Rural Relief Fund.   In total, Washington received Funds of $3,563,199.59.

### V. Washington: Total Used & Total Remaining

27.     According to Affinity Health Partners, LLC, Washington spent $200,695.13 on expenses directly related to COVID-19 between February 1, 2020 and the Washington Closing Date.  See Exhibit A.

28.     The Trustee estimates that Washington lost approximately $703,083.14 in revenue due to the coronavirus between February 1, 2020 and the Washington Closing Date.  The Trustee's estimation was informed by the CARES Act Provider Relief Fund General Distribution FAQs (the "FAQs") distributed by HHS, which gave two, non-exclusive examples of reasonable methods for estimating reimbursable lost revenue.  The first, non-exclusive example is the difference between expected or budgeted revenues and actual revenues during the relevant time period, whereas the second non-exclusive example is the difference between 2020 revenues and revenues in the same period last year.  The Trustee could not look to the first, non-excusive example for guidance as no budgeted revenues exist for the Hospitals for the relevant time period.  With respect to the second, non-exclusive example, the Trustee asserts that it is improper to compare the Hospitals' 2019 revenues to 2020 revenues because during the relevant period in 2019, the Hospitals had just

entered bankruptcy and were barely functioning.  Instead, the Trustee has used the Hospitals' respective 2018 revenues because the Hospitals were functioning at a comparable capacity at that time.  From February 1, 2018 through April 19, 2018, Washington had Net Patient Service Revenue ("NPSR") of $1,768,686.00.  From February 1, 2020 through the Washington Closing Date, Washington had NPSR of $1,114,285.00.  The Consumer Price Index ("CPI") measures the overall general upward price and services in an economy, also known as inflation.  Because there was inflation from 2018 to 2020, the 2018 NPSR is not a completely accurate tool for comparison of revenue lost in 2020 until it is adjusted for inflation.  After applying the CPI adjustment to the 2018 NPSR for April of 2020, the adjusted 2018 NPSR ("ANPSR") is $1,817,368.14.  After subtracting the 2020 NPSR from the 2018 ANPSR, Washington lost an estimated $703,083.14 in revenue due to the coronavirus between February 1, 2020 and the Washington Closing Date.  For monthly CPI calculations, see BLS.gov, CONSUMER PRICE INDEX INFLATION CALCULATOR, (May 14, 2020), https://www.bls.gov/data/inflation_calculator.htm.

29.    Between expenses and lost revenue due to coronavirus, Washington has Used Funds of $903,778.27 because such funds meet the existing guidance of the CARES Act for the period between February 1, 2020 and the Washington Closing Date.

30.    Washington received Funds of $3,563,199.59 and has Used Funds of $903,778.27. Therefore, the Washington bankruptcy estate should not retain the Unused Funds of $2,659,421.32.

**B. Prague**

31.    On March 21, 2019, Prague filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court.

32.    Prague's case is jointly administered along with six other critical access hospitals under Prague's Chapter 11 Case.  On March 29, 2019, the Trustee was appointed as Chapter 11 Trustee for Prague pursuant to Section 1104 of the Bankruptcy Code.  No official committee of unsecured creditors was appointed in this case.

33.    Prague is a for-profit 25-bed hospital. Prague is classified a CAH by CMS.

34.    The Trustee closed the sale of Prague to Transcendental Union with Love and Spiritual Advancement ("<u>TULSA</u>") on May 4, 2020 (the "Prague Closing Date").

**I.   Prague: First Round of Funds**

35.    On April 10, 2020, Prague received $260,869.02 from the First Round.

36.    Prague is an eligible health care provider under the CARES Act because it provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 between February 1, 2020 and the Prague Closing Date.

37.    Prague received the First Round disbursement on April 10, 2020, before the Prague Closing Date.  Accordingly, the Prague First Round funds were not sold to TULSA because, among other reasons, they constitute excluded assets as cash and cash equivalents under the Asset Purchase Agreement for Prague (the "<u>Prague APA</u>").

**II. Prague: OHA Grant**

38.    The Oklahoma Hospital Association Grant (the "<u>OHA Grant</u>") was created to support the urgent preparedness and response needs of hospitals and health systems related to COVID-19.  See <u>Exhibit B</u>.

39.    The Oklahoma Hospital Association receives its funding from the Assistant Secretary of Preparedness and Response of HHS.  <u>See Exhibit B</u>.

40.     The OHA Grant's permissible uses include updating pandemic or emergency preparedness plans to include COVID-19 preparedness activities; purchasing personal protective equipment; providing COVID-19 training to staff; examining certain physical infrastructural needs, such as minor retrofitting and alteration or inpatient care areas for enhanced infection control; planning and implementing expanded telemedicine and telehealth capabilities; or creating alternate temporary care sites.  See Exhibit B.

41.     On April 24, 2020, Prague received $5,545.00 from the OHA Grant.

42.     As stated above, these funds were not sold to TULSA because, among other reasons, they constitute excluded assets as cash and cash equivalents under the Asset Purchase Agreement for Prague (the "Prague APA").

**III. Prague: SHIP Grant**

43.     The Small Rural Hospital Improvement Grant Program (the "SHIP Grant") is supported by HHS, specifically the Health Resources and Services Administration's Federal Office of Rural Health Policy.  The SHIP Grant assists eligible hospitals in meeting the costs of implementing data systems, including using funds to assist hospitals in participating in improvements in value and quality to health care.  DEPARTMENT OF HEALTH AND HUMAN SERVICES, SMALL RURAL HOSPITAL IMPROVEMENT PROGRAM: PROGRAM OVERVIEW (2020), (May 11, 2020), https://www.hrsa.gov/sites/default/files/hrsa/ruralhealth/state-support-to-rural-hospitals.pdf.

44.     CAHs are eligible for the SHIP Grant.  DEPARTMENT OF HEALTH AND HUMAN SERVICES, SMALL RURAL HOSPITAL IMPROVEMENT PROGRAM: PROGRAM OVERVIEW (2020). Id. See also Small Rural Hospital Improvement Grant Program (SHIP), (May 11, 2020), https://www.ruralcenter.org/ship.

45.    Generally, the SHIP Grant may be spent to (1) ensure hospitals are safe for staff and patients; (2) detect, prevent, diagnose, and treat COVID-19; or (3) maintain hospital operations affected by COVID-19.  See <u>Exhibit C</u>.

46.    On or about April 24, 2020, Prague received $78,499.00 from the SHIP Grant.

47.    As stated above, these funds were not sold to TULSA because, among other reasons, they constitute excluded assets as cash and cash equivalents under the Prague APA.

### IV. Prague: Rural Relief Fund

48.    On May 6, 2020, Prague received $2,896,348.19 from the Rural Relief Fund.

49.    Prague is an eligible health care provider under the Rural Relief Fund because it is a CAH.

50.    For the reasons stated above, notwithstanding the timing of the Prague Closing Date, the Trustee did not sell the funds from the Rural Relief Fund to TULSA.  Furthermore, if the Prague APA were to apply to the Funds, it would indicate that the Funds constitute excluded assets because grants and proceeds of grants awarded to Prague are considered excluded assets under the Prague APA.

### V. Prague: Total Disbursements

51.    Prague received four disbursements: (1) $260,869.02 from the First Round of the Provider Relief Fund; (2) $5,545.00 from the OHA Grant; (3) $78,499.00 from the SHIP Grant; and (4) $2,896,348.19 from the Rural Relief Fund.  In total, Prague received Funds of $3,241,261.21.

### VI. Prague: Total Used and Total Remaining

52.     According to Cohesive Healthcare Management and Consulting, Prague spent an estimated $69,744.65 on expenses directly related to the coronavirus between February 1, 2020 and the Prague Closing Date. See Exhibit D.

53.     The Trustee estimates that Prague lost an estimated $1,693,511.83 in revenue due to the coronavirus between February 1, 2020 and the Prague Closing Date.  From February 1, 2018 through April 30, 2018, Prague had NPSR of $1,958,617.00.  From February 1, 2020 through April 30, 2020, Prague had NPSR of $328,302.00.  After applying the CPI adjustment to the 2018 NPSR for April of 2020, Prague's 2018 ANPSR is $2,021,813.83. After subtracting the 2020 NPSR from the 2018 ANPSR, Prague lost an estimated $1,693,511.83 in revenue due to the coronavirus between February 1, 2020 and the Prague Closing Date.

54.     Between expenses and lost revenue due to coronavirus, Prague has Used Funds of $1,763,256.48.

55.     Prague received Funds of $3,241,261.21 and has Used Funds of $1,763,256.48. Therefore, Prague has Unused Funds of $1,478,004.73.

### C. Fairfax

56.     On April 1, 2019, the state-court-appointed receiver for Fairfax filed a Chapter 11 bankruptcy petition for Fairfax in the Bankruptcy Court for the Northern District of Oklahoma, Case No. 19-10641-R.  On April 11, 2019, in the case of an affiliated debtor hospital, this Court ordered the transfer of the Oklahoma Case to this judicial district pursuant to Bankruptcy Rule 1014(b) [Case No. 19-00730-5-JNC, Dkt. No. 133].  This case was opened as a result of that Order.  On April 12, 2019, the Trustee was appointed to administer the estate of Fairfax.  The Trustee is the duly appointed, qualified, and acting trustee of Fairfax's estate.

57.    Fairfax is a for-profit 15-bed hospital.  Fairfax is classified a CAH by CMS.

58.    The Trustee closed the sale of Fairfax to Rural Wellness Fairfax, Inc. ("Rural Wellness") on March 20, 2020 (the "Fairfax Closing Date").

## I.    Fairfax: First Round of Funds

59.    On April 10, 2020, Fairfax received $141,037.14 from the First Round funds provided by the CARES Act.

60.    Fairfax is an eligible health care provider under the CARES Act because it provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 between February 1, 2020 and the Fairfax Closing Date.

61.    For the reasons stated above, notwithstanding the timing of the Fairfax Closing Date, which occurred prior to the Trustee's receipt of the First Round funds, the Trustee did not sell the funds from the First Round to Rural Wellness.  Furthermore, if the Fairfax APA were to apply to the Funds, it would indicate that the Funds constitute excluded assets because grants and proceeds of grants awarded to Fairfax are considered excluded assets under the Fairfax APA.

## II.    Fairfax: Rural Relief Fund

62.    On May 6, 2020, Fairfax received $2,763,429.39 from the Rural Relief Fund.

63.    Fairfax is an eligible health care provider under the Rural Relief Fund because it is a CAH.

64.    For the reasons stated above, notwithstanding the timing of the Fairfax Closing Date, which occurred prior to the Trustee's receipt of the funds from the Rural Relief Fund, the Trustee did not sell the funds from the Rural Relief Fund to Rural Wellness.  Furthermore, if the Fairfax APA were to apply to the Funds, it would indicate that the Funds constitute excluded assets

because grants and proceeds of grants awarded to Fairfax are considered excluded assets under the Fairfax APA.

### III. Fairfax: Total Disbursements

65.    Fairfax received two disbursements: (1) $141,037.14 from the First Round of the Provider Relief Fund and (2) $2,763,429.39 from the Rural Relief Fund.  In total, Fairfax received Funds of $2,904,466.5.

### IV. Fairfax: Total Used and Total Remaining

66.    According to Cohesive Healthcare Management and Consulting, Fairfax spent $0 on expenses directly related to the coronavirus between February 1, 2020 and the Fairfax Closing Date.

67.    The Trustee estimates that Fairfax lost $526,858.01 in revenue due to the coronavirus between February 1, 2020 and the Fairfax Closing Date.  From February 1, 2018 through March 19, 2018, Fairfax had NPSR of $618,790.00.  From February 1, 2020 through March 19, 2020, Fairfax had NPSR of $114,949.00.  After applying the CPI adjustment to the 2018 NPSR for March of 2020, Fairfax's 2018 ANPSR is $641,807.01 After subtracting the 2020 NPSR from the 2018 ANPSR, Fairfax lost an estimated $526,858.01 in revenue due to the coronavirus between February 1, 2020 and the Fairfax Closing Date.

68.    Between expenses and lost revenue due to coronavirus, Fairfax has Used Funds of $526,858.01 between February 1, 2020 and the Fairfax Closing Date.

69.    Fairfax received Funds of $2,904,466.53 and has Used Funds of $526,858.01 between February 1, 2020 and the Fairfax Closing Date due to expenses and lost revenue from the coronavirus.  Therefore, between February 1, 2020 and the Fairfax Closing Date, Fairfax has Unused Funds of $2,377,608.52.

**D. Haskell**

70.    On March 17, 2019, Haskell filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court.

71.    On March 18, 2019, the Court entered an Order approving the appointment of the Trustee.  The Trustee is the duly appointed, qualified, and acting trustee of Haskell's estate.

72.    Haskell is a for-profit 25-bed hospital.  Haskell is classified a CAH by CMS.

73.    The Trustee closed the sale of Haskell to Haskell Regional Hospital, Inc. ("Haskell Regional") on May 15, 2020 (the "Haskell Closing Date").

**I. Haskell – First Round of Funds**

74.    On April 10, 2020, Haskell received $88,288.89 from the First Round funds provided by the CARES Act

75.    Haskell is an eligible health care provider under the CARES Act because it provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 between February 1, 2020 and the Haskell Closing Date.

76.    Haskell received the First Round disbursement on April 10, 2020, before the Haskell Closing Date.  Accordingly, the Haskell First Round funds were not sold to Haskell Regional because, among other reasons, they constitute excluded assets as cash and cash equivalents under the Asset Purchase Agreement for Haskell (the "Haskell APA").

**II. Haskell: Second Wave of First Round**

77.    Haskell received $40,222.91 from the second wave of the First Round of the Provider Relief Fund on April 24, 2020.  Accordingly, the second wave of the Haskell First Round funds were not sold to Haskell Regional because, among other reasons, they constitute excluded assets as cash and cash equivalents under Haskell APA.

15

### III. Haskell: Total Disbursements

78.    Haskell received two disbursements: (1) $88,288.89 from the First Round of the Provider Relief Fund and (2) $40,222.91 from the second wave of the First Round of the Provider Relief Fund.  In total, Haskell received Funds of $120,511.80.

### IV. Haskell: Total Used and Total Remaining

79.    According to Cohesive Healthcare Management and Consulting, Haskell spent $153.95 on expenses directly related to the coronavirus between February 1, 2020 and the Haskell Closing Date. See Exhibit E.

80.    The Trustee estimates that Haskell lost an estimated $1,512,053.55 in revenue due to the coronavirus between February 1, 2020 and May 3, 2020.  From February 1, 2018 through April 30, 2018, Haskell had NPSR of $1,491,195.00.  From February 1, 2020 through April 30, 2020, Haskell had NPSR of $35,704.00.  After applying the CPI adjustment to the 2018 NPSR for April of 2020, Haskell's 2018 ANPSR is $1,547,757.55. After subtracting the 2020 NPSR from the 2018 ANPSR, Haskell lost an estimated $1,512,053.55 in revenue due to the coronavirus between February 1, 2020 and the Haskell Closing Date.

81.    Between expenses and lost revenue due to coronavirus, Haskell has Used Funds of $1,512,207.50.

82.    Haskell received Funds of $120,511.80 and has Used Funds of $1,512,207.50 between February 1, 2020 and the Haskell Closing Date due to expenses and lost revenue from the coronavirus.  Therefore, Haskell has no Unused Funds.

## Relief Requested

### A. Used Funds in Accordance with T&Cs

83.     The Trustee seeks confirmation that the Used Funds of the Hospitals were used in accordance with all applicable T&Cs and that the Trustee is now able to use the Used Funds as property of the Debtors' bankruptcy estates in accordance with the Bankruptcy Code.

### B. Transfer Unused Funds to Purchasers

84.     The Trustee also seeks confirmation that it may pass all Unused Funds to Purchasers to be used in accordance with applicable T&Cs.

85.     The T&Cs indicate that the use of the Funds will be subject to various documentation, reporting, audit, and other compliance requirements under the T&Cs, the CARES Act, and any regulations promulgated pursuant thereto.

86.     The Trustee requests that he only be responsible for any compliance requirements for the Used Funds.  He requests that the Purchasers only be responsible for any compliance requirements for the Unused Funds.

### C. Bar HHS from Holding Trustee Liable

87.     The Trustee also seeks an order barring HHS from holding the Trustee liable for any potential violation of any T&Cs related to the Funds.

WHEREFORE,  the Trustee respectfully requests that  the  Court  (i)  confirm  that  the Trustee's use of the Used Funds is in accordance with all applicable T&Cs; (ii) confirm the Trustee's ability to transfer the Unused Funds to purchasers of the Hospitals; (iii) prevent HHS from holding the Trustee liable for any use of the Funds; (iv) prevent HHS from holding the bankruptcy estates of the Hospitals liable for any use of the Funds; and (v) grant any such other relief as the Court may deem necessary and proper.

Respectfully submitted, this the 15th day of May, 2020.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

**- and –**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
rredwine@hendrenmalone.com

*Co-Counsel for the Trustee*

18

| Exhibit List | |
|---|---|
| A | Washington Coronavirus Expenses |
| B | OHA Grant Memorandum of Understanding |
| C | SHIP Grant T&Cs |
| D | Prague Coronavirus Expenses |
| E | Haskell Coronavirus Expenses |

# EXHIBIT A

# COVID 19 Expense Tracker

**Date:** May 14, 2020

**Washingto Regional Medical Center**
Thought, Word, & Deed

| Vendor | Category | Description | | COVID 19 Direct | Indirect | Total |
|---|---|---|---|---|---|---|
| Medline | Supplies | General supplies for COVID 19 | | Yes | Yes | $ 29,036.79 |
| MedPRO | Staffing | Additional Staff for COVID19 Preparation | | Yes | No | 57,630.00 |
| Pharmacy | Medications | Increased IV solutions | | Yes | Yes | 13,478.56 |
| PPE | Supplies | Masks, Gowns, Gloves | NO ADDITONAL | Yes | Yes | DONATED |
| Disinfectants | Supplies | Sprays, Handwash, Housekeeping | | Yes | Yes | 3,789.78 |
| Food | Food Service | Additional food for COVID Patients | NO ADDITONAL | No | No | - |
| Transportation | Misc | Transportation for COVID 19 | NO ADDITONAL | No | No | - |
| Plant Ops | Equipment | Additional requirements of Plant operations | NO ADDITONAL | No | No | - |
| Equipment | Equipment | Additional Ventilators or Hospital Equipment | NO ADDITONAL | No | No | - |
| Laboratory | Reagents | Additional Testing or Lab reagents | | Yes | Yes | 96,760.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | Total Discount | | Subtotal | $ 200,695.13 |
| | | | | | Sales Tax | |
| | | | | | Total | $ 200,695.13 |

AFFINITY HEALTH PARTNERS
THOUGHT, WORD, & DEED

# EXHIBIT B



## Memorandum of Understanding

This memorandum of understanding ("**MOU**"), effective as of April 10, 2020 ("**Effective Date**"), is by and between

the Oklahoma Hospital Association, Inc., ("**OHA**"), and Prague Community Hospital ,

(the "**Hospital**"), each a "**Party**" and collectively, the "**Parties**". [Note: each licensed hospital must execute a separate MOU.]

### BACKGROUND

In response to the COVID-19 pandemic, the Assistant Secretary of Preparedness and Response ("**ASPR**") of the U.S. Department of Health and Human Services ("**HHS**") established the Hospital Association COVID-19 Preparedness and Response Activities funding opportunity (the "**COVID-19 Preparedness and Response Program**" or "**Program**"). The COVID-19 Preparedness and Response Program seeks to support the urgent preparedness and response needs of hospitals and health systems using funds appropriated pursuant to the Coronavirus Preparedness and Response Supplemental Appropriations Act and Public Health Service Act (the "**Grant Program Legislation**"). ASPR has awarded Program funds to hospital associations across the country, which are authorized to distribute these funds to hospitals and health systems in their respective states. OHA has been awarded this funding from ASPR (the "**Award**") and wishes to distribute a portion of the funds to Hospital ("**Award Funds**"), pursuant to the terms of this MOU, which shall function as a Subaward.

Please note that the Award Funds are governed by the following documents (collectively, the "**Governing Documents**"), in the order of precedence listed below:

1. the Grant Program Legislation;
2. OHA's agreement with ASPR (the "**Cooperative Agreement**");
3. HHS's funding regulations (45 C.F.R. §§ 75.1–521) and general federal funding regulations (2 C.F.R. §§ 220.00–520); and
4. this MOU.

**By accepting and using all or a portion of Award Funds, your Hospital agrees to comply with all relevant sections of the Governing Documents.** This MOU summarizes the most relevant requirements from the other Governing Documents for each facility receiving funds; however, please also be sure to reference the other Governing Documents in full to determine whether additional requirements may apply to your facility. **Hospital must execute this MOU and submit the fully executed MOU to OHA by** <u>April 30, 2020</u>. If OHA does not receive Hospital's fully executed MOU by <u>April 30, 2020</u>, the Award Funds will be reallocated to other facilities.

### TERMS

**I.**    **Term and Termination.**

A.    **Term:**

1.    This MOU has an effective date beginning April 10, 2020 ("Effective Date") and shall continue until April 9, 2021 (the "**Initial Term**").

2.    Upon the expiration of the Initial Term, this MOU will renew for four (4) additional one (1) year terms (each a "**Renewal Term**"). The MOU will therefore expire on April 9, 2025.

3.    After expiration of the Initial Term or the then current Renewal Term, OHA will notify Hospital in writing of any additional funds that may become available during a Renewal Term ("**Notice of Renewal**"). The Notice of Renewal will also indicate whether Hospital will need to complete any additional or updated documentation for the Renewal Term.

4.    The Initial Term and Renewal Terms are collectively known as the "**Term**".

B.    **Termination:** OHA can terminate this MOU at any time for any reason by providing written notice of termination to the Hospital.



II.    **Roles of the Parties.**

    A.    **Role of OHA:** OHA will be responsible for the following:

        1.    coordinating, overseeing, and carrying out activities pursuant to the Cooperative Agreement;

        2.    distributing the Award Funds to Hospital; and

        3.    monitoring Hospital's use of Award Funds.

    B.    **Role of Hospital:** Hospital will comply with relevant terms of the Governing Documents, including the following:

        1.    Hospital will comply with the Use of Award Funds set forth in **Attachment A** to this MOU.

        2.    Hospital will provide daily data to the state's EMResource system unless exempted by the state.

        3.    <u>Depositing Award Funds</u>: Hospital should place Award Funds in insured accounts.

        4.    <u>Financial Management System Requirements</u>: Hospital will maintain a financial management system that demonstrates that Hospital has control over and accountability for all Award Funds and items purchased with Award Funds as required by 45 C.F.R. § 75.302(b). This requires at a minimum, a system that:

            a.    documents authorizations, obligations, unobligated balances, assets, liabilities, outlays or expenditures, and income related to the Award Funds; and

            b.    identifies the Award Funds in its records by including the following information:

                i.    *Catalog of Federal Domestic Assistance ("CFDA") Title and Number* – 93.889 - National Bioterrorism Hospital Preparedness Program

                ii.    *Awarding Agency* – U.S. Department of Health and Human Services

                iii.    *Federal Award Identification Number and Year* – U3REP200657 and 2020

        5.    <u>Health and Safety Regulations</u>: Hospital will comply with all relevant health and safety regulations governing the provision of its services.

        6.    <u>Internal Controls</u>: Hospital will establish internal controls to monitor its compliance with the terms of the Governing Documents. For more information, see 45 C.F.R. § 75.303.

        7.    <u>Maintaining Confidentiality</u>: During the Term, Hospital may have access to information that OHA either designates as "confidential" or could reasonably be considered to be confidential (**"Confidential Information"**). During and after the Term, Hospital agrees to take reasonably necessary steps to protect Confidential Information; only use Confidential Information for the purposes for which it was disclosed; not share Confidential Information without OHA's prior written permission; and, at the request of OHA, return or destroy Confidential Information.

        8.    <u>Mandatory Disclosures</u>: Hospital must disclose to OHA in writing all violations of federal criminal law involving fraud, bribery, or gratuity violations.

        9.    <u>Non-Discrimination</u>: While performing its responsibilities during the Term, Hospital will not exclude otherwise eligible individuals from participation in, deny benefits to, or discriminate against individuals on the basis of age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation.

      10.    <u>Procurement</u>: When using Award Funds to procure property or services, Hospital will comply with any relevant procurement standards at 45 C.F.R. §§ 75.327–335.

      11.    <u>Provision of Care Requirements</u>:

            a.    Hospital will comply with existing and/or future directives and guidance from ASPR regarding control of the spread of COVID-19.

            b.    In consultation and coordination with HHS, Hospital agrees to provide, commensurate with the condition of the individual, COVID-19 care to individuals of other jurisdictions who seek treatment from Hospital to the same extent that Hospital would provide care to similarly situated individuals who live in Hospital's jurisdiction.

            c.    Hospital will assist the U.S. Government in the implementation and enforcement of federal orders related to quarantine and isolation.

      12.    <u>Record Maintenance, Retention, and Access</u>:



      a.    *Record Maintenance* – Hospital will maintain records related to and required by the Governing Documents in accordance with the terms of the Governing Documents and, as applicable, generally accepted accounting principles.

      b.    *Record Retention* – Hospital will retain any records related to or required by the Governing Documents for at least five (5) years following the date of final payment of Award Funds, termination or expiration of this MOU, or completion of any required audit, whichever is later.

      c.    *Access to Records* – Hospital will permit OHA, ASPR, Inspectors General, the Comptroller General of the United States, or any other authorized representative, to access and examine any records related to or required by the Governing Documents and will not charge these entities or individuals for this access.

13.    <u>Requirements for Equipment and Supplies Purchased With Award Funds</u>: The requirements of **<u>Attachment B</u>** will apply if Award Funds are used to purchase equipment or supplies.

      a.    *Equipment (Cost Determined Per Unit)* – Equipment means tangible personal property (including information technology systems) having a useful life of more than one (1) year and a per-unit acquisition cost which equals or exceeds $5,000.

      b.    *Supplies (Cost Determined in Total Aggregate Value)* – Supplies means all tangible personal property other than those described in Equipment.

14.    <u>Requirements for Reporting</u>:

      a.    During the Term, Hospital will complete Financial and Performance Reports using forms that OHA will provide to Hospital and that will be due on dates that OHA will communicate to Hospital.

      b.    Hospital will also provide ASPR with copies of and/or access to COVID-19 data that is pertinent to the Award, which could include COVID-19 test results.

15.    <u>Supporting Documentation</u>:

      a.    For all purchases made with or reimbursed by Award Funds, Hospital must submit the following documentation to OHA (collectively, "**Supporting Documentation**"):

          i.    a completed Invoice Form, which OHA will provide to Hospital;

          ii.    a narrative description of how the purchases comply with the Governing Documents; and

          iii.    all supporting documentation to justify purchases made using Award Funds.

             a)    This documentation must include itemized receipts, contracts, invoices or similar proof of the purchases.

             b)    Credit card statements are **<u>not</u>** sufficient.

      b.    **If OHA does not receive sufficient Supporting Documentation from Hospital, Hospital may be required to refund to OHA the amount of Award Funds that were not supported by the required Supporting Documentation.**

16.    <u>Timeline for Submission of Supporting Documentation</u>:

      a.    *Purchases Made During the Term* – For purchases made with Award Funds during the Term, Hospital must submit Supporting Documentation to OHA within forty-five (45) days of the purchase.

      b.    *Prior Purchases* – Hospital may use Award Funds for purchases that comply with the Governing Documents that were made between January 20, 2020 and April 9, 2020. To use Awards Funds to reimburse itself for these prior purchases, Hospital must submit Supporting Documentation for these prior purchases to OHA by **<u>May 31, 2020</u>**. If OHA does not receive the Supporting Documentation for these prior purchases by **<u>May 31, 2020</u>**, the Award Funds may only be used for purchases made during the Term.

III.    **<u>Distribution of Award Funds</u>.** OHA will distribute Award Funds to Hospital by check no later than May 10, 2020.

IV.    **<u>Reallocation of Award Funds</u>.** If Hospital has not spent or will not spend its total Award Funds by October 10, 2020, then remaining Award Funds shall be returned to OHA and reallocated to other facilities.



V.      **Debarred, Suspended, and Ineligible Status.** Hospital certifies that neither Hospital nor any of its board members, employees, or vendors have been debarred, suspended, or declared ineligible by any agency of the United States or the State of Oklahoma. Hospital will immediately notify OHA if this changes.

VI.     **Notice.** Any notices required by or questions about the Governing Documents shall be sent to the individuals below. All required notices will be deemed delivered if sent via e-mail.

    A.      **For Hospital:** Notices or questions will be directed to Hospital's Chief Executive Officer.

    B.      **For OHA:** Notices or questions may be directed to Rick Snyder at rsnyder@okoha.com.

VII.    **LIMITATION OF LIABILITY.** BECAUSE OHA HAS NOT AND WILL NOT SELECT ANY VENDORS THAT PROVIDE SERVICES OR FURNISH GOODS THAT HOSPITAL PURCHASES USING AWARD FUNDS, OHA SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE, OR OTHER DAMAGES OF ANY KIND ARISING FROM ANY SERVICES PROVIDED OR GOODS FURNISHED BY SUCH VENDORS.  UNLESS OTHERWISE PROHIBITED BY LAW, THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION HOWEVER ALLEGED OR ARISING, INCLUDING, BUT NOT LIMITED TO, TORT, NEGLIGENCE, BREACH OF CONTRACT, PRODUCTS LIABILITY, OR STRICT LIABILITY.

The signatories to this MOU represent and warrant that they are authorized to execute this MOU and bind their organizations.

|          **OHA**          |          **Hospital**          |
|---------------------------|--------------------------------|
| By: _____ | By: _____ |
| Name: Patti Davis         | Name: Jamal Bandeh             |
| Title:   President        | Title: Administrator           |
| Date: _____ | Date: 4/27/2020                |



## Attachment A – Permissible and Impermissible Use of Funds

| Permissible Use of Funds | Impermissible Use of Funds |
|---|---|
| **Award Funds may be used to conduct any of the following activities:**<br>• Update existing pandemic or emergency preparedness plans to include COVID-19 preparedness activities, such as approaches for the assessment, transport, and treatment of persons suspected or confirmed to have COVID-19.<br>    • Update the existing patient transport plan to include an approach that allows for intra- and inter-state transport of potential or confirmed COVID-19 patients, as necessary.<br>• Purchase PPE in accordance with CDC guidelines and with attention to supply chain shortages, and share, in real time, situational awareness regarding PPE models/types and supply levels with their health care coalitions (HCCs) and state or jurisdiction public health department.<br>• Provide training of staff, specifically focusing on health care worker safety when caring for a COVID-19 patient (e.g., PPE donning/doffing, rapid identification and isolation of a patient, safe treatment protocols, and the integration of behavioral health support) and early recognition, isolation, and activation of the facility's updated pandemic or other emergency preparedness plan.<br>• Examine physical infrastructure needs, which may include minor retrofitting and alteration of inpatient care areas for enhanced infection control (e.g., donning/doffing rooms).<br>    • Reconfigure patient flow in emergency departments to provide isolation capacity for PUIs for COVID-19 and other potentially infectious patients.<br>    • Consider alternative or innovative models to reconfigure patient flow or transition to inpatient care, as necessary, such as leveraging alternative care sites (e.g., ambulatory surgical centers) or telemedicine to ensure all patients reach care.<br>    • Identify alternative care sites (on facility grounds or within close proximity) and additional sites (offsite) for sub-acute care patients to increase capacity.<br>• Plan and implement expanded telemedicine, telehealth, or other virtual health capabilities to ensure that appropriate care can be provided to individuals in their homes or residential facilities when social distancing measures are used to reduce virus transmission and that specialty care providers can provide consultation remotely.<br>    • Train health care workers on how to leverage telemedicine and telehealth to deliver care or how to incorporate telemedicine into daily workflows.<br>    • Provide training and technical support, as necessary, to EMS agencies and 9-1-1/Public Safety Answering Points on screening 911 callers in order to direct non-acute patients to the appropriate care setting and to implement evolving protocols related to the dispatch of EMS for COVID-19 suspected patients, and EMS response in general.<br>    • Ensure capability to maintain continuity of operations, leveraging alternative or innovative models, such as alternative care sites or telemedicine to support other critical operations.<br>• Create alternate care sites (e.g., temporary structures, etc.) to provide surge capacity for patient care, or increase the numbers of patient care beds at a facility.<br>• Consider including a focus on individuals at risk for high morbidity and mortality from COVID-199 in the development and execution of activities described above, including collaborating with health care facilities that directly serve these individuals such as long term residential and home health care.<br>Recipients may request retroactive compensation for any of the activities described herein that were conducted as part of COVID-19 response beginning January 20, 2020. | • Award Funds may not be used for research.<br>• Award Funds may not be used for clinical care.<br>• Award Funds generally may not be used for the purchase of furniture. Any such proposed spending must be pre-approved by OHA.<br>• Award Funds may not be used to pay the salary of an individual a rate in excess of $197,300 USD per year.<br>• Award Funds may not be used to advocate or promote gun control.<br>• Award Funds may not be used to maintain or establish a compu network unless such network blocks the viewing, downloading, and exchanging of pornography.<br>• Award Funds may not be used for lobbying activities.<br>• Award Funds may not be used for fundraising.<br>• Award Funds may not be used for the cost of money even if par of the negotiated indirect cost rate agreement.<br>• Award Funds may not be used to purchase of vehicles.<br>• Award Funds may not be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug.<br>    ○ However, this limitation does not apply to the use of funds for elements of a program (other than making su purchases) if the relevant state or local health departme in consultation with the Centers for Disease Control an Prevention, determines that the state or local jurisdictio is experiencing or is at risk for a significant increase in hepatitis infections or an HIV outbreak due to injection drug use and such program is operating in accordance with state and local law.<br>• Award Funds may not be used for construction and major alteration and renovation ("A&R") activities. Impermissible ma A&R activities include expansion, new construction, developm repair of parking lots, or other activities that would change the "footprint" of an existing facility. |



**Attachment B - Requirements for Equipment and Supplies**

| | Equipment (Cost Determined Per Unit) | Supplies (Cost Determined in Total Aggregate Value) |
|---|---|---|
| **Definition** | Equipment means tangible personal property (including information technology systems) having a useful life of more than one (1) year and a per-unit acquisition cost which equals or exceeds $5,000. | Supplies means all tangible personal property other than those described in Equipment. |
| **Insurance** | The Hospital must, at a minimum, provide the equivalent insurance coverage for equipment acquired or improved with Award Funds as provided to other equipment owned by Hospital. | N/A |
| **Title** | Title to equipment acquired or improved under Award Funds will vest in the Hospital and Hospital may not encumber the equipment without approval of ASPR or OHA. | Title to supplies will vest in the Hospital upon acquisition. |
| **Management Procedures** | • Property records must be maintained that include a description of the equipment; a serial number or other identification number; the funding source for the equipment (including the Federal Award Identification Number); title holder name; the acquisition date; cost of the equipment; percentage of Award Funds used to purchase the equipment; the location, use, and condition of the equipment; and any disposition information, including the date of disposal and sale price of the equipment.<br>• A physical inventory of the equipment must be taken, and the results reconciled with the records at least once every two (2) years.<br>• A control system must be developed to ensure adequate safeguards to prevent loss, damage, or theft of the equipment. Any loss, damage, or theft must be investigated.<br>• Adequate maintenance procedures must be developed to keep the equipment in good condition.<br>• If the Hospital is authorized or required to sell the equipment, proper sales procedures must be established to ensure the highest possible return. | N/A |
| **Disposition Instructions** | Hospital must notify OHA when original or replacement equipment acquired with Award Funds is no longer needed for the COVID-19 Preparedness and Response Program or for other activities currently or previously supported by ASPR. Disposition of the equipment will then be made as follows, in accordance with any other disposition instructions from ASPR:<br>• Items of equipment with a current per unit fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to ASPR.<br>• If ASPR fails to provide requested disposition instructions within 120 days, items of equipment with a current per-unit fair-market value in excess of $5,000 may be retained by the Hospital or sold. ASPR is entitled to an amount calculated by multiplying the current market value or proceeds from sale by ASPR's percentage of participation in the cost of the original purchase. If the equipment is sold, ASPR may permit the Hospital to deduct and retain the lesser of $500 or ten percent (10%) of the proceeds for Hospital's selling and handling expenses. | • If ASPR has an interest in the supplies, the Hospital must [...] use supplies acquired with Award Funds to provide servic[...] to other organizations for a fee that is less than priva[...] companies charge for equivalent services.<br>• If there is a residual inventory of unused supplies exceedin[...] $5,000 in total aggregate value upon termination [...] completion of the COVID-19 Preparedness and Respons[...] Program and the supplies are not needed for any other feder[...] program, the Hospital must retain the supplies for use on oth[...] activities or sell them.<br>   ○ Either way, ASPR must be compensated for its shar[...]<br>   ○ The amount of compensation must be computed [...] the same manner as for equipment. |

# EXHIBIT C

This is a list of CARES award activities and purchases that may support hospital funding to assist hospitals that are eligible to be funded through the Coronvirus SHIP one-time funding will provide support to hospitals to prevent, prepare for, and respond to coronavirus. Funds can be spent in the following categories.

- **Ensuring hospitals are safe for staff and patients**
- **Detecting, preventing, diagnosing, and treating COVID-19**
- **Maintaining hospital operations**

This list is not exhaustive, as there may be other allowable uses of funds consistent with the terms and conditions of your award. Ensure that your activities to address COVID-19 are consistent with CDC guidance for healthcare professionals and federal, state, territorial and local public health recommendations.

### Safety – Hospitals are safe for staff and patients

- Purchase supplies for respiratory hygiene and cough etiquette, including alcohol-based hand sanitizer that contains at least 60% alcohol, tissues, and no-touch receptacles for disposal.
- Purchase PPE or supplies to fashion protection for hospital personnel and suspected or known-infected patients, including National Institute for Occupational Safety and Health (NIOSH)-approved N95 respirators for hospital personnel.
- Review, update, and/or implement your emergency operations plan, including plans to address surge capacity and potential provider and other hospital staff absenteeism.
- Refresh training for all staff on standard and contact precautions, respiratory hygiene, and infection control procedures, including administrative rules and engineering controls, environmental hygiene, and appropriate use of personal protective equipment (PPE). Hospitals may consider using the Centers for Disease Control and Prevention's (CDC) pre-pandemic training for influenza, which is also recommended for COVID-19.
- Review your infection control plan and make necessary adjustments to align with CDC Guidelines for Environmental Infection Control in Health-Care Facilities.
- Ensure and enhance as needed to align with evolving recommendations, implementation of infection control plans and procedures, particularly regarding surface, space, clothing, and instrument cleaning/sanitization.
- Create new and enhance existing preparedness and response workflows to embed CDC guidelines and recommendations, which may require role/task reassignment.
- Train staff, establish workflows, and designate separate space for clinical and administrative services for persons under investigation and those testing positive for coronavirus.
- Purchase and post visual alerts (signs, posters) at entrances and in strategic places providing instruction on hand hygiene, respiratory hygiene, and cough etiquette.
- Embed CDC guidance into electronic health record (EHR) clinical decision support tools.
- Purchase and install temporary barriers and/or reconfigure space through minor alteration and renovation activities to support appropriate physical distancing of patients and/or maximize isolation precautions for persons under investigation and those testing positive for coronavirus.
- Renovate interior floor plan and/or purchase equipment to maximize the use of telehealth.

- Enhance or install heating, ventilation, and air conditioning (HVAC) systems to promote facility air quality and hygiene.

**Response – Detect, prevent, diagnose, and treat COVID-19**

- Support COVID-19 testing and laboratory costs, including purchasing COVID-19 tests, specimen handling and collection, storage, and processing equipment, as appropriate.
- Support increased capacity for patient triage, testing (including drive- or walk-up testing) and laboratory services, and assessment of symptoms, through enhanced telephone triage capacity, digital applications, text monitoring systems, videoconference, and additional providers and other personnel.
- Enhance telehealth infrastructure to perform triage, care, and follow-up via telehealth, including with patients in their homes, community settings, public housing, and other locations, including patients with unstable or no housing.
- Perform outreach and provide patient and community-wide education on hand hygiene, cough etiquette, and COVID-19 transmission, using existing materials where available.
- Disseminate educational materials on precautions to prevent, contain, or mitigate COVID-19 and other respiratory illnesses.
- Purchase and administer COVID-19 therapeutics and vaccines when available, including other measures that may be identified to lessen severity or length of COVID-19 illness.
- Enhance staffing and purchase equipment and supplies (e.g., triage tents) as necessary to create separate temporary testing areas and deploy drive- or walk-up testing and laboratory services locations.
- Enhance website and social media feeds to include patient self-assessment tools and facilitate access to telemedicine visits.
- Enhance telemedicine infrastructure to optimize virtual care, including the use of home monitoring devices and video to help triage need for emergency services.
- Enhance workflows, health information exchange capacity, and data exchange to support communications with public health partners, centralized assessment locations, and other health care providers.
- Provide or otherwise support enhanced medical respite/recuperative care services.
- Purchase or lease radiological equipment to aid in testing and diagnosis, including the purchase of health information technologies to support remote reading.
- Purchase a mobile unit to provide testing and/or to deliver care.
- Coordinate with public health entities to help develop and enact the local and state emergency response plans.
- Support transitions in care (e.g., to and from hospitals or other health care providers) and coordination with health care partners, including health departments and other hospitals, by enhancing workflows, health information exchange capacity, and data exchange.
- Increase enabling services that address social risk factors amplified by the public health emergency (e.g., transportation, community health workers, home visits).

**Maintain hospital operations**

- Support personnel salaries in response to COVID-19 impacts.

- Support transitions as necessary to increase access to care through telehealth.
- Repurpose office space and/or reassign personnel to maintain or increase capacity to hospital services in the context of COVID-19 and ongoing needs of the patient population.
- Develop new and/or update existing patient registries to inform workflows that will support continuity of services to patients whose access has been limited by COVID-19 response.
- Provide paid leave to exposed or vulnerable hospital staff, including those unable to work due to the public health emergency.
- Hire and/or contract with new providers and/or other personnel to support increased service demand due to COVID-19.
- Purchase equipment to enhance electronic tracking, data exchange, reporting, and billing.
- Purchase or upgrade of an electronic health record that is certified by the Office of the National Coordinator for Health Information Technology.

**The following are ineligible costs:**

- Purchase or upgrade of an electronic health record (EHR) that is not certified by the Office of the National Coordinator for Health Information Technology;
- New construction activities (new stand-alone structure) and/or associated work required to expand a structure to increase the total square feet of a facility;
- Significant site work such as new parking lots or storm water structures;
- Work outside of the building other than improvements to the building entry for handicapped accessibility, generator concrete pads, and other minor ground disturbance;
- Installation of a permanently affixed modular or prefabricated building; and
- Facility or land purchases.

# EXHIBIT D

**Prague Community Hospital**
**Direct Expenses Related to Covid 19**
**Through May  2, 2020**

**Accounts Payable**

| Vendor | Description | Amount |
|---|---|---|
| Terrell Lumber | COVID Isolation Materials | 681.12 |
| Beachlers Pharmacy | Hydroxychloroquine | 105.00 |
| Henry Schien | Azithromycin | 40.05 |
| Henry Schien | MDI Spacer 1 Way Valve | 172.05 |
| Henry Schien | Albuterol Sulfate Inhal | 580.25 |
| Cohesive Staffing Solutions INV 1719 | Telehealth Screenings | 619.15 |
| Cohesive Staffing Solutions INV 1725 | Telehealth Screening & Employee Sent home as precaution | 741.05 |
| Cohesive Staffing Solutions INV 1731 | Telehealth Screenings | 619.15 |
| Cohesive Staffing Solutions INV 1737 | Telehealth Screenings | 619.15 |
| Cohesive Staffing Solutions INV 1743 | Telehealth Screenings | 507.60 |

**Contract Labor**
Period End

| | |
|---|---|
| 3/21/2020 | 17,592.77 |
| 4/4/2020 | 21,344.25 |
| 4/18/2020 | 13,196.82 |
| 5/2/2020 | 12,926.24 |

Total Direct Expense        69,744.65

# EXHIBIT E

**Prague Community Hospital**
**Direct Expenses Related to Covid 19**
**Through May  2, 2020**

**Accounts Payable**

| Vendor | Description | Amount |
|---|---|---|
| **Walmart** | Liners to cover supplies | 28.34 |
| **Walmart** | Storage Boxes & Drawer Organizer for ER Supplies | 31.34 |
| **Walmart** | Bias Tape to Sew Staff PPE Mask | 8.67 |
| **Walmart** | Cover ER supplies | 14.19 |
| **Walmart** | Cover ER supplies | 45.19 |
| **Stigler Home Center** | Rod to hang divider & Sprayer to  mix bleach cleaning srpay | 26.22 |

**Contract Labor**
Period End

| | | |
|---|---|---|
| Total Direct Expense | | 153.95 |