**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY 7, LLC, | ) | Case No. 19-01298-5-JNC |
| dba PRAGUE COMMUNITY HOSPITAL, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**RESPONSE OF THE UNITED STATES TO TRUSTEE'S MOTION FOR
APPROVAL OF CONSENT ORDER AND STIPULATION BY AND
BETWEEN THE TRUSTEE AND TRANSCENDENTAL UNION WITH LOVE
AND SPIRITUAL ADVANCEMENT, RESOLVING, IN PART, MOTION
SEEKING (I) AN ORDER CONFIRMING THAT (A) CERTAIN STIMULUS
FUNDS WERE USED IN ACCORDANCE WITH APPLICABLE TERMS AND
CONDITIONS AND (B) TRUSTEE MAY TRANSFER ANY REMAINING
STIMULUS FUNDS TO PURCHASERS; AND (II) AN ORDER
ELIMINATING ANY LIABILITY OF TRUSTEE
AND DEBTORS' ESTATES FOR USE OF STIMULUS FUNDS**

The United States Department of Health and Human Services ("DHHS"), by and through the United States Attorney, respectfully submits this response to the Trustee's Motion (Motion) for approval of a Consent Order and Stipulation ("Consent Order"), by and between the Trustee and certain purchasers of Debtors' assets in the following jointly administered cases: Washington County Hospital ("Washington")(Case No. 19-00730-5-JNC); Prague Community Hospital ("Prague")(Case No. 19-01298-5-JNC); and Fairfax Community Hospital ("Fairfax")(Case No. 19-01697-5-JNC).  In each case, the Trustee requests entry of the respective Consent Order for the purpose of resolving, in part, Trustee's "Motion Seeking (I) an Order Confirming that (A) Certain Stimulus Funds Were Used in

Accordance with Applicable Terms and Conditions and (B) Trustee May Transfer Any Remaining Stimulus Funds to Purchasers; and (II) an Order Eliminating Any Liability of Trustee and Debtors' Estates for Use of Stimulus Funds ("Original Motion"). The DHHS, having reviewed the facts pertaining to the asset sales under which title changed from the respective Debtor to the corresponding purchaser, responds to the Trustee's Motion as follows.

The Consent Order proposed to the Court would, if entered, cause the Trustee to violate DHHS's express nationwide policy prohibiting the transfer of payments received from the Provider Relief Fund ("PRF") to a third party. As summarized below, a debtor that properly received a PRF payment may use the payment only to cover its own COVID-19 related expenses and losses. Once Debtor sold its hospital, it no longer had such expenses and thus must return the unused portion of the PRF payment to DHHS.

By order entered February 27, 2020, this Court approved the sales of four small rural hospitals operated by the above-named Debtors. The sales have closed only more recently. In the interim, certain federal payments were issued to the hospitals from the PRF created by Congress in response to the COVID-19 crisis, in accordance with the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-136 [HR 748], 134 Stat. 281 (signed into law Mar. 27, 2020) (CARES Act).

Congress entrusted the administration of this fund to the Secretary of DHHS (Secretary) and directed the Secretary to implement the "most efficient payment systems practicable to provide emergency payment." DHHS thus implemented the

legislation expeditiously in response to the public health crisis. DHHS made initial payments from the General Distribution based upon the most recent information available to DHHS. It was anticipated from the outset that some of these initial payments might have gone to ineligible recipients and therefore might be due to be returned to DHHS. The directives published by DHHS on its website instruct recipients on how to return payments to DHHS.

The details of the requirements for receipt, acceptance, and usage of payments from the Fund have been published by DHS on its website, at www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html. This includes the publication on the website of a lengthy section of responses to Frequently Asked Questions ("FAQs"). DHHS has continued to add to and modify these materials, on an ongoing basis.

Due to the urgency of the COVID-19 crisis, DHHS distributed PRF payments directly to healthcare providers throughout the United States without any provider having to request those funds. The payments, however, were conditioned on the recipient agreeing to abide by DHHS requirements and guidance on the use of those funds. This agreement is an essential aspect of the program because, in order to timely act in the wake of the COVID-19 emergency, the DHHS has had no opportunity to consider much less adopt formal regulations to administer the program. Thus, the PRF program relies on the initial relationship created by the conditional PRF payment to a provider and that provider's assent to the conditions DHHS imposes.

Because DHHS policy has developed as the PRF program proceeded, the DHHS has used responses to Frequently Asked Questions (FAQs) to delineate program boundaries and provide ongoing guidance to program participants. At the time of the Court's hearing on May 21, 2020, it was unclear how the DHHS would address the situation presented here, and the parties tentatively agreed that PRF funds could be transferred from the Debtor to a purchaser of the assets, under a court order.

Following the hearing on May 21, 2020, counsel for the DHHS invited the parties involved here to submit written questions for the DHHS to consider and potentially address. Counsel for Affinity Health Partners, LLC thereafter submitted several written questions for response by the DHHS.

The DHHS provided an informal written response to several questions on June 19, 2020, a copy of which is attached here as Exhibit 1. The DHHS also accepted one submitted question to be addressed formally as part of its published FAQs. DHHS published that FAQ response on June 21, 2020, and a copy is attached here as Exhibit 2.[1] (The relevant FAQ response appears on page 9 of Ex. 2, under the question, "If a seller receives Provider Relief Fund money prior to the completion of a sale, can the seller transfer some or all of the Provider Relief Fund money to the buyer?")

The DHHS's response makes clear that only the initial recipient of a PRF

---

[1] DHHS is in the process of revising its response to the FAQ response on page 9 of Exhibit 2. However, as of the filing of this response the revised version has not been made available online. Undersigned Counsel will notify the relevant parties and the Court once the revised response is available online.

payment is entitled to hold, retain, or use the payment for approved purposes. The proposed Consent Order would contravene this limitation and expose the Trustee and the Debtors to liability for any PRF funds that were neither timely returned to the HHS nor properly applied to that Debtor's own approved uses. Similarly, the purchasing hospital, as a nonparty to the PRF payments here, is not entitled to receive, hold, or use those payments. Thus, the proposed division and transfer of "unused" PRF payments would expose both the Debtor and the purchaser to liability for misuse of these federal payments.[2]

<u>Conclusion</u>

For the foregoing reasons, the Trustee's Motion seeking to approve the propose Consent Order should be denied as presently worded.

Date: June 22, 2020                          Respectfully submitted,

                                             ROBERT J. HIGDON, JR.
                                             United States Attorney

                                             By:  /s/ Lauren A. Golden
                                             LAUREN A. GOLDEN
                                             Attorney for DHHS
                                             150 Fayetteville Street, Suite 2100
                                             Raleigh, North Carolina 27601
                                             Telephone: (919) 856-4870
                                             Email: lauren.golden@usdoj.gov
                                             N.C. Bar # 43071

---

[2] The DHHS also relies upon and incorporates by reference its arguments against the Trustee's original motion presented in the Objection Of The United States Department Of Health And Human Services To Trustee's Motion For (I) An Order Confirming That (A) Certain Stimulus Funds Were Used In Accordance With Applicable Terms And Conditions And (B) Trustee May Transfer Any Remaining Stimulus Funds To Purchasers; And (Ii) An Order Eliminating Any Liability Of Trustee Or Debtors' Estates For Use Of Stimulus Funds (filed May 20, 2020.)

UNITED STATES OF AMERICA

By:  /s/ Michael J. Quinn
MICHAEL J. QUINN
Attorney for U.S. Dept. of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 307-0243
Email: Michael.quinn3@usdoj.gov
D.C. Bar No. 401376


CERTIFICATE OF SERVICE


I do hereby certify that I have this 22nd day of June 2020, served a copy of the foregoing upon the below-listed parties electronically  as follows:

Rayford K. Adams, III
Attorney for Debtors

Thomas W. Waldrep, Jr.
Trustee

Jason L. Hendren
Attorney for the Trustee


ROBERT J. HIGDON, JR.
United States Attorney

By:  /s/ Lauren A. Golden
LAUREN A. GOLDEN
Attorney for DHHS
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4870
Email: lauren.golden@usdoj.gov
N.C. Bar # 43071

DHHS Informal Response to
Affinity Health Bankruptcy Questions (6.19.20)

1.      A hospital was purchased, in bankruptcy, after January 31, 2020.  The TIN remained the same before and after the purchase, whereby, the same billing TIN provided Medicare fee-for-service in 2019 and provided care to patients after January 31, 2020.  Some COVID-19 expenses and lost revenue were incurred before the closing of the sale by the bankruptcy estate or its representative, while other expenses and lost revenues are being incurred after the closing of the sale by the new owner.  Some of the Provider Relief Funds arrived before the closing of the sale while others amounts arrived after the closing of the sale. Can the bankruptcy estate or its representative, or the new owner transfer the applicable share of funds to the other party; and if so, what is the mechanism for each party to attest, report, and be liable to HHS independently for such party's share of the funds?

No, recipients of Provider Relief Fund payments may not transfer the payments to another party.

2. The Terms and Conditions require certification that the funds "will only be used to prevent, prepare for, and respond to coronavirus," and that they "shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus." HHS has clarified that such expenses or lost revenues do not have to be specific to treating COVID-19, and that HHS broadly views every patient as a possible case of COVID-19.  Will HHS take the broad view that every patient is a possible case of COVID-19, and therefore all patient care expenses and lost revenue incurred by a seller in bankruptcy are eligible for reimbursement using CARES Act funds?

No.  The health care related expenses or lost revenues must be attributable to coronavirus in order to be eligible.

4.      For entities sold through bankruptcy or otherwise during the public health emergency, new owners may have experienced delays with establishing a new bank account in the name of the purchased entity due to various logistical issues, including, without limitation, Know Your Customer rules and resource availability at the banks.  Although the TIN was the same before and after the sale, the persons eligible to access a bank account may be different.  What is the mechanism to request that future funds be directed to a new bank account or sent to the new owner by check?

Please call the provider support line at (866) 569-3522 and make this request.

**GOVERNMENT EXHIBIT**

1

# CARES Act Provider Relief Fund
# Frequently Asked Questions

CARES Act Provider Relief Fund  Frequently Asked Questions

**Provider Relief Fund General Information FAQs**

*Overview*

*Attestation*

*Rejecting Payments*

*Terms and Conditions*

*Reporting Requirements*

*Balance Billing*

*Appeals*

*Publication of Payment Data*

**General Distribution FAQs**

*Overview and Eligibility*

*Provider Relief Fund Payment Portal*

*Determining Additional Payments*

*Data Sharing*

**Targeted Distribution FAQs**

*Rural Targeted Distribution*

*COVID-19 High Impact Area Targeted Distribution*

*Skilled Nursing Facilities Targeted Distribution*

*Indian Health Service Targeted Distribution*

*Medicaid Targeted Distribution*

*Safety Net Hospitals Targeted Distribution*

---

## Provider Relief Fund General Information FAQs

### *Overview*

**Who is eligible to receive payments from the Provider Relief Fund?**  *(Modified 6/12/2020)*

Provider Relief Fund payments are being disbursed via both "General" and "Targeted" Distributions.

To be eligible for the General Distribution, a provider must have billed Medicare fee-for-service

1

GOVERNMENT
EXHIBIT
2

in 2019 and provide or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19. $50 billion will be disbursed in the General Distribution.

A description of the eligibility for the announced Targeted Distributions can be found here.  U.S. healthcare providers may be eligible for payments from future Targeted Distributions. Information on future distributions will be shared when publicly available.

All providers retaining funds must sign an attestation and accept the Terms and Conditions associated with payment.

**Is this a loan or a grant that I will need to pay back?**
Retention and use of these funds are subject to certain terms and conditions. If these terms and conditions are met, payments do not need to be repaid at a later date. These Terms and Conditions can be found here.

**If a provider owns several hospitals, can the provider retain the funds or must the provider distribute the funds throughout their system?** *(Added 5/12/2020)*
The Provider Relief Fund payment recipient has discretion in allocating the funds to support health care related expenses or lost revenue attributable to COVID-19, so long as they are not reimbursed from other sources and other sources were not obligated to reimburse them.

**How should providers classify the Provider Relief Fund payments in terms of revenue type?** *(Added 6/12/2020)*
CMS will issue guidance about how Provider Relief Fund payments should be treated for purposes of uncompensated care and how it should be reported on cost reports.

**If, as a result of the sale of a practice/hospital, the TIN that received a Provider Relief Fund payment is no longer providing healthcare services as of January 31, 2020, is it required to return the payment?** *(Modified 6/12/2020)*
Yes. If, as a result of the sale of a practice/hospital, the TIN that received a Provider Relief Fund payment did not provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 on or after January 31, 2020, the provider must reject the payment. The Provider Relief Fund Payment Attestation Portal will guide you through the attestation process to reject the payment.

**Can an organization that sold its only practice or facility under a change in ownership in 2019 and is no longer providing services accept payment and transfer it to the new owner?** *(Added 5/19/2020)*
No. A provider that sold its only practice or facility must reject the Provider Relief Fund payment because it cannot attest that it was providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 on or after January 31, 2020, as required by the Terms and Conditions. Seller organizations should not transfer a payment received from HHS to another entity. If the current TIN owner has not yet received any payment from the Provider Relief Fund, it may still receive funds in other distributions.

**Can a provider that purchased a TIN in 2019 accept a Provider Relief Fund payment from a previous owner and complete the attestation for the Terms and Conditions?** *(Added*

*6/12/2020)*

No. The new TIN owner cannot accept the payment from another entity nor attest to the Terms and Conditions on behalf of the previous owner in order to retain the Provider Relief Fund payment. However, the new TIN owner may still receive funds in other distributions.

**Can an organization that received a Provider Relief Fund payment and provided care on or after January 31, 2020 that sold, terminated, transferred, or otherwise disposed of a provider accept the payment (received via ACH or check) associated with the sold provider?** *(Modified 6/12/2020)*

If an organization that sold, terminated, transferred, or otherwise disposed of a provider that was included in its most recent tax return gross receipts or sales (or program services revenue) figure can attest to meeting the Terms and Conditions, it may accept the funds. The Terms and Conditions place restrictions on how the funds can be used.  In particular, all recipients will be required to substantiate that these funds were used for increased healthcare-related expenses or lost revenue attributable to coronavirus, and that those expenses or losses were not reimbursed from other sources and other sources were not obligated to reimburse them.

**Can a parent organization transfer Provider Relief Fund payments to its subsidiaries?** *(Added 5/21/2020)*

Yes, a parent organization can accept and allocate funds at its discretion to its subsidiaries. The Terms and Conditions place restrictions on how the funds can be used.  In particular, the parent organization will be required to substantiate that these funds were used for increased healthcare-related expenses or lost revenue attributable to COVID-19, and that those expenses or losses were not reimbursed from other sources and other sources were not obligated to reimburse them.

**In the case of a parent organization with multiple billing TINs that may have each received payment, may the parent organization attest to the Terms and Conditions and keep the payments?** *(Added 6/2/2020)*

Yes, the parent organization with subsidiary billing TINs that received payments may attest and keep the payments as long as providers associated with the parent organization were providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 on or after January 31, 2020 and can otherwise attest to the Terms and Conditions.  The parent organization can allocate funds at its discretion to its subsidiaries. If the parent organization would like to control and allocate Provider Relief Fund payments to its subsidiaries, the parent organization must attest to accepting its subsidiaries' payments and agreeing to the Terms and Conditions.

*Attestation*

**What action does a provider need to take after receiving a Provider Relief Fund payment?** *(Modified 5/26/2020)*

The CARES Act requires that providers meet certain terms and conditions if a provider retains a Provider Relief Fund payment. If a provider chooses to retain the funds, it must attest that it meet these terms and conditions of the payment. The <u>CARES Act Provider Relief Fund Payment Attestation Portal</u> will guide you through the attestation process to accept or reject the funds. Not returning the payment within 90 days of receipt will be viewed as acceptance of the <u>Terms and Conditions</u>. A provider must attest for each of the Provider Relief Fund distributions received.

**Does the Provider Relief Fund Payment Attestation Portal require payment recipients to attest that the payment amount was received?** *(Added 5/12/2020)*
Yes. The Payment Attestation Portal requires payment recipients to (1) confirm they received a payment and the specific payment amount that was received; and (2) agree to the Terms and Conditions of the payment.

**If a provider received two direct payments through the General Distribution, can a provider accept one payment and then reject the other payment?** *(Added 5/12/2020)*
Yes. If a provider would like to reject one payment, the provider may still accept future distribution payments. The provider must use the Payment Attestation Portal to accept or reject payments.

**What if I attested and accepted a Provider Relief Fund payment, but would now like to reject the funds and retract my attestation?** *(Added 6/3/2020)*
If you affirmatively attested to a Provider Relief Fund payment already received and later wish to reject those funds and retract your attestation, you may do so by calling the provider support line at (866) 569-3522; for TTY dial 711. Note, HHS is posting a public list of providers and their payments once they attest to receiving the payment and agree to the Terms and Conditions.

*Rejecting Payments*

**How can I return a payment I received under the Provider Relief Fund? (***Modified 6/12/2020***)**
Providers may return a payment by going into the attestation portal within 90 days of receiving payment and indicating they are rejecting the funds. The <u>CARES Act Provider Relief Fund Payment Attestation Portal</u> will guide providers through the attestation process to reject the funds.

To return the money, the provider needs to contact their financial institution and ask the institution to refuse the received Automated Clearinghouse (ACH) credit by initiating an ACH return using the ACH return code of "R23 - Credit Entry Refused by Receiver." If a provider received the money via ACH they must return the money via ACH. If a provider was paid via paper check, after rejecting the payment in the Payment Attestation Portal, the provider should destroy the check if not deposited or mail a paper check to UnitedHealth Group with notification of their request to return the funds.

**How should a provider return a payment it received via check?** *(Modified 6/12/2020)*
If the provider received a payment via check and has not yet deposited it, destroy, shred, or securely dispose of it. If the provider has already deposited the check, mail a refund check for the full amount, payable to "UnitedHealth Group" to the address below. Please list the check number from the original Provider Relief Fund check in the memo.

> UnitedHealth Group
> Attention: CARES Act Provider Relief Fund
> PO Box 31376
> Salt Lake City, UT 84131-0376

**How does a provider who received an electronic payment return funding if their financial institution will not allow them to return the payment electronically?** *(Added 5/12/2020)*

Contact UnitedHealth Group's Provider Support Line at (866) 569-3522 (for TTY, dial 711).

**If I changed my mind after I rejected a Provider Relief Fund Targeted Distribution payment through the Attestation Portal and returned the payment, can I receive a new payment?** *(Added 5/29/2020)*
No, HHS will not issue a new Targeted Distribution payment to a provider that received and then subsequently rejected and returned the original payment.  The provider may be considered for future distributions if it meets the eligibility criteria for that distribution.

*Terms and Conditions*

**What is the definition of individuals with possible or actual cases of COVID-19?** *(Added 5/6/2020)*
Unless the payment is associated with specific claims for reimbursement for COVID-19 testing or treatment provided on or after February 4, 2020 to uninsured patients, under the Terms and Conditions associated with payment, providers are eligible only if they provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19.

Not every possible case of COVID-19 is a presumptive case of COVID 19. For clarification as it relates to presumptive COVID 19 cases, refer to the Frequently Asked Question that defines a presumptive case of COVID-19

**What oversight and enforcement mechanisms will HHS use to ensure providers meet the Terms and Conditions of the Provider Relief Fund payments?** *(Added 5/6/2020)*
Failure by a provider that received a payment from the Provider Relief Fund to comply with any term or condition can subject the provider to recoupment of some or all of the payment. Per the Terms and Conditions, all recipients will be required to submit documents to substantiate that these funds were used for increased healthcare-related expenses or lost revenue attributable to coronavirus, and that those expenses or losses were not reimbursed from other sources and other sources were not obligated to reimburse them. HHS will have significant anti-fraud monitoring of the funds distributed, and the Office of Inspector General will provide oversight as required in the CARES Act to ensure that Federal dollars are used appropriately.

**Does HHS intend to recoup any payments made to providers not tied to specific claims for reimbursement, such as the General or Targeted Distribution payments?** *(Added 5/6/2020)*
The Provider Relief Fund and the Terms and Conditions require that recipients be able to demonstrate that lost revenues and increased expenses attributable to COVID-19, excluding expenses and losses that have been reimbursed from other sources or that other sources are obligated to reimburse, exceed total payments from the Relief Fund. Generally, HHS does not intend to recoup funds as long as a provider's lost revenue and increased expenses exceed the amount of Provider Relief funding a provider has received. HHS reserves the right to audit Relief Fund recipients in the future to ensure that this requirement is met and collect any Relief Fund amounts that were made in error or exceed lost revenue or increased expenses due to COVID-19. Failure to comply with the Terms and Conditions may be grounds for recoupment.

**What is the definition of Executive Level II pay level, as referenced in the Terms and**

**Conditions?** *(Added 5/29/2020)*

The Terms and Conditions state that none of the funds appropriated in this title shall be used to pay the salary of an individual, through a grant or other mechanism, at a rate in excess of Executive Level II. The salary limitation is based upon the Executive Level II of the Federal Executive Pay Scale. Effective January 5, 2020, the Executive Level II salary is $197,300. For the purposes of the salary limitation, the direct salary is exclusive of fringe benefits and indirect costs. The limitation only applies to the rate of pay charged to Provider Relief Fund payments and other HHS awards. An organization receiving Provider Relief Fund payments may pay an individual's salary amount in excess of the salary cap with non-federal funds.

**Can providers who have ceased operation due to the COVID-19 pandemic still receive this funding?** *(Added 5/29/2020)*

If a provider ceased operation as a result of the COVID-19 pandemic, they are still eligible to receive Provider Relief Fund payments so long as they provided on or after January 31, 2020, diagnoses, testing, or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19, therefore, care does not have to be specific to treating COVID-19.  Recipients of funding must still comply with the Terms and Conditions related to permissible uses of Provider Relief Fund payments.

**If a provider secures COVID-19-related funding separate from the Provider Relief Fund, such as the Small Business Administration's Paycheck Protection Program, does that affect how they can use the payments from the Provider Relief Fund?  Does accepting Provider Relief Fund payments preclude a provider organization from seeking other funds authorized under the CARES Act?** *(Added 5/29/2020)*

There is no direct ban under the CARES Act on accepting a payment from the Provider Relief Fund and other sources, so long as the payment from the Provider Relief Fund is used only for permissible purposes and the recipient complies with the Terms and Conditions. By attesting to the Terms and Conditions, the recipient certifies that it will not use the payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse.

**How will HHS recoup funds from providers that are required to repay all or part of a Provider Relief Fund payment?** *(Added 5/29/2020)*

HHS has not yet detailed how recoupment or repayment will work.  However, the Terms and Conditions associated with payment require that the Recipient be able to certify, among other requirements, that it was eligible to receive the funds (e.g., provides or provided after January 31, 2020, diagnoses, testing, or care for individuals with possible or actual cases of COVID-19) and that the funds were used in accordance with allowable purposes (e.g., to prevent, prepare for, and respond to coronavirus). Additionally, recipients must submit all required reports as determined by the Secretary.  Non-compliance with any term or condition is grounds for the Secretary to direct recoupment of some or all of the payments made. HHS will have significant anti-fraud monitoring of the funds distributed, and the Office of Inspector General will provide oversight as required in the CARES Act to ensure that Federal dollars are used appropriately.

**The Terms and Conditions state that Provider Relief Fund payments will only be used to prevent, prepare for, and respond to coronavirus and shall reimburse the Recipient only for healthcare-related expenses or lost revenues that are attributable to coronavirus.  What**

6

**expenses or lost revenues are considered eligible for reimbursement?** *(Modified 6/19/2020)*
The term "healthcare related expenses attributable to coronavirus" is a broad term that may cover a range of items and services purchased to prevent, prepare for, and respond to coronavirus, including:

- supplies used to provide healthcare services for possible or actual COVID-19 patients;
- equipment used to provide healthcare services for possible or actual COVID-19 patients;
- workforce training;
- developing and staffing emergency operation centers;
- reporting COVID-19 test results to federal, state, or local governments;
- building or constructing temporary structures to expand capacity for COVID-19 patient care or to provide healthcare services to non-COVID-19 patients in a separate area from where COVID-19 patients are being treated; and
- acquiring additional resources, including facilities, equipment, supplies, healthcare practices, staffing, and technology to expand or preserve care delivery.

Providers may have incurred eligible health care related expenses attributable to coronavirus prior to the date on which they received their payment.  Providers can use their Provider Relief Fund payment for such expenses incurred on any date, so long as those expenses were attributable to coronavirus and were used to prevent, prepare for, and respond to coronavirus. HHS expects that it would be highly unusual for providers to have incurred eligible expenses prior to January 1, 2020.

The term "lost revenues that are attributable to coronavirus" means any revenue that you as a healthcare provider lost due to coronavirus.  This may include revenue losses associated with fewer outpatient visits, canceled elective procedures or services, or increased uncompensated care.  Providers can use Provider Relief Fund payments to cover any cost that the lost revenue otherwise would have covered, so long as that cost prevents, prepares for, or responds to coronavirus.  Thus, these costs do not need to be specific to providing care for possible or actual coronavirus patients, but the lost revenue that the Provider Relief Fund payment covers must have been lost due to coronavirus.  HHS encourages the use of funds to cover lost revenue so that providers can respond to the coronavirus public health emergency by maintaining healthcare delivery capacity, such as using Provider Relief Fund payments to cover:

- Employee or contractor payroll
- Employee health insurance
- Rent or mortgage payments
- Equipment lease payments
- Electronic health record licensing fees

You may use any reasonable method of estimating the revenue during March and April 2020 compared to the same period had COVID-19 not appeared. For example, if you have a budget prepared without taking into account the impact of COVID-19, the estimated lost revenue could be the difference between your budgeted revenue and actual revenue. It would also be reasonable to compare the revenues to the same period last year.

All providers receiving Provider Relief Fund payments will be required to comply with the reporting requirements described in the Terms and Conditions and specified in future directions issued by the Secretary.  HHS will provide guidance in the future about the type of documentation we expect recipients to submit. Additional guidance will be posted at https://www.hhs.gov/provider-relief/index.html.

**In order to accept a payment, must the provider have already incurred eligible expenses and losses higher than the Provider Relief Fund payment received?** *(Added 6/8/2020)*
No.  Providers do not need to be able to prove, at the time they accept a Provider Relief Fund payment, that prior and/or future lost revenues and increased expenses attributable to COVID-19 (excluding those covered by other sources of reimbursement) meet or exceed their Provider Relief Fund payment.  Instead, HHS expects that providers will only use Provider Relief Fund payments for permissible purposes and if, at the conclusion of the pandemic, providers have leftover Provider Relief Fund money that they cannot expend on permissible expenses or losses, then they will return this money to HHS.  HHS will provide directions in the future about how to return unused funds.  HHS reserves the right to audit Provider Relief Fund recipients in the future and collect any Relief Fund amounts that were used inappropriately.

**The Terms and Conditions set forth a list of "statutory provisions" that "also apply" to the Provider Relief Fund payment.  Do these requirements apply to any government funding received by the recipient, or only the Provider Relief Fund payment associated with those Terms and Conditions?** *(Added 6/8/2020)*
The "statutory provisions" listed in the Terms and Conditions apply to the Provider Relief Fund payment associated with those Terms and Conditions.  Those statutory provisions may also independently apply to other government funding that you receive.

**Are Provider Relief funds accessible in whole or in part to bankruptcy creditors and other creditors in active litigation?** *(Added 6/8/2020*)
Payments from the Provider Relief Fund shall not be subject to the claims of the provider's creditors and providers are limited in their ability to transfer Provider Relief Fund payments to their creditors.  A provider may utilize Provider Relief Fund payments to satisfy creditors' claims, but only to the extent that such claims constitute eligible health care related expenses and lost revenues attributable to coronavirus and are made to prevent, prepare for, and respond to coronavirus, as set forth under the Terms and Conditions.

**What if my Targeted Distribution payment is greater than expected or received in error?** *(Added 6/15/2020)*
Providers that have been allocated a payment must sign an attestation confirming receipt of the funds and agree to the Terms and Conditions within 90 days of payment.  In accordance with the Terms and Conditions, if you believe you have received an overpayment and expect that you will have cumulative lost revenues and increased costs that are attributable to coronavirus during the COVID-19 public health emergency that exceed the intended calculated payment, then you may keep the payment.

If a provider does not have or anticipate having these types of COVID-19-related eligible expenses or lost revenues equal to or in excess of the Provider Relief Fund payment received, it should reject the payment in Provider Relief Fund Attestation Portal and return the entire

payment, and with the Provider Support Line at (866) 569-3522 (for TYY, dial 711) for step-by-step instructions on returning the payment and receive the correct payment when relevant.

**For how long are the Terms and Conditions of the Provider Relief Fund applicable?** *(Added 6/19/2020)*
All recipients receiving payments under the Provider Relief Fund will be required to comply with the Terms and Conditions. Some Terms and Conditions relate to the provider's use of the funds, and thus they apply until the provider has exhausted these funds. Other Terms and Conditions apply to a longer time period, for example, regarding maintaining all records pertaining to expenditures under the Provider Relief Fund payment for three years from the date of the final expenditure.

**If a seller receives Provider Relief Fund money prior to the completion of a sale, can the seller transfer some or all of the Provider Relief Fund money to the buyer?** *(Added 6/21/2020)*
If the transaction is a purchase of the recipient entity (e.g., a purchase of its stock or membership interests), then the Provider Relief Fund recipient may continue to use the funds, regardless of its new owner. But if the transaction is an asset purchase (whether for some or all of the Provider Relief Fund recipient's assets), then the original recipient must use the funds for its eligible expenses and lost revenues and return any unused funds to HHS. In these circumstances, the Provider Relief Fund money does not transfer to the buyer. If a bankrupt recipient is liquidated, it must similarly use the funds for its eligible expenses and lost revenues and return any unused funds to HHS.

*Reporting Requirements*

**The Terms and Conditions for all Provider Relief Fund payments require recipients who receive at least $150,000 in the aggregate from any statute primarily making appropriations for the coronavirus response to submit quarterly reports to HHS and the Pandemic Response Accountability Committee. This requirement is from section 15011 of the CARES Act. What do providers need to do in order to be in compliance with this provision in the Terms and Conditions?** *(Added 6/13/2020)*
Recipients of Provider Relief Fund payments do not need to submit a separate quarterly report to HHS or the Pandemic Response Accountability Committee. HHS will develop a report containing all information necessary for recipients of Provider Relief Fund payments to comply with this provision. For all providers who attest to receiving a Provider Relief Fund payment and agree to the Terms and Conditions (or retain such a payment for more than 90 days), HHS is posting the names of payment recipients and their payment amounts on its public website here. HHS Is also working with the Department of Treasury to reflect the aggregate total of each recipient's attested to Provider Relief Fund payments on USAspending.gov. Posting these data meets the reporting requirements of the CARES Act. See Appendix A of OMB Memo M-20-21 [Implementation Guidance for Supplemental Funding Provided in Response to the Coronavirus Disease 2019 (COVID-19)].

However, the Terms and Conditions for all Provider Relief Fund payments also require recipients to submit any reports requested by the Secretary that are necessary to allow HHS to ensure compliance with payment Terms and Conditions. HHS will be requiring recipients to

submit future reports relating to the recipient's use of its PRF money. HHS will notify recipients of the content and due date(s) of such reports in the coming weeks.

*Balance Billing*

**Do the Terms and Conditions for the General, Rural or High Impact Distributions require attesting to a ban on balance billing for all patients and/or all care, because "HHS broadly views every patient as a possible case of COVID-19"?** *(Added 5/6/2020)*
No. As set forth in the Terms and Conditions, the prohibition on balance billing applies to "all care for a presumptive or actual case of COVID-19."

**The Terms and Conditions provision related to balance billing suggests that providers that provide out-of-network care to an insured, presumptive or actual COVID-19 patient can bill the patient's insurer any amount, as long as they do not bill the patient directly. Is that correct?** *(Added 5/6/2020)*
The Terms and Conditions do not impose any limitations on the ability of a provider to submit a claim for payment to the patient's insurance company. However, an out-of-network provider delivering COVID-19-related care to an insured patient may not seek to collect from the patient out-of-pocket expenses, including deductibles, copayments, or balance billing, in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network provider.

**The Terms and Conditions require that "for all care for a presumptive or actual case of COVID-19, Recipient certifies that it will not seek to collect from the patient out-of-pocket expenses in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network Recipient." How does HHS define a presumptive case of COVID-19?** *(Modified 6/12/2020)*
A presumptive case of COVID-19 is a case where a patient's medical record documentation supports a diagnosis of COVID-19, even if the patient does not have a positive in vitro diagnostic test result in his or her medical record.

**How will a provider know the in-network rates to be able to comply with the requirement to bill a presumptive or actual COVID-19 patient for cost-sharing at the in-network rate?** *(Added 5/6/2020)*
Providers accepting the Provider Relief Fund payment should submit a claim to the patient's health insurer for their services. Most health insurers have publicly stated their commitment to reimbursing out-of-network providers that treat health plan members for COVID-19-related care at the insurer's prevailing in-network rate. If the health insurer is not willing to do so, the out-of-network provider may seek to collect from the patient out-of-pocket expenses, including deductibles, copayments, or balance billing, in an amount that is no greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network provider.

**If a hospital receives a Provider Relief Fund payment under the General, Rural or High Impact Distribution and the hospital contracts with an independently contracted provider (e.g., anesthesiologist or laboratory), is that independently contracted provider banned from balance billing for care provided to a "presumptive or actual COVID-19 patient"?**

**(Modified 6/12/2020)**

Yes, if the independently contracted provider also attested to receiving a payment from the Provider Relief Fund then the provider is banned from balance billing for care provided to a "presumptive or actual COVID-19 patient."

**The Terms and Conditions require recipients to attest that for all care for a presumptive or actual case of COVID-19 the recipient will not seek to collect from the patient out-of-pocket expenses in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network recipient. How should skilled nursing facilities comply with this requirement?** *(Added 6/8/2020)*

For skilled nursing facility patients with insurance, an out-of-network skilled nursing provider delivering care to a presumptive or actual COVID-19 patient may not seek to collect from the patient out-of-pocket expenses, including deductibles, copayments, or balance billing, in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network provider.

### *Appeals*

**Who determines the amount my organization will receive?**

HHS will apportion relief funds to US healthcare providers with the intention of optimizing the beneficial impact of the funds.

**Who can I talk to at HHS about my distribution payment?**

HHS is not taking direct inquiries from providers, and no remedy or appeals process will be available. For additional information, please call the Provider Support Line at (866) 569-3522 (for TTY, dial 711).

**How do I appeal or dispute a decision made?**

There is no appeals or dispute process.

### *Publication of Payment Data*

**Is there a publicly available list of providers and the payments they received through the Provider Relief Fund?** *(Modified 6/12/2020)*

HHS has posted a public list of providers and their payments once they attest to receiving the money and agree to the Terms and Conditions. All providers that received a payment from the Provider Relief Fund and retain that payment for at least 90 days without rejecting the funds are deemed to have accepted the Terms and Conditions. Providers that affirmatively attest through the Payment Attestation Portal or that retain the funds past 90 days, but do not attest, will be included in the public release of providers and payments. The list includes current total amounts attested to by providers from each of the Provider Relief Fund distributions, including the General Distribution and Targeted Distributions.

**What providers are included in the Provider Relief Fund data file on the CDC website?** *(Modified 6/12/2020)*

The data that are posted in the public list represent providers that received one or more payments from the Provider Relief Fund and that have attested to receiving at least one payment and agreed to the associated Terms and Conditions. If a provider has received more than one

payment but has not accepted all of the payments (by attesting and agreeing to the Terms and Conditions), only the dollar amount associated with the accepted payment or payments will appear. These data displayed on the website will be updated biweekly.

**Why might a provider not be listed or listed with a different address than their service location?** *(Added 5/12/2020)*
Provider Relief Fund payments are being made to providers or groups of providers that are organized within a Tax Identification Number (TIN). The information displayed is of providers by billing TIN that have received at least one payment, which they have attested to, and the address associated with that billing TIN. Providers will not be listed if they have not yet attested to the payment terms and conditions or if they are within a larger billing entity that received payment. In addition, the address listed for the billing TIN often corresponds with the billing location (based on the Center for Medicare & Medicaid Services' Provider Enrollment, Chain, and Ownership System (PECOS)), and may not align with the physical location of a healthcare practice site. Updated data will be made available on the Center for Disease Control and Prevention's (CDC) website.

**How often will the public reporting of payments data file on the CDC's website be updated?** *(Added 5/12/2020)*
HHS will update the data biweekly.

**Will HHS release additional data elements, such as provider types, payment amount per distribution, or payment recipients' NPIs, on the public list of providers and payments?** *(Added 5/12/2020)*
HHS does not have plans to include additional data fields in the public list of providers and payments.

**Can a provider choose to have its payment data omitted from the** Provider Relief Fund public list **on the CDC's website?** *(Added 5/20/2020)*
No. To ensure transparency, HHS will publish the names of payment recipients and the amounts accepted and attested to by the payment recipient.

**How is HHS publically reporting Provider Relief Fund payments? Would it be accurate to add the payments received by a healthcare provider together based on the provider's name in order to determine how much a particular organization has received as a whole?** *(Added 5/29/2020)*
This approach may not be accurate.  Each row in the public list is associated with an individual billing TIN, which is the unique identifier that received and attested to one or more payments.  If an organization name is listed more than once, it may be because the organization has more than one billing TIN that received a payment, or it may be because multiple providers have the same name.

<u>**General Distribution FAQs**</u>

*Overview and Eligibility*

**Which types of providers are eligible to receive a General Distribution Provider Relief Payment?** *(Modified 6/12/2020)*

12

To be eligible for a General Distribution payment, providers must have billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019. Additionally, under the Terms and Conditions associated with payment, these providers are eligible only if they provide or provided after January 31, 2020, diagnoses, testing, or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19.

All providers retaining funds must sign an attestation and accept the Terms and Conditions associated with payment. Providers must also submit tax documents and financial loss estimates if they wish to be eligible for additional funds by June 3, 2020.

**How did HHS determine the additional payments under the General Distribution?**
*(Modified 6/12/2020)*
HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 gross receipts or sales/program service revenue. The allocation methodology is designed to provide relief to providers, who bill Medicare fee-for-service, with at least 2% of that provider's gross receipts regardless of the provider's payer mix. Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) gross receipts or the sum of incurred losses for March and April. If the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual gross receipts, you may not receive additional General Distribution payments.

**How can I estimate 2% of gross receipts or sales/program service revenue to determine my approximate General Distribution payment?** *(Modified 6/12/2020)*
In general, providers can estimate payments from the General Distribution of approximately 2% of 2018 (or most recent complete tax year) gross receipts or sales/program service revenue. To estimate your payment, use this equation:

(Individual Provider Revenues/$2.5 Trillion) X $50 Billion = Expected Combined General Distribution.

Providers should work with a tax professional for accurate submission.

This includes any payments under the first $30 billion General Distribution as well as under the $20 billion General Distribution allocations. Providers may not receive a second distribution payment if the provider received a first distribution payment of equal to or more than 2% of gross receipts.

**I am a healthcare provider that received a previous General Distribution payment and I submitted my revenue information through the Provider Relief Fund Payment Portal. Why am I not receiving an additional payment?** *(Modified 6/12/2020)*
HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 gross receipts or sales/program service revenue. Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) gross receipts or the sum of incurred losses for March and April. If the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual gross receipts or

sales/program service revenue, you may not receive additional General Distribution payments. There may be additional distributions in the future for which providers are eligible.

**I submitted my financial information on the Provider Relief Fund Payment Portal. Why have I not received funds yet?** *(Added 5/14/2020)*
HHS is reviewing providers' uploaded financial information. Payments will go out weekly, on a rolling basis, as information is validated. HHS may seek additional information from providers as necessary to complete its review.

**My organization did not receive funding in the General Distribution. When can I expect to receive funding?** *(Added 5/12/2020)*
Providers that did not receive funding under the General Distribution may be included in future Targeted Distribution allocations under the Provider Relief Fund. Additional information will be posted as available at https://www.hhs.gov/provider-relief/index.html.

**If I have billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019 and provide or provided after January 31, 2020, diagnoses, testing, or care for individuals with possible or actual cases of COVID-19, but did not receive a General Distribution Payment, am I still eligible for a General Distribution payment?** *(Added 6/12/2020)*
HHS will consider for future payment those providers who did not receive a General Distribution payment, but otherwise meet the eligibility criteria for this distribution and are able to attest to the Terms and Conditions.

**Why might a provider that bills Medicare fee-for-service not have received a payment from the initial $30 billion General Distribution?** *(Added 6/15/2020)*
To be eligible for the general distribution, a provider must have billed Medicare fee-for-service in CY2019. General Distribution payments were made to the billing organization according to its Taxpayer Identification Number (TIN). Payments to providers and practices that are part of larger medical groups went to the group's central billing office.

Some providers who did bill Medicare fee-for-service in CY2019 were not eligible for payment because either the provider is terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; is currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; or currently has Medicare billing privileges revoked as determined by either the Centers for Medicare & Medicaid Services or the HHS Office of Inspector General.

If the provider's TIN that was intended for payment identifies both a social security number of an individual Medicare provider and another Medicare provider's employer identification number, that TIN was excluded from the General Distribution. Providers were also excluded from the General Distribution if there was incomplete banking information and/or personal contact information. HHS is working to determine eligibility for a General Distribution payment for those affected providers.

**My organization bills Medicare through the Medicare Advantage program. I did not receive funding in the General Distribution. When can I expect to receive funding?** *(Added 5/12/2020)*

14

Providers that did not receive funding under the General Distribution may be included in future allocations under the Provider Relief Fund. Additional information will be posted as available at https://www.hhs.gov/provider-relief/index.html.

**I did not receive any payments from the previous General Distribution. Can I still receive funding though the additional General Distribution?** *(Added 5/14/2020)*
No, only providers that received a previous payment under the General Distribution are eligible to receive funding through this additional distribution.

**Can I receive additional funding through the Targeted Distribution if I received a General Distribution payment?** *(Added 5/14/2020)*
Yes, you may receive additional funding through Targeted Distribution payments related to COVID-19. Additional allocations will be made separately from General Distribution payments. You may also file claims for testing and treatment of uninsured COVID-19 patients.

**Can I modify my application?** *(Modified 6/12/2020)*
No. Unless requested by HHS, a provider may not resubmit its application for consideration for an additional payment in the General Distribution Provider Relief Fund Payment Portal. The application process for additional General Distribution payments closed on June 3, 2020.

**What should a provider do if a General Distribution payment is greater than expected or received in error?** *(Modified 6/12/2020)*
Providers that have been allocated a payment must sign an attestation confirming receipt of the funds and agree to the Terms and Conditions within 90 days of payment. If a provider believed it was overpaid or may have received a payment in error, it had until June 3, 2020 to reject the entire General Distribution payment and submit the appropriate revenue documents through the Provider Relief Fund Payment Portal to facilitate HHS determining their correct payment. If a provider believed it was underpaid, it had until June 3, 2020 to accept the payment and submit its revenues in the Provider Relief Fund Payment Portal to determine the correct payment.

**Can a provider that purchased a TIN in 2019 accept a Provider Relief Fund payment from a previous owner and complete the attestation for the Terms and Conditions?** *(Added 5/19/2020)*
No. The new TIN owner cannot accept the payment from another entity nor attest to the Terms and Conditions on behalf of the previous owner in order to retain the Provider Relief Fund payment. If the new TIN owner did not receive a direct payment under the General Distribution, it is not eligible to receive a payment under the General Distribution. However, the new TIN owner may still receive funds in other distributions.

**An organization that sold part of a practice in 2019 or January 2020 received a payment under the General Distribution that reflected the 2019 Medicare fee-for-service billing of that part of the practice. Can it return a portion of the payment for the part of the practice it no longer owns?** *(Added 5/20/2020)*
No. A provider may not return a portion of a Provider Relief Fund payment. If a provider that sold a practice that was included in its most recent tax return gross receipts or sales (or program services revenue) figure can attest to meeting the Terms and Conditions, it may accept the funds. The Terms and Conditions place restrictions on how the funds can be used. In particular, all

recipients will be required to substantiate that these funds were used for increased healthcare-related expenses or lost revenue attributable to coronavirus, and that those expenses or losses were not reimbursed from other sources and other sources were not obligated to reimburse them.

**How does HHS calculate who gets specific amounts of funding?** *(Modified 6/12/2020)*
HHS distributed the initial $30 billion in Provider Relief Fund payments in proportion to a provider's 2019 Medicare fee-for-service billings. A description of the allocation methodologies is provided here.

**Are hospitals and health systems in all states and territories eligible for a General Distribution payment?**
Yes. Hospitals and health systems in all states and territories eligible for a General Distribution payment.

*Provider Relief Fund Payment Portal*

**Why is there a new Provider Relief Fund Payment Portal?** *(Modified 6/12/2020)*
The Enhanced Provider Relief Fund Payment Portal will initially be used for new submissions from Medicaid and Children's Health Insurance Program (CHIP) providers seeking payments under the Provider Relief Fund starting Wednesday, June 10, 2020.  At this time, this portal will serve as the point of entry for providers who have received **Medicaid and CHIP** payments in 2017, 2018, 2019 or 2020 and who **have not** already received any payments from the $50 billion Provider Relief Fund General Distribution.

**What is the difference between the first Provider Relief Fund Payment Portal and the Enhanced Provider Relief Fund Payment Portal for the Medicaid Targeted Distribution?** *(Modified 6/12/2020)*
The first Provider Relief Fund Payment Portal was used for providers who received a General Distribution payment prior to Friday, April 24th.  These providers were required to submit financial information in order to receive approximately 2% of gross revenues derived from patient care.
HHS has developed the new Enhanced Provider Relief Fund Payment Portal for providers who did not receive payments under the previous General Distribution, including those providers who bill Medicaid and CHIP (e.g., pediatricians, long-term care, and behavioral health providers.)

**Can I edit, re-access or resubmit my General Distribution submission that I previously submitted prior to June 3, 2020 in this new portal?** *(Modified 6/12/2020)*
No. The new Enhanced Provider Relief Fund Payment Portal will **not** process applications from providers who have received payment from the previous $50 billion Provider Relief Fund General Distribution.

**Am I able to edit or resubmit my Medicaid Targeted Distribution application in the Enhanced Provider Relief Fund Payment Portal?** *(Modified 6/122020)*
You can only submit one application.  You can edit the data on the application form, until the form is submitted. You cannot edit or resubmit the application form once it is submitted. You should not apply until you have available all of the information and documentation required by the application form.

16

**Why is HHS collecting financial information in the Provider Relief Fund Payment Portal from providers that received a General Distribution payment?**
The Provider Relief Fund Payment Portal has been deployed to collect information from providers who received General Distribution payments prior to April 24, 2020 at 5:00 pm EST. The $50 billion general allocation is apportioned based on provider revenue. Tax forms are needed to ascertain and confirm provider revenue.

**Why does the General Distribution website say I have to attest before requesting additional funds?**
The CARES Act requires that providers meet certain terms and conditions to receive Provider Relief Fund payments. In order to keep the initial General Distribution payment, and in order to be eligible to receive additional General Distribution funds, you must attest that you meet these terms and conditions and you must submit your financial and tax information.

**Why do I need to upload my tax forms?**
The $50 billion general allocation is apportioned based on provider revenue. Tax forms are needed to ascertain and confirm provider revenue.

**What documents do I need to begin entering information into the Provider Relief Fund Payment Portal?**
1. TIN that received prior Provider Relief Fund payments
2. TIN(s) of subsidiary organizations that received prior Provider Relief Fund payments but do not file separate tax forms (i.e., subsidiary organizations that are accounted for in the parent organization's tax filing)
3. Amount of payments received
4. Provider Relief Fund payment transaction numbers / check numbers
5. A copy of your most recently filed tax forms

**Who is eligible to receive additional payments under the General Distribution through the Provider Relief Fund Payment Portal?**
Any provider who received a General Distribution payment from the Provider Relief Fund as of 5:00 pm EST Friday, April 24, 2020 can apply for additional funding via the Provider Relief Fund Payment Portal.

Providers who have not received General Distribution funding as of 5:00 pm EST Friday April 24, 2020 are not eligible to use the Provider Relief Fund Payment Portal. However these providers may still be eligible for payments from the Provider Relief Fund through other mechanisms, including the Targeted Distributions.

**What information is HHS collecting in the Provider Relief Fund Payment Portal?**
The Provider Relief Fund Payment Portal has been deployed to collect information from providers who received General Distribution payments prior to April 24, 2020 at 5:00 pm EST.

The Provider Relief Fund Payment Portal collects four pieces of information to allocate remaining General Distribution funds:

1. A provider's "Gross Receipts or Sales" or "Program Service Revenue" as submitted on its federal income tax return;

2. The provider's estimated revenue losses in March 2020 and April 2020 due to COVID;
3. A copy of the provider's most recently filed federal income tax return;
4. A listing of the TINs for any of the provider's subsidiary organizations that received relief funds but DO NOT file separate tax returns.

This information may also be used to allocate other Provider Relief Fund distributions.

HHS is collecting: the "gross receipt or sales" or "program service revenue" data to have an understanding of a provider's usual operations; the revenue loss information to have an understanding of COVID impact; and, tax forms to verify the self- reported information. HHS is collecting information about organizational structure and subsidiary TINs so that we do not overpay or underpay providers who file tax returns covering multiple legal entities (e.g. consolidated tax returns).

Providers meeting the following criteria are required to submit a separate portal application:
(a) Provider has received Provider Relief Fund payments as of 5:00pm EST Friday April 24, 2020 **AND**
(b) Provider has filed a federal income tax return for 2017, 2018, or 2019.

As such, each entity that files a federal income tax return is required to file an application even if it is part of a provider group. However, a group of corporations that files one consolidated return will have only the tax return filer apply.

Each provider submitting an application is required to list the TINs of each subsidiary that (a) has received Provider Relief Fund payments as of 5:00 EST Friday April 24, 2020 **AND** (b) **has not filed** federal income tax returns for 2017, 2018, or 2019.

Do not list any subsidiary's TIN that has filed a federal income tax return, because such subsidiary is required to submit a separate application.

For example:

1) A parent entity and two subsidiaries received Provider Relief Fund payments. The parent filed a federal income tax return, but the two subsidiaries did not as they are consolidated with the parent.

   The parent should submit an application and list the subsidiary TINs therein. The subsidiaries cannot submit an application as they did not file a tax return.

2) A parent entity and two subsidiaries A and B received Provider Relief Fund payments. The parent and subsidiary A filed a federal income tax return, but the subsidiary B did not as it is consolidated with the parent.

   The parent and subsidiary A should submit separate applications. The parent would list the TIN subsidiary B in its application.

**What information do I need before I start the application process?**
❑ Eligibility

To enter the Provider Relief Fund Payment Portal you must meet two criteria:
1.  You must have already received a Provider Relief Fund Payment by 5:00 pm EST, Friday April 24, 2020
2.  You must attest to having received the payment via the Provider Attestation Portal, and you must agree to the Terms and Conditions on the Attestation Portal.

❑ Data
Before you initiate your application via the Provider Relief Fund Payment Portal, please collect the following data
1.  The Taxpayer Identification Number for the organization applying for Provider Relief Fund payments. ("Application TIN")
2.  The Taxpayer Identification Number(s) of any subsidiary organizations if, and only if, those organizations do not file separate tax returns, but rather consolidate into the returns of the "Application TIN." If your organization has subsidiaries that file separate tax returns, a separate application must be made for each subsidiary that files a separate return.
3.  An estimate of the organization's lost revenue for March 2020 and April 2020. Lost revenue can be estimated by comparing year-over-year revenue or by comparing budgeted revenue to actual revenue.  For April 2020, an estimate of the total monthly loss based on data from the first few weeks in April or by extrapolation from March data is acceptable.
4.  A copy of the most recent tax form filed by the organization associated with the Application TIN.

**Who should fill out this form?**
Any person authorized by the provider organization may complete this form. We recommend it be completed by an organization's corporate office, specifically, the chief financial officer or other accounting professional.

**Will I be penalized if I take several days to collect the necessary information?**
No. HHS will be processing applications in batches every week. Funds will not be disbursed on a first-come-first-served basis, which is to say, an applicant will be given equal consideration regardless of when they apply.

**Why does the website say my TIN is not eligible?**
HHS is collecting tax and financial loss data from *providers who have already received payments* under the General Distribution. If you have not already received a Provider Relief Fund payment, you are not eligible to submit your tax and financial loss information to the Provider Relief Fund Payment Portal. However, this does not mean that you are ineligible for future allocations of the Provider Relief Fund.

If you received a General Distribution payment by 5:00 pm EST, Friday April 24, 2020 and are being told that your TIN is ineligible, please check to see if you entered your TIN correctly and check to see that the TIN matches the TIN for the organization that received a Provider Relief Fund payment.

**Are TINs that did not receive initial General Distribution payment eligible?**
Organizations that have not received any General Distribution payments as of April 24, 2020

may be eligible for relief funds in future distributions. The Provider Relief Fund Payment Portal is only collecting TINs from providers who have received a General Distribution payment.

**What is a Federal Tax Classification?**
The Federal Tax Classification describes the type of tax filer that the applicant is for purposes of the applicant's federal income tax return with the Internal Revenue Service, for example Partnership or S Corporation.

**How do I know if my organization is a sole proprietor/disregarded entity? C Corporation? S Corporation? Partnership? Trust? Tax-exempt organization?**
The answer is determined by the type of the applicant's entity and any tax elections the applicant has made.

**Which tax form did the applicant file for the most recent year?**
- Form 1040      The applicant is a sole proprietor or provides services as the sole member of an LLC.
- Form 1065      The applicant is a partnership.
- Form 1120      The applicant is a C corporation.
- Form 1120-S   The applicant is an S corporation.
- Form 990       The applicant is a tax-exempt organization.
- Form 1041      The applicant is a trust.

**Which type of supporting documentation should I submit if I am an institution without IRS filings?** *(Added 5/14/2020)*
All providers that have filed tax returns in 2019 or 2018 should submit the filings as supporting documentation. If a particular healthcare provider has a legitimate reason (e.g. tax exempt) for not having IRS filings, then alternative financial statements are acceptable. If the entity is tax exempt, the entity should use Net Patient Revenues from its most recent audited annual financial statements as a substitute for "Program Services Revenue" when prompted. Further, the entity should submit its most recent audited financial statements as a substitute for the federal income tax return Form 990 requested.

**Where do I find my Gross Receipts or Sales?**
- Form 1040      Box 1 of Schedule C
- Form 1065      Box 1a
- Form 1120      Box 1a
- Form 1120-S   Box 1a
- Form 990       Use Part I, 9 "Program Services revenue"
- Form 1041      Box 1 of Form 1040 Schedule C

[Note: you use a Form 1040 Schedule C also for Form 1041]

**Which information should be submitted in the Provider Relief Fund Payment Portal by a government-run entity (e.g., state university medical center or county-run skilled nursing facility) that has no parent organization that files a federal income tax return?** *(Modified 6/12/2020)*
The applying entity should select "Tax-Exempt Organization" in the dropdown menu for "Federal Tax Classification." The entity should use Net Patient Revenues from its most recent

audited annual financial statements as a substitute for "Program Services Revenue". Further, the entity should submit its most recent audited financial statements as a substitute for the federal income tax return Form 990.

**How do I estimate lost revenue in March or April?**
You may use a reasonable method of estimating the revenue during March and April compared to the same period had COVID-19 not appeared. For example, if you have a budget prepared without taking into account the impact of COVID-19, the estimated lost revenue could be the difference between your budgeted revenue and actual revenue. It would also be reasonable to compare the revenues to the same period last year.

**Why is the Provider Relief Fund Payment Portal asking for gross receipts or sales?**
HHS is asking for gross receipts because it is a measure of revenues you received during the applicable filing period.

**Why is the Provider Relief Fund Payment Portal asking me to estimate my revenue?**
HHS realizes that a final revenue number may not be available until a certain time after the end of April. As the program seeks to provide liquidity support to the healthcare system in a timely manner, we are using estimated revenues.

**Where do I find program service revenue if I am a tax-exempt organization?** *(Modified 6/12/2020)*
This figure can be found in Box 9 of the Form 990.

**Do I submit 2019 or 2018 forms?**
Submit the most recent form that you have filed with the IRS (typically 2017, 2018 or 2019).

**What if I have not filed taxes for the year being requested?**
If you are required to, but have not filed a tax return in 2017 or 2018, you are ineligible to apply. You should file the applicable tax return and then re-apply.

**If I have more than one TIN but I either have not attested or did not receive payments on some or all of them, am I eligible?**
You must attest for all payments received to be eligible for additional General Distribution funding. You are only eligible to apply for additional funding through the Provider Relief Fund Payment Portal if you have TINs that have received prior relief fund payments. Fill out one application for each eligible TIN that has received a Provider Relief Fund payment and for which there is a corresponding tax filing. If you are a subsidiary of a tax filing organization, and do not file a separate tax return, you are ineligible to apply for additional funds.

**Where do I find my Medicare ID number?**
Providers may find their Medicare ID number by logging into the Medicare Provider Enrollment, Chain, and Ownership System (PECOS).

**What is a CAQH Provider ID? Where do I find it?**
Council for Affordable Quality Healthcare (CAQH) Provider ID number is the unique identifier assigned to each CAQH ProView user at the time of registration. If you have been invited to join CAQH ProView by a health plan, hospital, or other participating organization, you may have

received a welcome letter with your CAQH Provider ID Number. New users also have the option to self-register through the CAQH ProView Provider Portal: https://proview.caqh.org/pr. Upon completion of the self-registration process, users will receive a welcome email with their unique CAQH Provider ID Number.

**How many requests should I make?**
You may make one request for each TIN that has received prior Provider Relief Fund payments.

**An organization purchased a practice during or after the year of the organization's most recent tax filing and the purchased practice's revenues are not reflected in the most recent tax return. How does the organization account for these acquisitions when submitting revenue information in the Payment Portal?** *(Added 5/19/2020)*
An organization's adjusted gross receipts should be calculated as gross receipts as shown on the organization's most recent tax return plus gross receipts of the practice acquired not reflected in the organization's tax return minus gross receipts of providers sold not reflected in the organization's tax return. If an organization's adjusted gross receipts exceed the gross receipts shown in the tax return by more than 20%, the organization is eligible to enter the adjusted gross receipts figure in the Provider Relief Fund Payment Portal. Otherwise, the organization should enter the gross receipts figure as shown on the tax return. Organizations that have already submitted an application in the Payment Portal can resubmit a revised application using the adjusted gross receipts number accounting for acquisitions, if the adjusted gross receipts exceeds the gross receipts shown in the tax return by more than 20%. Gross receipts of acquired entities that provide care as of January 31, 2020 and file their own tax returns cannot be included in such adjusted gross receipts figure, because they should submit their own application as tax return filers.

**In the case of a merger of a provider entity (billing TIN) into another entity (billing TIN), or the consolidation of two or more entities (each with a billing TIN), resulting in the creation of a new entity (single billing TIN) between January 1, 2018 through January 31, 2020, how should the entities apply?** *(Added 5/20/2020)*
If the non-surviving entity (billing TIN) received a General Distribution payment but was not providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 on or after January 31, 2020, that provider must reject the General Distribution payment. If the surviving entity (billing TIN) received a General Distribution payment, it should accept the payment and submit its adjusted gross receipts if its adjusted gross receipts exceed the gross receipts shown in the tax return by more than 20% in **the Provider Relief Fund Payment Portal** to be considered for additional Provider Relief Fund payments.

**How should an organization currently undergoing a change in ownership to purchase a practice report revenue in its application?** *(Added 5/20/2020)*
Until the purchase is complete, the organization should only report current gross receipts in its application and should exclude the practice it is intending to purchase. Any changes in ownership that have not occurred should not be included in your revenue submission. Submissions must be based on the organization that exists at the time of application, not a projection of expected lost revenue from the practice that is being acquired.

**A new organization that did not bill Medicare fee-for-service in 2019, and thus did not**

**receive a payment under the General Distribution, purchased in 2019 or January 2020 all or part of a practice (i.e., a full or partial change in ownership) that did bill Medicare fee-for-service in 2019.  Can the new organization submit documentation through the Provider Relief Fund Payment Portal to receive payment?** *(Added 5/21/2020)*
If a provider that purchased a practice or facility in 2019 or January 2020 did not bill Medicare fee-for-service in 2019 and did not receive any Provider Relief Fund payment, it is not eligible for payments under the General Distribution and may not submit its gross revenue receipts in the Provider Relief Fund Payment Portal. However, the provider may still receive funds in future distributions.

**A parent entity submitting an application for a General Distribution payment from the $20 billion payment tranche has more than 20 subsidiaries with Billing TINs. How should it complete the application in** the Provider Relief Fund Payment Portal**?** *(Added 5/20/2020)*
The parent entity should attach and submit a statement as the first page of the uploaded tax return file indicating any additional billing TINs not previously entered into the application forms, as well as the Provider Relief Fund payments that these billing TINs received.

**A parent entity files a tax return ("Filing TIN") but does not bill Medicare. The parent entity has one or more subsidiaries that bill Medicare ("Billing TIN") but do not file tax returns (disregarded or consolidated entities).  Accordingly, the parent entity did not receive a payment under the $30 billion General Distribution and entering the parent's Filing TIN does not allow the Provider Relief Fund Payment Portal application to proceed. How should this be addressed with respect to the application?** *(Added 5/21/2020)*
The parent entity should complete an application by listing the Billing TINs of the respective subsidiaries without entering its own Filing TIN. In the application, the parent entity should enter the sum of all "gross sales or receipts" or "program service revenue" of all subsidiary entities with Billing TINs in the applicable field in the application form. Further, the parent entity should submit a statement on the first page of the uploaded tax return file stating (i) the parent entity's Filing TIN and that it does not bill Medicare and (ii) a schedule of the billing subsidiaries, their Billing TINs, and gross sales or receipts.

**A vertically-integrated organization has both patient care revenues as well as revenues that are not directly related to patient care (e.g. insurance, retail, real estate). How should this scenario be addressed with respect to the application?** *(Added 5/21/2020)*
The applying organization should complete an application by listing the Billing TINs of the eligible subsidiaries that provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19. In the application, the parent entity should enter the sum of all "gross sales or receipts" or "program service revenue" of all eligible subsidiary entities that provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19 and enter the subsidiaries' Billing TINs in the applicable fields in the application form. Further, the parent entity should submit a statement on the first page of the uploaded tax return file stating (i) the parent entity's Filing TIN and (ii) a schedule of the eligible subsidiaries, their Billing TINs, and gross sales or receipts. Any revenues from subsidiaries that are not directly providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 may not be included.

**I submitted my revenue information in the Provider Relief Fund Payment Portal.  Why am**

**I being asked by HHS to resubmit my information?** *(Added 6/2/2020)*
During the HHS review of the data submitted through the Provider Relief Fund Payment Portal, a number of healthcare providers that submitted their information for payments from the General Distribution were flagged for data verification, and may require additional follow-up and communication prior to receiving funds.  Common issues that prompted a submission to be flagged for further review include information entered not matching tax documentation, providers with significantly lower than expected Medicare revenue, and apparent data entry errors.

**What action should I take if HHS has asked me to resubmit my revenue information?** *(Added 6/2/2020)*
Please resubmit your revenue information on the General Distribution Provider Relief Fund Payment Portal for HHS verification.  Resubmissions have the same instructions and requirements as the original DocuSign submission, which can be found here.  Please review these instructions and requirements to ensure that you are submitting the correct information.

**Will the amount of the potential payment be affected if my submission has been identified by HHS for resubmission?** *(Modified 6/12/2020)*
No. Potential payment is not affected by a requirement to resubmit additional information. HHS is working to process all providers' submissions as quickly as possible. HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 gross receipts or sales/program service revenue. Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) gross receipts or the sum of incurred losses for March and April 2020. If after further review of your resubmitted revenue information, the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual gross receipts, you may not receive additional General Distribution payments.

**Do all providers who submitted revenue information in the Provider Relief Fund Payment Portal have to resubmit their information?** *(Added 6/2/2020)*
No.  HHS reached out directly to those providers who need to resubmit their revenue information.  If you did not receive an email from HHS requesting resubmission, you do not need to take any action at this time.

**I was not able to submit my revenue information to the Provider Relief Fund Payment Portal by June 3, 2020 to be considered for a portion of the $20 billion General Distribution.  Can I still be considered for these funds?** *(Added 6/3/2020)*
No. The application process for the $20 billion General Distribution closed on June 3, 2020. Providers will still be considered for future Provider Relief Fund payments.  Information on future distributions will be shared when publicly available.

**I was not able to attest to the $20 billion General Distribution funding by June 3, 2020.  What should I do?** *(Added 6/3/2020)*
The June 3, 2020 deadline was for providers to submit revenue information to be considered for a portion of the $20 billion General Distribution.  Providers have 90 days from receipt of their payment from the $20 billion General Distribution to attest and agree to the Terms and

Conditions.

**Can a healthcare provider that files its 2019 tax forms in July use financial information prepared for its 2019 tax filings for revenue submission even if it has not yet filed its 2019 tax forms?** *(Added 6/8/2020)*
When a provider submits its revenue information in the Provider Relief Fund Payment Portal, it should use the most recent completed tax year's filings.  If, when a provider submits its revenue information, it has its 2019 tax filings available, it may use those tax filings.  Payments are determined based on the lesser of 2% of a provider's most recent complete tax year gross receipts or the sum of healthcare-related expenses or lost revenue attributable to COVID-19 for March and April 2020.

**A parent organization has a subsidiary that received a Provider Relief Fund General Distribution payment, but one or more of its other subsidiaries did not.  When the parent entity submits its revenue information, should it report the gross receipts or receipts (or program service revenue) for the parent entity, which includes multiple subsidiaries' data, or only the specific provider/subsidiary that received a payment?** *(Added 6/8/2020)*
The parent organization should complete an application by listing the Billing TINs of the eligible subsidiaries that provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19. In the application, the parent entity should enter the sum of all "gross sales or receipts" or "program service revenue" of all eligible subsidiary entities that provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19 and enter the subsidiaries' Billing TINs in the applicable fields in the application form. Any revenues from subsidiaries that are not directly providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 may not be included.

**Our tax identification number (TIN) covers all our business lines, including our skilled nursing facility (SNF), assisted living facility, home health agency, and independent living services to older adults. Can I submit lost revenues for all these business lines for March and April 2020 if they are related to COVID-19, or must I only report lost revenues for those business lines that receive Medicare payments (e.g. SNF and/or home health)?** *(Added 6/9/2020)*
Providers can report lost revenues for all business lines under the same TIN that are actively caring for patients with COVID-19 or actively working to prevent the spread of COVID-19.  Providers must use any payments received from the Provider Relief Fund consistent with associated Terms and Conditions.

**A parent entity is submitting revenue information on behalf of its subsidiaries.  Each subsidiary has its own Medicare and Medicaid ID number.  The parent TIN does not have a Medicare/Medicaid ID number.  The distribution portal form allows the parent entity to group the TINs together and report all TINs that would be part of the tax form filed. However, there is only space for one Medicare/Medicaid ID number.  How should the Medicare/Medicaid ID number be reported?**  *(Added 6/9/2020)*
The parent entity should submit a statement on the first page of the uploaded tax return file stating (i) the parent entity's Filing TIN and that it does not bill Medicare and (ii) a schedule of the billing subsidiaries, their Billing TINs, their Medicare/Medicaid ID numbers, and gross sales

or receipts.

**An organization has prescription sales as part of its revenue.  Can these sales be captured in the data submitted as "gross sales or receipts" or "program service revenue?"** *(Added 6/9/2020)*

Generally no.  Only patient care revenues from providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 may be included.  Patient care revenues **do include** drug rebates paid to providers enrolled in the 340B program.

*Determining Additional Payments*

**How can I estimate the total payment amount I can anticipate through the General Distribution?** *(Modified 6/12/2020)*

In general, providers can estimate payments from the General Distribution of approximately 2% of 2018 (or most recent complete tax year) gross receipts or sales/program service revenue. To estimate your payment, use this equation:

(Individual Provider Revenues/$2.5 Trillion) X $50 Billion = Expected Combined General Distribution.

Providers should work with a tax professional for accurate submission.

This includes any payments under the first $30 billion General Distribution as well as under the $20 billion General Distribution allocations. Providers may not receive a second distribution payment if the provider received a first distribution payment of equal to or more than 2% of gross receipts.

**How long does it take for HHS to make a decision on additional General Distribution funding?  When can I expect to receive additional funds?** *(Modified 6/12/2020)*

HHS is working to process all providers' submissions as quickly as possible. HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 gross receipts or sales/program service revenue. Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) gross receipts or the sum of incurred losses for March and April. If after further review of your resubmitted revenue information, the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual gross receipts, you may not receive additional General Distribution payments. It is the Department's intention to distribute relief funds as quickly as possible.

**How will HHS notify me that my application has been processed?** *(Modified 6/12//2020)*

You will receive an email when your application is completed. You will receive a notification from HHS as to the final status of your application. HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 gross receipts or sales/program service revenue. Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) gross receipts or the sum of incurred losses for March and April. If after further review of your resubmitted revenue information, the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual

gross receipts, you may not receive additional General Distribution payments.

**If a healthcare provider changed its fiscal year and filed a partial year cost report, will this impact its General Distribution payment? If so, how can a provider indicate the cost year report does not reflect an entire year?** *(Added 6/9/2020)*
Additional General Distribution payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) gross receipts or the sum of incurred losses for March and April. HHS is collecting the "gross receipt or sales" or "program service revenue" data to have an understanding of a provider's usual operations; the revenue loss information to have an understanding of COVID impact; and, tax forms to verify the self-reported information. Cost reports made up one of several data elements that HHS used to determine payments.

*Data Sharing*

**Why am I being redirected to DocuSign to fill out certain elements?**
HHS is using DocuSign to securely pass encrypted data to HHS. Neither DocuSign nor UnitedHealth Group will have access to your data.

**What is DocuSign doing with my data?**
DocuSign is securely passing your data to HHS in encrypted files. Neither DocuSign nor UnitedHealth Group will have access to your data.

**What information is shared with UnitedHealth Group, UnitedHealthcare, Optum, or any other subsidiary of UnitedHealth Group?**
UnitedHealth Group and its subsidiaries will not have access to any information collected from providers, nor do they participate in determining the methodology used to allocate Provider Relief Fund payments. UnitedHealth Group will know the amounts of relief funding paid to providers as UnitedHealth Group is processing the payments.

**Who has access to my revenue data?**
HHS will have access to your revenue data to optimally allocate Provider Relief Fund payments. HHS will not share your revenue data with any other entities, in or outside of government, except as prescribed by law.

**Targeted Distribution FAQs**

*Rural Targeted Distribution*

**What was the formula used to make the Rural Targeted Distribution payment to rural hospitals?** *(Added 5/12/2020)*
Rural Targeted Distribution payments were made to rural acute care general hospitals and critical access hospitals (CAHs), rural health clinics (RHCs), and community health centers located in rural areas. Hospitals and RHCs will each receive a minimum base payment plus a percent of their annual expenses. This method accounts for operating cost and lost revenue incurred by rural hospitals for both inpatient and outpatient services. The base payment will account for RHCs with no reported Medicare claims, such as pediatric RHCs, and CHCs lacking expense data, by ensuring that all clinical, non-hospital sites receive a minimum level of support no less than

$100,000, with additional payment based on operating expenses. Rural acute care general hospitals and CAHs will receive a minimum level of support of no less than $1,000,000, with additional payment based on operating expenses.

**Is it accurate that rural hospitals would receive 4% of operating expenses from the Rural Distribution? What year's Medicare cost report was used?** *(Added 5/12/2020)*
Rural hospitals received a graduated base payment plus approximately 2% of total operating expenses reported on their most recent, publicly available cost reports. The base payment gradually increases from $1 to $3 million depending on hospital operating expenses and establishes a floor for rural hospitals to support their financial stability during the COVID-19-pandemic. The additional amount is a percentage of each individual hospital's total operating expenses so that payments are related to the actual operating expenses that rural hospitals are incurring. Worksheet G-3, Line 4 of the Medicare hospital cost report was used for total operating expenses. If cost reports were more or less than a year in length, then total operating expenses were adjusted to reflect a full year.

**Will the Rural Distribution include urban healthcare hospitals that have obtained classifications as rural facilities under a** 42 CFR 412.103 **exception?** *(Added 5/12/2020)*
No. Eligibility for Rural Distribution payments is limited to rural acute care general hospitals, CAHs, RHCs, and community health centers that are located in a rural area as defined by HHS's Federal Office of Rural Health Policy. The 42 CFR 412.103 exception hospitals include a significant number of very large urban facilities. The Rural Distribution payments focused on smaller rural hospitals that are struggling to remain financially viable.

**How were rural providers identified for the Rural Targeted Distribution?** *(Added 5/14/2020)*
Rural facilities were identified based on their provider type and the physical addresses of the hospital or clinic site as reported to CMS for rural acute care general hospitals, CAHs, and independent RHCs, and to HRSA for community health centers, regardless of affiliation with organizations based in urban areas. HHS used the December 2019 CMS Provider of Services file to identify hospitals, CAHs, and RHCs. Due to data constraints, facilities that were not included in the December 2019 Provider of Services file were not included in the Rural Targeted Distribution.

**How does HHS define rural for these payments?** *(Added 5/12/2020)*
For the Rural Targeted Distribution, HHS used the Federal Office of Rural Health Policy's definition of rural, which includes:
1. All non-Metro counties.
2. All Census Tracts within a Metropolitan county that have a Rural-Urban Commuting Area (RUCA) code of 4-10. The RUCA codes allow the identification of rural Census Tracts in Metropolitan counties.
3. 132 large area census tracts with RUCA codes 2 or 3. These tracts are at least 400 square miles in area with a population density of no more than 35 people per square mile.

**Did both freestanding and provider-based rural health clinics receive funding under the Rural Distribution?** *(Added 5/14/2020)*
If the RHC is owned by a rural hospital or CAH, the hospital received the payment. Rural

hospitals that own RHCs (also known as provider-based RHCs) report their RHCs' operating expenses as part of the hospital cost report. Since provider-based clinics operate under the ownership and administrative and financial control of the hospital, the RHC expenses are included in the base payments and additional payments calculated for the rural hospital. These provider-based RHCs did not receive separate payments. Urban hospitals did not receive Rural Targeted Distribution payments and neither did provider-based RHCs. If the RHC is a freestanding, independent facility, then it received the payment directly.

**Which rural providers received a payment under the Rural Targeted Distribution?** *(Added 5/14/2020)*
Rural Targeted Distribution funding is directed at organizations that provide acute and primary care in rural areas. Acute care hospitals in rural areas and CAHs in rural areas and non-rural areas are eligible for Rural Provider Relief funding. CAHs outside of rural areas are included in the rural provider distribution because CAHs have a unique safety net role and statutory charge. That statute also initially gave state governors the authority to designate necessary provider CAHs, a number of which did not make a distinction between rural and urban designations.

In addition to hospitals, the following types of organizations received payments: freestanding (not provider-based) RHCs and community health centers. For provider-based RHCs, RHC funds were distributed through the rural hospital and CAH allocation.

**Which data sources did you use for operating costs for hospitals, RHCs, and other facility types?  How recent was the data used?** *(Added 5/14/2020)*
HHS analyzed the following files to identify facility locations and operating costs:
- Provider of Services Files, December 2019 update, https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Provider-of-Services/index
- Healthcare Cost Report Information System (HCRIS), 1/17/2020 update, https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Cost-Reports contains the most recent cost report data available. For most hospitals, this is the 2018 fiscal year. We used hospital data from 2016 to replace missing data for two hospitals and 2017 data for 16 hospitals.
- The HRSA Bureau of Primary Health Care extracted data from the most recent Uniform Data System (UDS) to identify rural community health center sites.

**Our hospital's operating costs have gone up dramatically in recent months after COVID-19 started. Will our increased operating costs be reflected in the Rural Targeted Distribution formulas?** *(Added 5/14/2020)*
No. Rural provider allocations are based on historical operating expense data to enable rapid distribution of funds to meet immediate rural needs.

**How were facilities identified for the Rural Targeted Distribution?** *(Added 5/20/2020)*
Facilities were identified from the December 2019 CMS Provider of Services file. Due to data constraints, facilities that were not included in the December 2019 Provider of Services file were not included in this rural allocation.

*COVID-19 High Impact Area Targeted Distribution*

**Why is HHS targeting High Impact Areas for COVID-19 funding?** *(Added 5/12/2020)*
In allocating the funds, the Administration is working to address both the economic harm across the entire healthcare system due to COVID-19 and the economic impact on providers directly treating patients with COVID-19. The distribution takes into consideration the challenges faced by facilities serving a significantly disproportionate number of low-income patients and that inpatient admissions are a primary driver of costs to hospitals related to COVID-19.

**How were the initial COVID-19 High Impact Area funds allocated?** *(Modified 6/8/2020)*
HHS allocated High Impact Area funding based on a fixed amount per COVID-19 inpatient admission with an additional distribution based off each hospital's portion of Medicare Disproportionate Share Hospital (DSH) payments and Medicare Uncompensated Care Payments (UCP).

**Should providers continue to update their High Impact data?** *(Modified 6/8/2020)*
Providers should update their capacity and COVID-19 census data to ensure that HHS can make timely payments in the event that the provider becomes a High Impact Area provider. Providers can continue to update their information through the same method they used previously.

**How are COVID-19 High Impact Area payments distributed?** *(Added 5/12/2020)*
HHS is partnering with UnitedHealth Group to deliver funds. Payments are sent via Automated Clearing House (ACH). The automatic payments are sent via Optum Bank with "CARES Act HighImpactAreaPmt*HHS.GOV" in the payment description. Payments are sent to the group's central billing office. All relief payments are made to provider billing organizations based on their TINs.

**How many payments did HHS make under the initial COVID-19 High Impact Area Distribution?** *(Modified 6/8/2020)*
HHS made payments to nearly 400 hospitals and health systems that provided inpatient care for 100 or more COVID-19 patients through April 10, 2020. Some payments were made to hospitals and health systems that operate more than one hospital.

**What was the rationale behind requiring at least 100 COVID-19 admissions to be eligible for the initial High Impact payment?** *(Modified 6/8/2020)*
HHS used COVID-19 admissions as a proxy for the extent to which each facility experienced lost revenue and increased expenses associated with directly treating a substantial number of COVID-19 inpatient admissions. The hospitals that received the initial round of COVID-19 High Impact Area distributions encountered over 70% of the national COVID-19 inpatient admissions reported by April 10, 2020.

**What types of entities are eligible to receive new COVID-19 High Impact Area payments?** **(***Added 6/8/2020)*
HHS is making COVID-19 High Impact Area payments to hospitals that have a high number of COVID-19 positive inpatient admissions. Payments are made at the billing TIN level. Hospital systems with more than one facility under a common Tax Identifier Number (TIN) must report the number of a COVID-19 positive-inpatient admissions occurring within each facility. Reporting this information is accomplished by using the comma separated values (CSV) document available on the TeleTracking portal.

30

**What data do I submit to be considered for the High Impact Area funding? And where? (*Modified 6/12/2020*)**
To be considered for a COVID-19 High Impact Area Targeted Distribution payment, applicants must use the TeleTracking platform to upload the number of their hospital's COVID-19 positive-inpatient admissions and deaths between January 1, 2020 and June 10, 2020.  Providers may report data on patients who were suspected of having COVID-19 at the time of admission, if they received a confirmatory diagnosis prior to discharge or death, so long as the diagnosis occurred by the end of the day on June 10, 2020.  Applicants should only report COVID-19-related deaths that occurred while the patient was admitted as a patient in the hospital.  Do not include deaths that occurred in the emergency department or while the patient was in observation status.

**What is the COVID-19 admission threshold for payment under this High Impact Area Distribution, and why was this value chosen? (*Added 6/8/2020*)**
HHS' allocation methodology will be determined after fully analyzing the collective data submitted by hospitals.

**How is this High Impact Area Distribution different from the Initial Distribution of High Impact Funding? (*Added 6/8/2020*)**
HHS intends to distribute the second round of High Impact Area funding to address the comprehensive impact of the cost of providing care to COVID-19 positive inpatients.  Funding from the prior round will be taken into account in making payments under this round.

**When is the deadline for my application? (*Added 6/8/2020*)**
HHS is collecting COVID-19 positive-inpatient hospital admissions for the period January 1, 2020, through June 10, 2020, via TeleTracking. The portal will be open for submission from June 8, 2020 through June 15, 2020 at 9:00 PM Eastern Time.

**If I submitted an application for the first round of High Impact Area funding, can I submit through this announcement as well?  (*Added 6/8/2020*)**
Yes.  Please go into TeleTracking and update your hospital's data to reflect all COVID-19 positive inpatient admissions from January 1, 2020 through June 10, 2020. Funding from the prior round will be taken into account in making payments under this round.

**In my last submission, I misunderstood the directions and submitted the total of all COVID-19 positive admissions throughout the system instead of by facility. Will that effect my new submission?  (*Added 6/8/2020*)**
Please go into TeleTracking and correct your submission and update your hospital's data to reflect all COVID-19 positive inpatient admissions from January 1, 2020 through June 10, 2020.

**My facility (four walls) does not have an ICU but there is one at another campus across the street, can I count that? (*Added 6/8/2020*)**
No.

**My billing TIN includes multiple locations and campuses, some of which are only a few blocks apart. How should we report COVID-positive inpatient admissions? (*Modified 6/12/2020*)**
Hospital systems with more than one facility or campus that bill under a single TIN must report

the number of a COVID-19 positive-inpatient admissions occurring within each facility (four walls) separately. You should enter the total COVID-19 positive inpatient admissions for each campus separately by using the comma separated values (CSV) file option on the TeleTracking portal.

**Should I count cases through June 10, 2020 (i.e. including that date) or up until that date (i.e. not including the end date)?  (***Added 6/8/2020***)**
You should count COVID-19 positive inpatient admissions from January 1, 2020, through the end of the day June 10, 2020.

**Does an emergency department (ED) admission or observation stay count as a COVID-19 positive inpatient admission? (***Modified 6/15/2020***)**
No. ED admissions and patients admitted for observation should not be included in your count.

**Can I count patients that had a pending positive test that came back positive after June 10, 2020? (***Modified 6/12/2020***)**
No. Applicants should only count COVID-19 positive inpatient admissions or suspected COVID-19 admissions if the confirmatory diagnosis occurred prior to discharge and before the end of the day on June 10, 2020.

**When reporting COVID-19 inpatient admissions, can applicants use ICD-10 codes to identify discharged patients, in combination with positive test results***? (Modified 6/12/2020***)**
No, applicants should only report positive COVID-19 inpatient admissions and deaths if there was a confirmatory diagnosis before the end of the day on June 10, 2020.

**If a positive COVID-19 patient was admitted as an inpatient during the reporting period of January 1 to June 10, was discharged, and then subsequently readmitted for COVID-19-related care several days later (still during the reporting period), would those be considered two COVID-19-related patients or one?  (***Added 6/13/2020***)**
For purposes of reporting, these COVID-19 inpatient admissions would count as two patients if COVID-19 was the primary diagnosis during each stay.  However, if the patient is admitted to the hospital in either case due to a circumstance other than COVID-19 as a primary diagnosis, only one of them can be considered a COVID-19-positive inpatient admission.

*Skilled Nursing Facilities Targeted Distribution*

**What is the Skilled Nursing Facility funding amount and how did HHS determine the amount?** *(Added 5/26/2020)*
HHS will distribute $4.9 billion in additional funding (over and above General Distributions received) to more than 13,000 skilled nursing facilities. Eligible facilities range in size between six and 1,389 beds. This represents a range of distributions between $65,000 and $3,255,500 and a national average distribution of ~$315,600 per facility. Each Skilled Nursing Facility received a fixed distribution per facility of $50,000 plus distribution of $2,500 per bed.

**Which Skilled Nursing Facility providers received a payment under the SNF Targeted Distribution?  ***(Added 5/26/2020)***
HHS allocated funding for certified Skilled Nursing Facilities with a capacity between six and 1,389 beds.

**How will HHS disperse the Skilled Nursing Facility Targeted Distribution payments?** *(Added 5/26/2020)*
Most SNF fund payments will be dispersed electronically based upon banking account information associated with the organization's billing TIN.  If the organization's billing TIN does not have a bank routing number associated with it, the organization will most likely receive a paper check.

**What constituted a "certified" skilled nursing facility for purposes of the Targeted Distribution?** *(Added 6/8/2020)*
A "certified" skilled nursing facility must be certified under Medicare and/or Medicaid to be eligible for this Targeted Distribution.  All standalone and/or hospital-based skilled nursing facilities with at least six beds were eligible for this Targeted Distribution.

**How do I input data to apply for the latest round of COVID-19 High Impact Area Targeted Distribution payments?** *(Added 6/12/2020)*
Providers must submit data via the TeleTracking portal. Please refer to the email sent to your site administrator by HHS.

Please contact TeleTracking Technical Support if you did not receive a link, have questions about the authentication, or registrations process.  The TeleTracking Technical Support is available to assist 24 hours a day, 7 days a week at 877-570-6903.

***Indian Health Service Targeted Distribution***

**Which Indian Health Service (IHS) providers received a payment under the IHS Targeted Distribution?** *(Added 5/29/2020)*
HHS allocated funding for IHS, Tribal, and Urban Indian Health programs.  This includes IHS and Tribal hospitals.

**How was IHS Targeted Distribution funding allocated across eligible entities?  What was the formula used to make the IHS Targeted Distribution payment to IHS providers?** *(Added 5/29/2020)*
HHS allocated $500 million to IHS, Tribal, and Urban Indian Health programs.  Approximately 4% of the $500 million in available funding was allocated for Urban Indian Health programs, consistent with the percent of patients served by Urban Indian Organizations (UIOs) in relation to the total IHS active user population, as well as prior allocations of IHS COVID-19 funding. IHS divided remaining funding equally between hospitals (48%) and clinics (48%). HHS used different formulas for each of the different facility types.
- IHS Hospitals and Tribal Hospitals
  - *Per hospital allocation = $2. 815 million base + (Total Operating expenses * 3%)*
- IHS and Tribal Clinics/Programs
  - *Per IHS clinic allocation = Base amount of $187,000 + 5% of (estimated service population * average cost per user)*
- IHS Urban Programs
  - *Per IHS Urban Indian health allocation = Base amount of $181,250 + 6% of (estimated service population * average cost per user)*

**Which data sources did HHS use for operating costs for IHS and tribal hospitals? How recent was the data used?** *(Added 5/29/2020)*
HHS analyzed the following files to determine the allocation for IHS Targeted Distribution to IHS and tribal hospitals:

- Provider of Services Files, December 2019 update.
- Healthcare Cost Report Information System (HCRIS), 1/17/2020 update, contains the most recent cost report data available. For most hospitals, this is the 2018 fiscal year.
- Total operating expenses are reflected in Worksheet B PART I COL 26 of the cost report.

**How did HHS determine operating costs for IHS clinics and Urban Indian Health Organizations?** *(Added 5/29/2020)*
HHS identified the service population for most service units, and estimated an operating cost of $3,943 per person per year based on actual IHS spending per user from a 2019 IHS Expenditures Per Capita and Other Federal Health Care Expenditures Per Capita.

**How will IHS Targeted Distribution payments be distributed?** *(Added 5/29/2020)*
HHS is partnering with UnitedHealth Group to deliver funds. Each organization's payment will be sent via Automated Clearing House (ACH). The automatic payments are sent via Optum Bank with "CARES Act Tribal&IndianHlthPmt*HHS.GOV" in the payment description. Payments are sent to the group's central billing office. All relief payments are made to provider billing organizations based on their Taxpayer Identification Numbers (TINs).

*Medicaid Targeted Distribution*

**What was the methodology/formula used to calculate provider payment?** *(Added 6/9/2020)*
The Medicaid Targeted Distribution methodology will be based upon 2% of (gross revenues * percent of gross revenues from patient care) for CY 2017, or 2018 or 2019, as selected by the applicant and with accompanying submitted tax documentation. Payments will be made to applicant providers who are on the filing TIN curated list submitted by states to HHS or whose applications underwent additional validation by HHS.

**Does payment from the $50 billion General Distribution affect what I may receive in this Medicaid Targeted Distribution?** *(Added 6/9/2020)*
Yes. Providers who received payments in the prior $50 billion General Distribution payment are not eligible to receive payment in this current Medicaid Targeted Distribution, regardless of the size of the payment received. However, prior payment in a Provider Relief Fund Targeted Distribution (like the High Impact Area, Rural, Indian Health Service, and Skilled Nursing Facility Targeted Distributions) does not affect eligibility, i.e. providers who have received a Targeted Distribution may use this portal as long as they have not been paid in the $50 billion General Distribution.

**If I rejected my General Distribution payment, can I apply for a Medicaid Targeted Distribution payment?** *(Added 6/9/2020)*
No, if you were eligible for the General Distribution payment and rejected the payment, you cannot be eligible for Medicaid Targeted Distribution payment.

**Why is the submission process asking me to set up an Automated Clearing House (ACH)**

**account?** *(Added 6/9/2020)*
The majority of payments will be made through bank transfer.  A smaller subset (e.g. large payments) will be required to set up ACH accounts to allow HHS to most effectively and quickly deliver funds to providers, as well as maximize program integrity and fraud avoidance.  Payment via check is available, but not preferred.

**Who is eligible for the Medicaid Targeted Distribution?** *(Added 6/9/2020)*
To be eligible to apply, the applicant must meet all of the following requirements:

1. must not have received payment from the $50 billion General Distribution; and
2. must have directly billed **Medicaid or CHIP** for healthcare-related services during the period of January 1, 2018, to December 31, 2019, or (ii) own (on the application date) an included subsidiary that has billed **Medicaid or CHIP** for healthcare-related services during the period of January 1, 2018, to December 31, 2019; and
3. must have either (i)  filed a federal income tax return for fiscal years 2017, 2018 or 2019 or (ii) be an entity exempt from the requirement to file a federal income tax return and have no beneficial owner that is required to file a federal income tax return. (e.g. a state-owned hospital or healthcare clinic); and
4. must have provided patient care after January 31, 2020; and
5. must not have permanently ceased providing patient care directly, or indirectly through included subsidiaries; and
6. if the applicant is an individual, have gross receipts or sales from providing patient care reported on Form 1040, Schedule C, Line 1, excluding income reported on a W-2 as a (statutory) employee.

**What if a Medicaid or CHIP provider is not on the filing TIN list submitted by states to CMS?**  *(Added 6/9/2020)*
Payments will be made to applicant providers who are in the filing TIN curated list from CMS. If applicants are not on that list, HHS will establish an additional process to validate eligibility.

**What are the reasons that I would not be eligible for a Medicaid Targeted Distribution payment?**  *(Added 6/9/2020)*
You must meet the Medicaid Targeted Distribution eligibility criteria described above.  You must not be currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; must not be currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and must not currently have Medicare billing privileges revoked. Your billing TIN must be included in the State-provided list of eligible Medicaid and CHIP providers or your application must pass additional validation by HHS.  You also must not have previously received a payment from the Provider Relief Fund $50 billion General Distributions.

**What if I do not see Medicaid or CHIP patients, but my parent medical group does?** *(Added 6/9/2020)*
Medicaid Targeted Distribution payments will be paid to the Filing / Organizational TIN, and not directly to subsidiary TINs.  The Provider Relief Fund payment recipient has discretion in allocating the Provider Relief funds to support its subsidiaries' health care related expenses or lost revenue attributable to COVID-19, so long as the payment is used to prevent, prepare for, or

respond to coronavirus and those expenses or lost revenue are not reimbursed from other sources or other sources were not obligated to reimburse them.

**A subsidiary of ours received payments from the $50 billion General Distribution, but another subsidiary of ours did not and is a Medicaid provider – can I apply for this Medicaid Targeted Distribution?** *(Added 6/9/2020)*
As long as the Filing TIN or one of the Billing TINs was not eligible for the $50 billion General Distribution, but is a Medicaid or CHIP provider and is on the State-provided list of eligible Medicaid and CHIP providers, then they are eligible to apply. Medicaid or CHIP providers who are not on the State-provided list, their applications will undergo additional validation by HHS.

**Are Federally Qualified Health Centers (FQHCs) and their providers eligible?** *(Added 6/9/2020)*
FQHCs are eligible for this distribution if they have not received a payment from the $50 billion General Distribution. Most FQHC providers are paid by the FQHC as salaried or contracted employees and do not independently bill for services. However, if a provider who works at an FQHC bills under his or her TIN for FQHC out-of-scope patient services, that provider may also be eligible for a distribution.

**When is the deadline to submit an application?** *(Added 6/9/2020)*
The deadline to submit an application for the Medicaid Targeted Distribution is July 20, 2020.

**Will payments be sent at one time or disbursed in phases?** *(Added 6/9/2020)*
Payments will be disbursed on a rolling basis, as information is validated. HHS may seek additional information from providers as necessary to complete its review.

**How long will it take from portal submission to payment decision or receipt?** *(Added 6/9/2020)*
HHS is working to process all providers' submissions as quickly as possible. HHS may seek additional information from providers as necessary to complete its review.

**What documentation must be uploaded to the application form?** *(Added 6/9/2020)*
- o The applicant's most recent federal income tax return for 2017, 2018 or 2019 or a written statement explaining why the applicant is exempt from filing a federal income tax return (e.g. a state-owned hospital or healthcare clinic).
- o The applicant's Employer's Quarterly Federal Tax Return on IRS Form 941 for Q1 2020, Employer's Annual Federal Unemployment (FUTA) Tax Return on IRS Form 940, or a statement explaining why the applicant is not required to submit either form (e.g. no employees).
- o The applicant's FTE Worksheet (provided by HHS).
- o If required by Field 15, the applicant's Gross Revenue Worksheet (provided by HHS).

**What should I do if I do not have the federal tax form to submit my information?** *(Added 6/9/2020)*
Upload a statement explaining why the entity is not required to file a federal tax form (note that non-profit entities should submit a Form 990) or is unable to provide the required information. In addition, provide the most recent audited financial statements (or management prepared

financial statements) for the TIN entity.  If the financial information of a TIN entity is reported as part of a parent organization, it may be necessary to provide consolidating audited financial statements that breakout the revenue and expenses for the TIN entity.

**What Medicaid data sources did HHS use to inform policy and payment decisions?** *(Added 6/9/2020)*
HHS collected Medicaid and CHIP provider data from state and federal sources, including corporate names, TINs, and payment amounts, and is using this data to validate Portal submissions. The data collected from states was also used to help inform the overall payment methodology.

**How long do I have to accept or reject a payment from the Medicaid Targeted Distribution?** *(Added 6/9/2020)*
Providers that have been allocated a payment must sign an attestation confirming receipt of the funds and agree to the Terms and Conditions within 90 days of payment.

**What if I do not meet the requirements of the Terms and Conditions, either now or after attesting?** *(Added 6/9/2020)*
If a provider cannot meet the Terms and Conditions of the payment, they must reject the payment.  This can be done by going into the attestation portal within 90 days of receiving payment and indicating you are rejecting the funds. The CARES Act Provider Relief Fund Payment Attestation Portal will guide providers through the attestation process to reject the funds.

To return the money, the provider needs to contact their financial institution and ask the institution to refuse the received Automated Clearinghouse (ACH) credit by initiating an ACH return using the ACH return code of "R23 - Credit Entry Refused by Receiver." If a provider received the money via ACH they must return the money via ACH. If a provider was paid via paper check, after rejecting the payment in the attestation portal, the provider should destroy the check if not deposited or mail a paper check to UnitedHealth Group with notification of their request to return the funds.

If you affirmatively attested to a Provider Relief Fund payment already received and later wish to reject those funds and retract your attestation, you may do so by calling the Provider Support Line at (866) 569-3522; for TTY dial 711. Note, HHS is posting a public list of providers and their payments once they attest to receiving the payment and agree to the Terms and Conditions.

**Where can I find the Terms and Conditions for the Medicaid Targeted Distribution?** *(Added 6/9/2020)*
The Terms and Conditions for the Medicaid Targeted Distribution can be found on the HHS Provider Relief Fund website, in the following location: https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/for-providers/index.html

**I am a non-Medicare provider that serves a large proportion of Medicaid and uninsured patients, and therefore, have lower patient revenue compared to some other Medicaid or Medicare providers.  Under the Medicaid Distribution, can I receive any additional funding on top of the 2% of reported gross revenues from patient care?** *(Added 6/12/2020)*

No.  However, HHS is making payments to safety net hospitals that serve the nation's most vulnerable citizens on the front lines in addition to the Medicaid Targeted Distribution payments. These hospitals serve a disproportionate number of Medicaid recipients or provide large amounts of uncompensated care and operate on thin profit margins.  HHS may make further Provider Relief Fund payments to non-hospital safety net providers in the future.

**Will the Provider Relief Fund prioritize any type of providers for quicker funding, such as those under imminent financial stress?** *(Added 6/12/2020)*
HHS intends to make Provider Relief Fund payments in a fair, transparent, and fast manner. HHS will distribute payments on a weekly basis according to submission date.

**How should a parent organization that files taxes on behalf of its subsidiaries report NPIs if the NPIs are associated with the subsidiaries' TINs, not the filing TIN?** *(Added 6/15/2020)*
If the parent organization does not have an NPI, the NPI field can be left blank.

**Can a healthcare provider that has a primarily Medicaid-focused practice that received a small initial General Distribution payment, but forewent applying for an additional General Distribution payments, now apply for the Medicaid Targeted Distribution?** *(Added 6/19/2020)*
No, if a healthcare provider was eligible for the General Distribution payment, even if it rejected the payment, it is not eligible for a Medicaid Targeted Distribution payment.  Providers that are not eligible for this distribution may be eligible for future allocations of the Provider Relief Fund.

**Can a healthcare provider that has not billed Medicaid/CHIP during the eligibility window (January 1, 2018 to December 31, 2019), but is a Medicaid/CHIP enrolled provider, apply for a Medicaid Targeted Distribution payment?** *(Added 6/19/2020)*
Providers who are enrolled in Medicaid and were not eligible for a General Distribution payment may apply for a payment through the Enhanced Provider Relief Fund Payment Portal as long as they provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 after January 31, 2020.   HHS broadly views every patient as a possible case of COVID-19. Providers that are not eligible for this distribution may be eligible for future allocations of the Provider Relief Fund.

**If a healthcare provider has changed tax status between the most recent tax filing and the current year, which status should the practice use to apply?**  *(Added 6/19/2020)*
The healthcare provider should use the status that was included in the most recent tax filing when applying for Provider Relief Fund payments.  For example, if a practice was a C corporation in 2019 and is an S corporation in 2020, it should apply as a C corporation.

**When applying for funding, how should patients' out-of-pocket costs be reported when calculating the payer mix?**  *(Added 6/19/2020)*
Patients' out-of-pocket costs are considered part of the revenue received from a payer, therefore, should be reported in the commercial payer amount or whichever category is applicable, not separated out into "other" field.

**When calculating lost revenue, can healthcare providers include portions of anticipated lost value-based payments (for example, due to quality measures that do not account for stay-at-home orders)?**  *(Added 6/19/2020)*
Lost revenue estimates should be based on budget-to-actual or year-over-year, and should include revenue from all sources that can be attributed to COVID-19.  This may include value-based payments, such as quality measure achievement payments.

**HHS' press release indicated that the eligibility timeframe for billing Medicaid or CHIP was January 1, 2018 to May 31, 2020, but the Medicaid/CHIP Provider Relief Fund Payment Forms and Guidance's instructions indicates the timeframe is January 1, 2018 to December 31, 2019. Are healthcare providers that started billing Medicaid or CHIP in 2020 eligible to apply for these fund?**  *(Added 6/19/2020)*
No, new Medicaid or CHIP providers are not eligible to apply yet.  Providers who began billing Medicaid/CHIP between Jan 1 and May 31, 2020 may be eligible for future allocations of the Provider Relief Fund.

HHS collected 2018 and 2019 Medicaid and CHIP provider data from state and federal sources, including corporate names, TINs, and payment amounts, and is using this data to validate Portal submissions.  Data is not yet available for new providers who submitted claims between January 1 and May 31, 2020.

**Are Indian healthcare providers eligible for a Medicaid Targeted Distribution payment if they otherwise meet the eligibility criteria, including not having received a General Distribution payment and billing Medicaid or CHIP during the applicable time period?**  *(Added 6/19/2020)*
Yes. Indian healthcare providers are eligible to apply for a Medicaid Targeted Distribution payment if they meet all of the eligibility criteria. Prior payment from the Indian Health Service Targeted Distribution (or another targeted distribution) does not affect eligibility for the Medicaid Targeted Distribution, i.e., providers who have received a Targeted Distribution may use this portal as long as they have not been paid in the $50 billion General Distribution.

**Are healthcare providers that only bill Medicaid or CHIP through managed care arrangements eligible for the Medicaid Targeted Distribution?**  *(Added 6/19/2020)*
Yes.  Healthcare providers that bill either fee-for-service or managed care in Medicaid or CHIP are eligible for the Medicaid Targeted Distribution if they otherwise meet the other eligibility criteria.

**States have limited funds and want information so that they can better allocate state resources.  Can HHS share information with states and state Medicaid and CHIP agencies on which providers received funds?**  *(Added 6/19/2020)*
HHS is currently posting payment information for providers who have attested to receiving a payment from the Provider Relief Fund and accepted the associated Terms and Conditions.

**HHS' press release mentioned that there will be a future Targeted Distributions for dentists. If a provider applies for and receives the Medicaid Targeted Distribution will they be eligible for the Dental Targeted Distribution?** *(Added 6/19/2020)*
All providers eligible for the Medicaid Targeted Distribution, including dentists, should apply in

the Enhanced Provider Relief Fund Payment Portal by the deadline of July 20, 2020.  HHS has not determined the methodology for the dental allocation at this time, but will share additional information in the future.  Dental providers should not have the expectation that there will be advantaged by applying for funds from one distribution over another.  Dentists should apply for a Provider Relief Fund payment in the first Targeted Distribution in which they are eligible.

### *Safety Net Hospitals Targeted Distribution*

**What is the purpose of the Safety Net Hospital Targeted Distribution?** *(Modified 6/12/2020)*
This allocation will distribute $10 billion of Provider Relief Fund payments to more than 700 "safety net" hospitals that serve the nation's most vulnerable citizens on the front lines. These hospitals serve a disproportionate number of Medicaid recipients and provide large amounts of uncompensated care and operate on thin profit margins. Recipients will receive a minimum distribution of $5 million and a maximum distribution of $50 million.

**How was a safety net hospital defined for the purpose of this targeted distribution?** *(Modified 6/19/2020)*
Safety net payments are allocated to hospitals that serve a disproportionate number of Medicaid patients and provide large amounts of uncompensated care.

Qualifying acute care hospitals will have:
- Medicare Disproportionate Patient Percentage (DPP) of 20.2% or higher.
- Annual Uncompensated Care (UCC) of at least $25,000 per bed.
  - For example, a hospital with 100 beds would need to provide $2,500,000 in Uncompensated Care in a year to meet this requirement;
- Profit Margin of 3% or less, as reported to CMS in its most recently filed Cost Report.

Qualifying children's hospitals will have:
- A Medicaid-Only Ratio of 20.2% or greater
- Profit Margin of 3.0% or less

**What was the methodology/formula used to calculate safety net hospital distributions from the Provider Relief Fund?** *(Modified 6/12/2020)*
The distribution amount for an eligible safety net hospital is the proportion of the individual facility score (number of facility beds multiplied by DPP for an acute care facility or number of facility beds multiplied by Medicaid only ratio for a children's hospital) to the cumulative facility scores for all safety net hospitals, times the $10 billion safety net distribution.

**Why are you using the 2018 CMS cost report?** *(Added 6/9/2020)*
The verified 2019 Medicare cost report data for hospitals was not available to calculate eligibility for the Safety Net Hospital Targeted Distribution. As such, the 2018 Medicare cost report data was used to calculate safety net eligibility.

**We are a new hospital that opened in 2019, are we eligible for this distribution?** *(Added 6/9/2020)*
No. Hospitals that opened in 2019 will not be included in the Medicare cost report, and thus are not eligible for payments under the Safety Net Hospitals Targeted Distribution. However, these

providers may still receive funds in future Provider Relieve Fund distributions using available data.

**Did any payments go to hospitals that closed or were bought?**  *(Added 6/9/2020)*
Hospitals that are no longer operational are not eligible to receive Safety Net Hospitals Targeted Distribution payments. If the ownership status changed in 2019, HRSA may evaluate the successor hospital to determine whether it is eligible for safety net funding.

**What are the Terms and Conditions for the Safety Net Hospitals Targeted Distribution?** *(Added 6/9/2020)*
The Terms and Conditions for the Safety Net Hospitals Targeted Distribution can be found on the HHS Provider Relief Fund website, in the following location:
https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/for-providers/index.html

**How was profitability calculated for safety net hospitals?** *(Added 6/12/2020)*
Using the CMS cost report, profitability was determined by calculating the sum of net patient revenue (line 3) + total other income (line 25). The net income (line 29) was then divided by the sum of lines 3 and line 25.

**Will the DPP be adjusted to reflect the 2018 SSI Ratios that were released after the 2018 cost reports were filed?**  *(Added 6/19/2020)*
No, there will not be future adjustments to the cost reports using SSI Ratios.

**What W/S S-10 line are using to determine the Uncompensated Care Cost Per Bed total?**  *(Added 6/19/2020)*
The Uncompensated Care Cost Per Bed is based on line 30.00 of W/S S-10.

**Were the calculations for the Safety Net Hospital Targeted Distribution based on profit or total margins?**  *(Modified 6/21/2020)*
The calculations were based on total margins.