**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-01298-5-JNC** |
| CAH ACQUISITION COMPANY 7, LLC, | ) | |
| d/b/a PRAGUE COMMUNITY HOSPITAL, | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |

<u>**BRIEF IN SUPPORT OF TRUSTEE'S MOTION FOR (I) AN ORDER CONFIRMING THAT (A) CERTAIN STIMULUS FUNDS WERE USED IN ACCORDANCE WITH APPLICABLE TERMS AND CONDITIONS AND (B) TRUSTEE MAY TRANSFER ANY REMAINING STIMULUS FUNDS TO PURCHASERS; AND (II) AN ORDER ELIMINATING ANY LIABILITY OF TRUSTEE AND DEBTORS' ESTATES FOR USE OF STIMULUS FUNDS**</u>

**NOW COMES** Thomas W. Waldrep, Jr., Chapter 11 trustee (the "**Trustee**") for the above-captioned debtor (the "**Debtor**"), by and through the undersigned counsel, pursuant to the *Scheduling Order for Hearings on Matters of Law* [ECF No. 622], as amended,[1] and hereby files this Brief regarding non-evidentiary legal issues in support of the *Trustee's Motion for (I) an Order Confirming that (A) Certain Stimulus Funds Were Used in Accordance with Applicable Terms and Conditions and (B) Trustee May Transfer any Remaining Stimulus Funds to Purchasers; and (II) an Order Eliminating Any Liability of Trustee and Debtors' Estates for Use of Stimulus Funds* (the "**CARES Act Fund Motion**") [ECF No. 573] filed on May 15, 2020, and states as follows:

<u>**BACKGROUND FACTS**</u>

1.      On March 21, 2019, CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital (the "**Debtor**") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, before this Court, commencing the above-captioned case (the

---

[1] The *Scheduling Order for Hearings on Matters of Law* was entered by the Court on June 10, 2020. Such Order was amended by the Court on July 8, 2020 [ECF No. 649] to extend the deadline for this Brief and continue the hearing upon the issues presented herein, and further amended on July 20, 2020 [ECF No. 660] to again extend and continue the briefing deadline and hearing.

"**Case**").

2.       Prior to the Petition Date and during the pendency of this Case, the Debtor provided healthcare services to beneficiaries of Medicare and Medicaid and was reimbursed by the Centers for Medicare and Medicaid Services ("**CMS**"), an agency of the United States Department of Health and Human Services ("**DHHS**"), pursuant to a provider agreement (the "**Provider Agreement**").[2]  At all times relevant, the Debtor's hospital facility was and remains classified as a Critical Access Hospital ("**CAH**") by CMS.

3.       On March 29, 2019, Thomas W. Waldrep, Jr. was appointed as the Trustee of the bankruptcy estate of the Debtor.

4.       On February 4, 2020, this Court entered the *Order (A) Approving Sale Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Sale Order**") [ECF No. 450].  Pursuant to the Sale Order, this Court authorized the Trustee to sell to Transcendental Union with Love and Spiritual Advancement ("**TULSA**") and TULSA to acquire substantially all of the assets of the Prague Debtor (the "**Sale**"), including assignment of certain assumed executory contracts, pursuant to a Court-approved Asset Purchase Agreement (the "**APA**").  Excluded from the APA were, *inter alia*, "cash and cash equivalents on hand as of the Closing" as well as the Debtor's accounts receivable arising from the pre-Sale provision of services (the "**Excluded Assets**").  The provisions of the Sale Order and APA are incorporated herein by reference.

---

[2] A "provider agreement" is a pseudo-contractual arrangement, governed by the Social Security Act, 42 U.S.C. §§ 301, *et seq.*, and the regulations promulgated thereunder, by which a qualified entity can receive reimbursement from CMS in exchange for providing healthcare services to beneficiaries of Medicare and Medicaid.  See Medicare General Information, Eligibility, and Entitlement: Chapter 5 – Definitions (Nov. 2, 2018),  https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ge101c05.pdf.

5.      On or about May 1, 2020—shortly before the closing of the Sale and predicated by uncertainty surrounding the receipt of certain stimulus funding, defined below—TULSA presented the Trustee with a draft Addendum to the APA (the "**Addendum**") stating, *inter alia*, that the Trustee agreed to transfer stimulus funding received after the closing date of the Sale to TULSA. The Trustee executed the Addendum to facilitate the closing of the Sale.  At the time of such execution, however, neither the Trustee nor TULSA were in possession of any information as to the transferability of such funds.[3]

6.      The Sale closed on May 4, 2020 (the "**Prague Closing Date**"), and, since that date, TULSA has been operating the 25-bed hospital known as the Prague Community Hospital (the "**Prague Hospital**") in Prague, Oklahoma.

7.      As set out in the CARES Act Fund Motion, the Trustee, on the Debtor's behalf, received certain stimulus Provider Relief Fund payments (the "**Funds**") through DHHS pursuant to the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-136 [HR 748], 134 Stat. 281 (signed into law Mar. 27, 2020) (the "**CARES Act**").  Additionally, the Trustee has received funds in two other programs supported by DHHS and identified in the CARES Act Fund Motion, as defined below: the Oklahoma Hospital Association Grant (the "**OHA Grant**") and the Small Rural Hospital Improvement Grant Program (the "**SHIP Grant**").

8.      The Funds distributed pursuant to the CARES Act were made available to entities that "billed Medicare fee-for-service in 2019, [were] a known Medicaid and CHIP or dental provider and provide or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19, or prevented in the spread of COVID-19."  PROVIDER RELIEF FUND GENERAL INFORMATION (FAQS),  https://www.hhs.gov/coronavirus/cares-act-

---

[3] Counsel for DHHS assigned to address the issues salient to the subject matter of this Brief and the CARES Act Fund Motion did not appear in this Case until May 20, 2020.

provider-relief-fund/faqs/provider-relief-fund-general-info/index.html#pr-overview (last visited July 23, 2020). Additional Funds have been distributed pursuant to the CARES Act to providers classified as CAHs. CARES ACT PROVIDER RELIEF FUND: GENERAL INFORMATION, https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/general-information/index.html (last visited July 23, 2020). Based on communications with counsel for DHHS as well as the attestation requirements on the DHHS website, qualified entities were identified for the distribution of stimulus funds based on, and must attest to the acceptance and qualifying use for those funds under, their Tax Identification Numbers ("**TINs**," and each, a "**TIN**").

9.      Pursuant to the foregoing, the Trustee has received the total of $3,290,722.63[4] cash in CARES Act Funds, funds pursuant to the OHA Grant, and funds pursuant to the SHIP Grant on account of the Debtor's behalf (the "**Prague Fund Payments**"). Of the Prague Fund Payments, $344,913.02 were received before the Prague Closing Date and $2,945,809.61 were received after the Prague Closing Date.

10.     On May 15, 2020, the Trustee filed the CARES Act Fund Motion.

11.     Pursuant to the CARES Act Fund Motion, the Trustee contends that $1,763,256.48 of the Prague Fund Payments (the "**Used Funds**") represent lost "revenue due to the coronavirus between February 1, 2020 and the Prague Closing Date." CARES ACT Fund Motion at ¶ 54.[5] As such, the Trustee contends that he should be entitled to retain the Used Funds for the benefit of the Debtor's estate and its creditors. The Trustee further contends that he should be permitted to

---

[4] The Trustee received additional stimulus funds in the amount of $49,461.42 on May 20, 2020, after the CARES Act Fund Motion was filed.

[5] The Trustee's calculation of lost revenues was based on a comparison of the Debtor's revenues from the period in which the Prague Hospital operated during the COVID-19 pandemic to the same period in the most recent year preceding the Case, which comports with DHHS guidance regarding such calculations. See CARES Act Provider Relief Fund Frequently Asked Questions, https://www.hhs.gov/sites/default/files/provider-relief-fund-general-distribution-faqs.pdf (last visited July 24, 2020).

transfer to TULSA $1,527,466.15 of the Prague Fund Payments (the "**Unused Funds**"), subject to the Trustee's attestation and certain other conditions (the "**Transfer Conditions**") set forth in the *Amended Consent Order and Stipulation by and Between the Trustee and Rural Wellness Fairfax, Inc. Resolving, in Part, the CARES Act Fund Motion* [ECF No. 632] and the *Amended Consent Order and Stipulation by and Between the Trustee and Affinity Health Partners, LLC Resolving, in Part, the CARES Act Fund Motion* [ECF No. 892], both entered in their respective cases on July 8, 2020.

12.    On May 20, 2020, TULSA filed its objection to the CARES Act Fund Motion (the "**TULSA Objection**") in the case of the Debtor's affiliate, CAH Acquisition Company #1, LLC d/b/a Washington County Hospital, also pending before this Court [Case No. 19-00730, ECF No. 810]. TULSA contends that the Prague Fund Payments received by the Trustee after the Prague Closing Date belong to TULSA as a result of the Sale.

## ARGUMENT

13.    The Trustee is authorized to retain the Used Funds and transfer the Unused Funds to TULSA pursuant to the Transfer Conditions. All the Prague Fund Payments are property of the Debtor's estate. Furthermore, TULSA did not purchase the Prague Fund Payments under the APA. The Addendum, under which TULSA asserts it is entitled to the Prague Fund Payments received after the Prague Closing Date, is unenforceable as it (i) attempts to modify rights towards property that was excluded from the APA, (ii) is contrary to the laws and regulations governing the Prague Fund Payments, and (iii) was never approved by this Court.

### I.    The Prague Fund Payments Are Property of the Debtor's Estate.

14.    The commencement of a bankruptcy case creates an estate that includes "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. §

541(a)(1).  The estate also includes "any interest in property that the estate acquires after the commencement of the case."  11 U.S.C. § 541(a)(7).  The Prague Fund Payments, as will be set forth below, relate directly to the Debtor's prepetition business operations and are, thus, property of the Debtor's estate.

15.    In general, "Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate."  In re Neidorf, 534 B.R. 369, 371 (B.A.P. 9th Cir. 2015) (quoting In re TMT Procurement Corp., 764 F.3d 512, 524–25 (5th Cir. 2014), and citing H.R. REP. 95-595, 549, reprinted in 1978 U.S.C.C.A.N. 5963, 6455 & 6523-24).  Section 541(a)(7) of the Bankruptcy Code is not an independent basis for the creation of estate property; "some 'property' of the bankruptcy estate within the meaning of § 541(a)(1) must be used to acquire the 'interest in property' post-petition for § 541(a)(7) to bring that after-acquired 'interest' into the bankruptcy estate."  In re Porrett, 564 B.R. 57, 69 (D. Idaho 2016).

16.    In Segal v. Rochelle, the Supreme Court determined that property received post-petition, but firmly rooted in prepetition conduct, can be property of the bankruptcy estate.  382 U.S. 375, 380 (1966).  In Segal, the Court held that the debtor had an existing interest in a tax refund, finding that the debtor's interest in a loss carryback under the tax code was "sufficiently rooted in the pre-bankruptcy past" to be included as property of the estate.  Id.  While Segal is distinguishable because it was based on the Bankruptcy Act instead of the Bankruptcy Code, bankruptcy courts within the Fourth Circuit still follow Segal.  See In re Townside Constr., Inc., 582 B.R. 407, 414 (Bankr. W.D. Va. 2018) ("Segal remains good law in this Circuit.") (citing In re Jenkins, 410 B.R. 182, 189 (Bankr. W.D. Va. 2008) and Andrews v. Riggs Nat'l Bank (In re Andrews), 80 F.3d 906 (4th Cir. 1996)); see also In re Vanwart, 497 B.R. 207, 212 (Bankr.

6

E.D.N.C 2013) ("[I]f payments are rooted in prepetition conduct, such payments can be considered property of the estate.").

17.    A readily discernable legal interest at the time of filing may arise from statutes, contracts, or lawsuits.  In re Vote, 276 F.3d 1024, 1027 (8th Cir. 2002).  These legal interests confer upon the debtor "some potential value, even though those interests may have been only contingent."  Id.  In Vote, the court found that post-petition crop loss payments for prepetition crop losses were not property of the bankruptcy estate.  Id. at 1027.  The debtor had no legal or equitable interest in a payment until passage of the legislation, only "a mere hope that his losses might generate revenue in the future."  Id. at 1026.  The debtor had no contract with the government concerning on-going services.  Id. at 1027 ("Vote had no interest of any kind.").

18.    Several courts have held that property received post-petition is not property of the estate when it was insufficiently rooted in a prepetition interest.  See In re Neidorf, 534 B.R. 369 (B.A.P. 9th Cir. 2015); In re Bracewell, 454 F.3d 1234 (11th Cir. 2006); In re Vote, 276 F.3d 1024, 1027 (8th Cir. 2002); In re Schmitz, 270 F.3d 1254 (9th Cir. 2001).  In none of these cases was there a "readily discernable legal interest *at the time of the bankruptcy filing*, pursuant to which the property at issue was subsequently obtained, which would have made the post-petition property bankruptcy estate property."  In re Porrett, 564 B.R. 57, 76 (D. Idaho 2016).

19.    Unlike those cases, the Debtor had a readily discernable legal interest related to the Prague Fund Payments at the time of the bankruptcy filing.  Since well before the Petition Date, the Prague Hospital, under the Debtor's ownership and operation, operated under the Provider Agreement with CMS to provide services to Medicare and Medicaid recipients.  Additionally, pursuant to CMS regulations—and as stated in substantially every pleading in the Debtor's Case— the Prague Hospital is classified as a CAH, a special designation for small rural hospitals that are

at least a specific distance from the next nearest hospital. The Debtor's status as a CAH substantially predates the Petition Date as well.

20.    In order to qualify to receive any stimulus funds pursuant to the CARES Act, "a provider must have billed Medicare fee-for-service in 2019, be a known Medicaid and CHIP or dental provider and provide or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19, or prevented in the spread of COVID-19." PROVIDER RELIEF FUND GENERAL INFORMATION (FAQS), https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/faqs/provider-relief-fund-general-info/index.html#pr-overview (last visited July 23, 2020). Additionally, a portion of the Prague Fund Payments received by the Debtor in May of 2020, as part of the "Rural Distribution" stimulus program enacted under the CARES Act, were delivered solely to the Debtor due to its status as a CAH. CARES ACT PROVIDER RELIEF FUND: GENERAL INFORMATION, https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/general-information/index.html (last visited July 23, 2020).

21.    The Trustee received the Prague Fund Payments on the Debtor's behalf only because, pursuant to the Provider Agreement, the Debtor billed Medicare in 2019 and operated a CAH at all times relevant. Therefore, the Prague Fund Payments, while received post-petition pursuant to a statutory relief program, are inextricably tied to the Debtor's prepetition operations. Accordingly, under Section 541(a)(7) of the Bankruptcy Code, the Prague Fund Payments are property of the estate.

## II.    The APA Governing the Sale of the Debtor's Assets Excludes the Prague Fund Payments.

22.    The Sale of the Debtor's Assets giving rise to the dispute now before the Court was governed by an APA attached to the Sale Order authorizing the sale of substantially all the Debtor's assets to TULSA. But the Trustee did not sell the Excluded Assets to TULSA. APA at p. 9. The

Excluded Assets include "cash and cash equivalents" and "accounts receivable." APA at p. 36. TULSA contends that "[t]he CARES Act funds are not 'cash' or equivalents as the funds are government money unless the provider can demonstrate proper uses under the Act." TULSA Objection at ¶ 5.

23.     Without citation, TULSA argues that the Prague Fund Payments sitting in the Trustee's bank account do not constitute cash or cash equivalents. TULSA contends that the Trustee does not possess the Prague Fund Payments (though the Prague Fund Payments are in the Trustee's sole possession and control) because the Trustee must prove that he can use or has used the money in accordance with the relevant terms and conditions governing the Prague Fund Payments.

24.     TULSA's argument is in stark contrast to the definition of "property of the estate," which includes interests in property that may arise from contracts or statutes and may be subject to contingencies. In re Vote, 276 F.3d 1024, 1027 (8th Cir. 2002). To analogize, every set of Schedules and Statement of Financial Affairs filed by a debtor contains a disclosure of known potential claims for damages against third parties. Such claims are not guaranteed to result in cash to the estate, and there are numerous ways by which such claims can be transferred or lost. However, even despite those uncertainties, such claims constitute property of the estate, must be scheduled as such, and are subject to the protections of the automatic stay.

25.     Thus, the appropriate characterization of the Prague Fund Payments is an interest in cash or a cash equivalent, liquidated or contingent as of the Prague Closing Date. Further, as the stated purpose of the Prague Fund Payments is to compensate for lost revenues, it may even be appropriate to consider the Prague Fund Payments as a form of accounts receivable, liquidated or contingent as of the Prague Closing Date, similar to other federal subsidy programs that, for

example, reimburse healthcare providers for the provision of service to Medicare or Medicaid beneficiaries or compensate farmers for the production of certain crops.

26.     Furthermore, the terms and conditions governing the Prague Fund Payments do not intimate that the monies do not belong to the recipient unless and until the recipient or provider can demonstrate proper uses under the Act.  Rather, recipients of such funds are free to use them on the condition that they later attest to their use in accordance with the relevant terms and conditions or, if those recipients have incurred no costs or lost revenues attributable to the COVID-19 pandemic, return them to DHHS.    See Terms and Conditions Provider Relief, https://www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-30-b.pdf (last visited July 23, 2020).

27.     As of the submission of this Brief, the Trustee has attested for $260,869.02 of the Prague Fund Payments received, well below the balance of the Used Funds.  The mere fact that the Trustee's use and retention of the Prague Fund Payments, received as a result of the Debtor's prepetition activity, is governed by compliance with a regulatory program does not divest the Debtor's estate from its interest in the Prague Fund Payments nor change the nature of the Prague Fund Payments: they are comprised of transferrable United States currency, provided to the Debtor to compensate for costs and lost revenues, that can be exchanged for goods and services.  The Prague Fund Payments are thus cash, a cash equivalent, and/or accounts receivable in which the Debtor had a liquidated or contingent interest as of the Prague Closing Date—an Excluded Asset under the APA.

III.    **The Addendum to the APA Through Which TULSA Asserts It Is Entitled to the Prague Fund Payments Received After the Prague Sale Closing Is Not Enforceable**.

28.    The final APA governing the Sale of the Debtor's assets to TULSA comported almost completely with the APA approved by the Court in the Sale Order.  However, due to the novel issues and uncertainty created by the CARES Act funding program, TULSA presented the Addendum for the Trustee's execution the Friday before the Prague Closing Date.  However, the Addendum has no effect on the assets transferred in the Sale: (i) as stated *supra* in Section II, the Prague Fund Payments are cash, a cash equivalent, and/or accounts receivable, Excluded Assets in the APA, so the Addendum cannot control or affect the Prague Fund Payments; (ii) even if the Prague Fund Payments were included in the assets subject to the APA, the Addendum proposes a transfer of assets in contravention of DHHS regulations governing the Prague Fund Payments; and (iii) for the Addendum to permit a transfer of any of the Prague Fund Payments beyond the scope of the regulations governing them, it would have to have been approved by an Order of this Court.

29.    The terms of the Addendum propose that the Trustee transfer the Prague Fund Payments in a manner that, through subsequent conversations with counsel for DHHS, the Trustee now understands is a violation of the terms and conditions and regulatory guidance governing the Prague Fund Payments.

30.    Specifically, with respect to the Prague Fund Payments received after the Prague Closing Date, the Addendum proposes that "[a]ny payments by [DHHS] pursuant to the CARES Act, SHIP Program, or OHCA received by either [the Trustee or TULSA] after transferring ownership of the Assets from [the Trustee] to [TULSA] belong to [TULSA], who shall have all rights, responsibilities and liabilities in connection therewith."  Addendum at ¶ 3.

31.     The foregoing provisions of the Addendum violate the relevant terms and conditions and regulatory guidance issued by DHHS.  TULSA did not operate the Prague Hospital or bill Medicare fee-for-service for services provided at the Prague Hospital during 2019.  TULSA did not purchase and does not own the TIN assigned to the Debtor.  Only the Trustee—the only party with authority to control the Debtor and operate under its TIN—can attest for the receipt and qualifying use of the Prague Fund Payments.  Therefore, even if the Prague Fund Payments were not Excluded Assets under the APA, TULSA has no independent authority to use or attest for the Prague Fund Payments, making the Addendum a nullity.  No party is able to contract around the relevant DHHS terms and conditions.

32.     Furthermore, even if the Prague Fund Payments were included in the assets sold under the APA—and *even if* the Addendum proposed a transfer of funds in compliance with DHHS terms and conditions and regulatory guidance—the Addendum was entered into outside the ordinary course of business without the approval of the Court and is therefore void.

33.     A trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing. 11 U.S.C. § 363(c)(1).  On the other hand, a trustee may only enter into a transaction outside the scope of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1).

34.     The Trustee received approval from this Court through the Sale Order to enter into the APA with TULSA.  The Addendum was never before the Court, as none of the parties before the Court could have foreseen the COVID-19 pandemic and subsequent passage of the CARES Act at the time the APA was drafted and executed.  The Addendum was drafted by TULSA and presented to the Trustee shortly before the Sale of the Debtor's assets was scheduled to close.  The Addendum was never presented to or approved by the Court.

35.    The enforceability of the Addendum, executed without court approval, depends on whether the Addendum was entered into within the ordinary course of the Debtor's business.  See In re Stiletto Mfg., Inc., 588 B.R. 762, 768 (Bankr. E.D.N.C. 2018).  A trustee may not enter into transactions outside the ordinary course of business without court approval so that reasonable expectations of creditors and other parties in interest are protected.  Id.

36.    As this Court has previously noted, there are two tests to determine whether a transaction is in the ordinary course of the debtor's business: a horizontal and vertical dimension test.  Id. at 769.

37.    The horizontal dimension test "asks 'whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry.'  For example, 'raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business.'"  Id. (quoting In re Roth Am., Inc., 975 F.2d 949, 953 (3d Cir. 1992) and Johnston v. First St. Cos. (In re Waterfront Cos., Inc.), 56 B.R. 31, 35 (Bankr. D. Minn. 1985)).

38.    The vertical dimension test, also referred to as the "creditor's expectation test," asks:

> "whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit."  Thus, while the focus of the horizontal dimension test is other similarly-situated businesses in the debtor's industry, the vertical dimension test focuses on the debtor's specific business practices and the reasonable expectations of creditors based thereon.  In evaluating the "ordinariness" of a debtor's activities, the court should therefore consider "the nature, type and size of its business.

Stiletto Mfg., 588 B.R. at 769 (quoting Roth Am., 975 F.2d at 953 and Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 917 (Bankr. S.D.N.Y. 1986)).

13

39.     The Addendum fails both the horizontal and vertical dimension tests.  Regarding the horizontal dimension test, an addendum to address the transfer of emergency federal stimulus funding, issued in response to a global pandemic, is not a common component of a change-of-ownership transaction for a hospital, inside or outside the context of a bankruptcy case.

40.     Regarding the vertical dimension test, no creditor could have anticipated the economic risk of the COVID-19 pandemic or the specific risks associated with acceptance of stimulus funds issued pursuant to the CARES Act.  All potential purchasers and creditors in this Case could expect various and sundry foreseeable risks attendant to transacting with a rural healthcare provider operating in a bankruptcy case.  However, the issues addressed in the Addendum—specifically, the transfer of and attestation for stimulus funds issued pursuant to emergency legislation passed in response to a pandemic—are not among those foreseeable risks.

41.     The matters that the Addendum purports to resolve are unforeseeable aberrations both in terms of the scope of a hospital change-of-ownership transaction and in terms of the economic risks presented.  Under either test, the Addendum was outside of the ordinary scope of the Debtor's business.  The Addendum was not presented to the Court nor approved by the Court in accordance with Section 363(b)(1) of the Bankruptcy Code, and, therefore, it is void.

**IV.     Agreement with TULSA's Asserted Position with Respect to the Prague Fund Payments Would Require the Trustee to Return Funds Received After the Prague Closing Date to DHHS, Not Transfer Such Funds to TULSA.**

42.     The Trustee's position is that the Debtor's estate should retain the Used Funds to compensate it for lost revenues during the period prior to the Prague Closing Date and the Unused Funds should be made available to the Prague Hospital to compensate it for ongoing costs and lost revenues incurred thereafter, but only under the Transfer Conditions, which comply with the relevant DHHS terms and conditions and regulatory guidance.

43.     TULSA, however, asserts that the Prague Fund Payments received by the Debtor's estate after the Prague Closing Date are rightfully its property.  As set forth previously, TULSA did not purchase the Prague Fund Payments in the APA, and the Addendum purporting to govern the transfer of the Prague Fund Payments is, for various reasons, a nullity.  However, should the Court side with TULSA on those issues—finding that the Trustee sold the estate's interest in and rights towards any and all Prague Fund Payments received after the Prague Closing Date—the Trustee would lack the authority to attest to the use of such Prague Fund Payments.  Accordingly, the Trustee would have to reject those Prague Fund Payments and return the sum of $2,945,809.61 to DHHS.

## **CONCLUSION**

44.     The Trustee is authorized to retain the Used Funds and distribute the Unused Funds as set forth above for the benefit of the Prague Hospital as long as the Transfer Conditions are met. The Prague Fund Payments constitute property of the Debtor's estate.  The Prague Payment Funds are cash, a cash equivalent, and/or accounts receivable inextricably linked to the Debtor's prepetition activities.  The APA between the Trustee and TULSA, which governs the Sale of the Debtor's assets to TULSA, specifically excluded such assets.

45.     The Addendum, under which TULSA asserts it is entitled to the Prague Fund Payments received after the Prague Closing Date, is unenforceable as it (i) attempts to modify rights towards property classified as Excluded Assets in the APA, (ii) proposes a transfer of funds that contravenes DHHS terms and conditions and regulatory guidance, and (iii) was not approved by this Court.  Finally, the logical conclusion of TULSA's arguments is a result that benefits no one—should this Court conclude that TULSA "purchased" all Prague Fund Payments received

after the Prague Closing Date, then the Trustee would have to return all such funds to DHHS as he would be unable to attest for their receipt and use.

Respectfully submitted, this the 27th day of July, 2020.

**WALDREP LLP**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

– and –

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
         rredwine@hendrenmalone.com

*Attorneys for the Trustee*